IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division



FILED
IN OPEN COURT

MAY 1 2 2016

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **FILED UNDER SEAL** |
| | ) | |
| v. | ) | CRIMINAL NO. 1:16-CR-114 |
| | ) | |
| SHAI COHEN, | ) | 18 U.S.C. § 371 |
| | ) | Conspiracy to Defraud and to Commit |
| Defendant. | ) | Offenses Against the United States |
| | ) | (Count 1) |
| | ) | |
| | ) | 8 U.S.C § 1324(a)(2)(B)(ii), 18 U.S.C. § 2 |
| | ) | Bringing Aliens to the United States for |
| | ) | Financial Gain |
| | ) | (Counts 2 – 8) |
| | ) | |
| | ) | 8 U.S.C § 1324(a)(1)(A)(iv), (a)(1)(B)(i), |
| | ) | 18 U.S.C. §2 |
| | ) | Encouraging and Inducing Aliens to |
| | ) | Unlawfully Come to, Enter and Reside in |
| | ) | the United States for Financial Gain |
| | ) | (Counts 9 – 18) |
| | ) | |
| | ) | 8 U.S.C. § 1324(a)(1)(A)(iii), 18 U.S.C.§ 2 |
| | ) | Harboring Illegal Aliens |
| | ) | (Counts 19 – 28) |
| | ) | |
| | ) | 18 U.S.C. § 1956(h) |
| | ) | Money Laundering Conspiracy |
| | ) | (Count 29) |
| | ) | |
| | ) | 8 U.S.C. § 1324(b), 18 U.S.C. |
| | ) | §§ 981(a)(1)(C), 982(a)(1), |
| | ) | 982(a)(6)(A), 28 U.S.C. § 2461 |
| | ) | Asset Forfeiture |

<u>INDICTMENT</u>

May 2016 Term – At Alexandria, Virginia

GENERAL ALLEGATIONS

At all times relevant to the Indictment:

A.     The Defendant and Associated Business Entities

1.     SHAI COHEN ("COHEN"), the defendant, a native of the State of Israel, had status as a Lawful Permanent Resident of the United States. He first entered the United States via an H-2B visa. At various times from in and around 2011 through in and around December 2013, he served as the President, Vice President, Registrant, Officer, Principal and/or Owner, and otherwise controlled, owned, registered, managed and/or operated, with the assistance of others both known and unknown to the Grand Jury, various related United States business entities/companies, including: STR Cosmetics Inc., STR Gratiae Cosmetics Inc., STR Consultation, Tomik Tom Inc., Tomikom Inc., Tora Ankave Inc., SCO Investments LLC, Gena Investments LLC, SYR Cosmetics Inc., SSC Elite LLC, RSE International Inc., and Tomik Tom Dba Premier Skin Care.

2.     These business entities marketed and sold retail beauty and skin care products, with an emphasis on products allegedly from the Dead Sea region of Israel. The business entities sold these products from retail space leased by COHEN and his associates, including kiosks, carts and a retail store, at various mall-type locations in Virginia and Maryland. The retail outlets used by the business entities to sell the products operated under various names, including Mica Beauty, Mica Bella, Gratiae, Oro Gold, DFI Aging and Premier. Collectively, these business entities and associated retail outlet operations are hereinafter referred to as "the Enterprise."

3.     Beginning in 2011, COHEN and/or his associates filed Articles of Incorporation with the Florida State Division of Corporations, the Commonwealth of Virginia State Corporation Commission (SCC), the Nevada Secretary of State, and elsewhere. Some of the companies were then established with the Internal Revenue Service (IRS) to obtain EINs (Employee Identification

Numbers).   The table below depicts the ownership structure of the companies that are known to comprise the Enterprise, with listed addresses leased by the Enterprise:

| Business Entity/FEIN | Chartered | Officer(s) | Address on Corporate Documentation |
|---|---|---|---|
| STR COSMETICS INC. 45-2829547 | VA/2011 | SHAI COHEN, T.A. | 11704 Fairfax Woods Way #20208 Fairfax, VA 4231 Monument Wall Way #242 Fairfax, VA |
| STR GRATIAE COSMETICS INC. 45-4953899 | VA/2012 FL/2012 | T.A. | 11704 Fairfax Woods Way #20208 Fairfax, VA 11704 Fairfax Woods Way #20306 Fairfax, VA |
| STR CONSULTATION INC. *NONE* | NV/2012 | T.A. | Nevada Address |
| TOMIK TOM INC. 45-1510921 | FL/2011 VA/2012 | SHAI COHEN, G.F. | 11704 Fairfax Woods Way #20208 Fairfax, VA |
| TOMIKOM INC. *NONE* | FL/2012 | SHAI COHEN, G.F. | 11704 Fairfax Woods Way #20208 Fairfax, VA |
| TORA ANKAVE INC. 45-4448752 | FL/2012 | T.A., A.K. | 11704 Fairfax Woods Way #20306 Fairfax, VA |
| SCO INVESTMENTS LLC 45-2889609 | FL/2011 | SHAI COHEN | Florida Address |
| GENA INVESTMENTS LLC 45-4438922 | FL/2012 | G.F. | 11704 Fairfax Woods Way #20208 Fairfax, VA 11730 Fairfax Woods Way #1108 Fairfax, VA |
| SYR COSMETICS INC. *NONE* | FL/2012 | SHAI COHEN | 11704 Fairfax Woods Way #20208 Fairfax, VA |
| PREMIER SKIN CARE *FICTITIOUS NAME FILING* | VA/2012 | TOMIK TOM INC. FAIRFAX CO. | 11704 Fairfax Woods Way #20208 Fairfax, VA FILED USING VA SCC ID# for TOMIK TOM |
| SSC ELITE LLC 45-3250908 | VA/2013 | S.A. | 4231 Monument Wall Way #242 Fairfax, VA |

B.     The Visa Program and Nonimmigrant Employment in the United States

4.      A citizen of a foreign country who wishes to enter the United States must first obtain a visa, either a nonimmigrant visa for temporary stay, or an immigrant visa for permanent residence. Under United States laws and regulations, non-citizens of the United States ("aliens") are not permitted to work in the United States unless they obtain employment authorization from the United States Government.

5.      Aliens living outside of the United States can apply for a nonimmigrant employment-based visa, referred to as an H-2B visa.  The H-2B visa permits aliens to work in the United States for a specified, temporary period of time for a specific employer.   An employer seeking to employ temporary alien employees via the H-2B visa must apply via an application process involving at least three steps and at least three government entities:   the United States

3

Department of Labor (DOL), the United States Department of Homeland Security (DHS), and the United States Department of State (DOS). The H-2B visa program is subject to stringent requirements and only a limited number of such visas are issued each year.

6.      Visitor visas, known as B-1 and/or B-2 visas, are nonimmigrant visas for persons who want to enter the United States temporarily, for business activities - excluding United States employment - tourism, pleasure, or medical treatment. The B-1/B-2 visas are issued by the DOS. A nonimmigrant visa is intended for an alien to enter the United States for a temporary stay. There are some activities which are prohibited for B-1/B-2 visa recipients. As indicated, one of these prohibited activities is employment. A B-1/B-2 visa holder is not permitted to work or be paid while in the United States.

7.      As part of the B-1/B-2 nonimmigrant visa application process, applicants complete the Form DS-160, Online Nonimmigrant Visa Application with the DOS. Form DS-160 is submitted electronically to the DOS website via the internet. Consular Officers use the information entered on the DS-160 to process the visa application and, combined with a personal interview, determine an applicant's eligibility for a nonimmigrant visa. Applicants certify with their electronic signature that the applicant has read and understood the questions in the application and that the answers are true and correct. They also certify that all declarations made on the application are unsworn declarations made under the penalty of perjury. In general, if a nonimmigrant alien applying to enter the United States under a B-1/B-2 or other non-employment visa classification declared their intention to work in the United States on the DS-160, doing so would render the alien inadmissible and would consequently result in a denial of entry into the United States.

8.      United States Citizenship and Immigration Services (USCIS), a component of the DHS, is the government agency that oversees lawful immigration to the United States. USCIS

adjudicates the petitions and applications of potential immigrants and is therefore responsible for administrating and regulating the various visa programs, petitions and applications available to aliens desiring to come to or currently in the United States, including the H-2B temporary non-agricultural worker visa, the B-1/B-2 temporary visitor visa, and the Form 1-539 Application to Extend/Change Nonimmigrant Status.

9.      Once DOS approves the B-1/B-2 visa, aliens enter the United States via a port of entry to the United States and are subject to inspection by U.S. Customs and Border Protection (CBP), part of the DHS. Aliens seeking to lawfully enter into the United States must establish their admissibility to the satisfaction of the CBP officer. This is done as part of the inspection process. As part of this process, aliens travelling on a nonimmigrant visa complete a Form 1-94 Arrival/Departure Record.

10.     A B-1/B-2 visa is valid only for a certain period of time for a stay in the United States, determined by CBP at entry, but not to exceed six months. In order to extend the authorized stay on a B-1/B-2 visa, a Form I-539 Application to Extend/Change Nonimmigrant Status must be filed with and approved by USCIS. Applicants certify under the penalty of perjury with their signature that the applicant has read and understood the questions in the application and that the answers and supporting evidence submitted are true and correct. Some of the material questions in the Form I-539 include: address where the applicant will stay, source of economic support during stay, whether the applicant has done anything to violate the terms of their current visa status and whether the applicant has been employed in the United States.

11.     A B-1/B-2 visa holder that enters the United States as part of an arrangement to illegally work in the United States, or engages in such work while within the United States, has violated the terms of his or her B-1/B-2 visa and is not eligible to enter and/or remain in the United States.

12.     The Visa Waiver Program (VWP) provides for visa-free travel by nationals of designated countries coming to the United States for tourism or business (B visa purposes) for a period not to exceed 90 days, provided the national is from a designated country.  Admission to the United States under the VWP prohibits the holder to work for a United States employer.

13.     A VWP holder that enters the United States as part of an arrangement to illegally work in the United States, or engages in such work while within the United States, has violated the terms of the VWP and is not eligible to enter and/or remain in the United States.

14.     An F-1 visa permits the visa holder to engage in academic study in the United States if certain requirements are met and only permits employment under limited circumstances in relation to the student's course of academic study.

15.     An F-1 visa holder that enters the United States as part of an arrangement to illegally work in the United States, or engages in such work while within the United States, under circumstances that are not authorized by the F-1 program, has violated the terms of the F-1 visa and is not eligible to enter and/or remain in the United States.

C.     The Enterprise's Scheme to Obtain Illegal Foreign Workers and Employ them in the United States

16.     From in and around 2011 through in and around December 2013, the Enterprise recruited, hired, and employed foreign nationals from primarily Israel to work as employees in its kiosks and stores in malls in the United States.  The Enterprise secured the services of many of its illegal workers using the assistance of Israel-based recruiting services on retainer for a monthly service charge.  First, various communications occurred between Enterprise personnel (to include COHEN, his kiosk/store managers, office assistants, and other employees) and contacts at the recruiting service and prospective recruits.  Then, after an agreement was reached for an alien's U.S. employment, including travel, housing and other subjects of negotiation, the Enterprise paid a fee to the recruiting service for a successful placement.  The fee ranged in price depending on the

U.S. immigration status of the recruit, with the least expensive recruits being those persons who held or would obtain B-1/B-2 visitor visas. If prospective employees did not already have a visa, the recruiting service would assist individuals in obtaining one for travel to the United States, even though such visas would not allow for employment. Since 2011, many such persons entered the United States via B-1/B-2 visitor visas to work for the Enterprise.

17.     From in and around 2011 through in and around December 2013, the Enterprise also hired and employed illegal workers who had previously come to the United States on B-1/B-2 or other non-employment visas, and had illegally worked for similar Dead Sea product retail operations prior to their employment with the Enterprise.

18.     A small number of Enterprise personnel, including COHEN and his associates who served as managers of retail locations, had immigration status in the United States that allowed for their employment. Only for this category of personnel did the Enterprise engage in some reporting of wages and employees to the Internal Revenue Service and state employment agencies, as well as applying for and reporting such employees to the Department of Labor (DOL), Department of State (DOS) and the Department of Homeland Security (DHS). When and if wages were reported for the small percentage of Enterprise employees that had legal status to work in the United States, the reports were, at times, inaccurate.

19.     The Enterprise used B-1/B-2 and other non-employment visa holders as its primary foreign workforce in the United States, rather than attempt to obtain workers through the legal means provided by the H-2B visa process. As such, the Enterprise did not disclose its B-1/B-2 or other non-employment visa holding foreign workforce to any government agency. The Enterprise did not withhold employment or income taxes from the compensation it provided to its B-1/B-2 or other non-employment visa holding employees, and did not report those employees to the IRS or state employment agencies.

7

20.     Following the recruitment of foreign nationals in Israel to work in the United States, Enterprise personnel entered into employment contracts with such individuals, whereby the Enterprise would agree to pay for some or all of the transportation costs to bring them to and within the United States.  This included assistance with international travel arrangements and providing for housing and transportation to and from work in the United States, and also providing pickup from the airport upon arrival in the United States.  The Enterprise also agreed to pay employees on a commission basis for sales conducted in the United States.  However, employees were required to reimburse the Enterprise for transportation, housing and other related expenses via deductions from the employees' pay, significantly reducing what they were paid for their work.

21.     Prior to an employee's arrival in the United States, Enterprise and recruiting service personnel in Israel exchanged via e-mail certain documents and information related to the pending arrival, including, at times, a biographical summary, travel itinerary, and the aforementioned employment contract.  Such emails were sent to and circulated amongst various Enterprise personnel, including COHEN, his assistants, and retail location managers.  In certain situations, employees were provided with addresses to use on their Form I-94 Arrival/Departure records and briefed on how to act and what to say and do during the CBP inspection process.  In some instances, employees were also provided with copies of hotel reservations that were subsequently cancelled before any charges were incurred, for use on their immigration forms and to show immigration authorities in order to make their status as visiting tourists appear more credible.

22.     In violation of their B-1/B-2 visitor or other visa status, Enterprise employees traveled to the United States and worked at the various kiosks in malls in Virginia and Maryland. Enterprise workers engaged in illegal employment were primarily compensated for their work via under the table cash payments or the transfer of money to stored value payment cards, rather than a legitimate payroll system.

D.   **The Enterprise's Financial Structure and Transactions in Furtherance of the Criminal Scheme**

23.      From in and around November 2011 through in and around December 2013, the Enterprise maintained various merchant service accounts used for the collection and deposit of payments for products sold at Enterprise retail locations.   During the same time period, the Enterprise also maintained various bank accounts with Bank of America.   Funds from the Enterprise-controlled merchant service accounts were moved into these Bank of America accounts.   Specific Enterprise Bank of America accounts were then used for making payments to COHEN and other managers and employees (including via transferring funds onto stored value payment cards); rental payments for office space, apartments, mall kiosks and store locations; airline tickets, vehicles and local transportation costs; recruiting costs, utility payments for apartment locations, point of sale software used at the retail locations and other business costs.

24.      The table below depicts the ownership structure of bank accounts which were held in the name of and used by the Enterprise, with listed addresses leased by the Enterprise:

| Bank of America Account/*Owner* | Account # | Address on Account |
|---|---|---|
| STR COSMETICS INC. <br> *Shai COHEN, T.A.* | ******** 6781 | 11704 Fairfax Woods Way #20208 <br> Fairfax, VA 22030 |
| STR COSMETICS C/O TOMIK TOM INC. | (as of 10/1/12) | 11350 Random Hills Rd. Suite 800, <br> Fairfax, VA 22030 |
| STR COSMETICS <br> *Shai COHEN, T.A.* | ******** 7862 | 11704 Fairfax Woods Way #20208 <br> Fairfax, VA 22030 |
| STR GRATIAE COSMETICS <br> *Shai COHEN, T.A.* | ******** 7023 | 11704 Fairfax Woods Way #20306 <br> Fairfax, VA 22030 |
| STR CONSULTATION INC. C/O TOMIK TOM <br> *Shai COHEN, T.A.* | ******** 6969 | 11350 Random Hills Rd. Suite 800 <br> Fairfax, VA 22030 |
| TOMIK TOM INC. | ******** 7749 | 11704 Fairfax Woods Way #20208 <br> Fairfax, VA 22030 |
| TOMIK TOM INC. | (as of 10/1/12) | 11350 Random Hills Rd. Suite 800, <br> Fairfax,VA 22030 |
| TOMIK TOM INC. <br> *Shai COHEN, G.F.* | ******** 9695 | 11704 Fairfax Woods Way #20208 <br> Fairfax, VA 22030 |
| TORA ANKAVE <br> *Shai COHEN, T.A.* | ******** 7532 | 4231 Monument Wall Way #135 <br> Fairfax, VA 22030 |
| TOMIK TOM INC. <br> *(G.F. individual account)* | ******** 7914 | 11704 Fairfax Woods Way #20208 <br> Fairfax, VA 22030 |
| TOMIK TOM INC. <br> *Shai COHEN, G.F.* | ******** 7600 | 11704 Fairfax Woods Way #20208 <br> Fairfax, VA 22030 |
| TOMIK TOM INC. | ******** 9750 | 11350 Random Hills Rd. Suite 800 |

| | | |
|---|---|---|
| *(Shai COHEN individual account)* | | Fairfax, VA 22030 |
| TOMIK TOM INC. | ******** 6943 | 11350 Random Hills Rd. Suite 800<br>Fairfax, VA 22030 |
| TOMIKOM INC.<br>*Shai COHEN, G.F.* | ******** 6888 | 11704 Fairfax Woods Way #20208<br>Fairfax, VA 22030 |
| SCO INVESTMENTS LLC | ******** 7930 | 11704 Fairfax Woods Way #20208<br>Fairfax, VA 22030 |
| Shai COHEN | ******** 1052 | 11704 Fairfax Woods Way #20208<br>Fairfax, VA 22030 |
| G.F. | ******** 7546 | 4162 Monument Hill Way #13202<br>Fairfax, VA 22030 |

26.     From in and around November 2011 through in and around December 2013, Enterprise accounts with Bank of America took in approximately $3.96 million through merchant services accounts and credit card processing accounts for sales occurring at Enterprise kiosks and stores.

27.     From in and around 2011 through in and around 2013, COHEN leased business office space located at 11350 Random Hills Rd. Suite 800 in Fairfax, Virginia where he oversaw the activities of the Enterprise, along with several of his assistants and subordinate employees. The office was leased in the name of STR Consultation.

28.     From in and around 2012 through in and around December 2013, apartments were leased by Enterprise personnel, including COHEN, to house employees.  The apartments were leased in the names of business entities and/or individuals associated with the Enterprise.  Along with the employees, COHEN and other Enterprise personnel resided in the leased apartment complexes.  Approximately $309,654.00 was paid from the Enterprise Bank of America accounts on rent and utilities for employee housing at these apartments.  The apartment lease structure was as follows:

| APARTMENT ADDRESS | RESIDENT/LESSEE | START | END |
|---|---|---|---|
| 11602 Fairfax Meadows Circle #16108, Fairfax, VA 22030 | TOMIK TOM INC. | 10/8/2013 | 10/5/2014 |
| 11600 Fairfax Meadows Circle #16003, Fairfax, VA 22030 | TOMIK TOM INC. | 10/23/2012 | 1/22/2014 |
| 11600 Fairfax Meadows Circle, Detached Garage #11606-6 | TOMIK TOM INC. | 10/23/2012 | 1/22/2014 |
| 11704 Fairfax Woods Way #20306, Fairfax, VA 22030 | COHEN | 7/26/2012 | 7/25/2014 |
| 11704 Fairfax Woods Way, Detached Garage #11618-1 | COHEN | 7/26/2012 | 7/25/2014 |
| 11717 Fairfax Woods Way #14012, Fairfax VA 22030 | TOMIK TOM/COHEN | 10/27/2013 | 10/26/2014 |
| 11730 Fairfax Woods Way #1308, Fairfax, VA 22030 | TOMIK TOM/COHEN | 8/28/2012 | 8/28/2014 |
| 11730 Fairfax Woods Way #1108, Fairfax, VA 22030 | TOMIK TOM./COHEN | 5/20/2013 | 5/19/2014 |
| 4231 Monument Wall Way #421 Fairfax, VA 22030 | COHEN, Y.H. | 9/16/2013 | 3/30/2014 |
| 4231 Monument Wall Way, Closet Storage Unit #C403 | COHEN, Y.H. | 9/16/2013 | 3/30/2014 |
| 4231 Monument Wall Way #242 Fairfax, VA 22030 | COHEN, S.A. | 8/14/2012 | 5/25/2014 |
| 4231 Monument Wall Way #135 Fairfax, VA 22030 | T.A. | 10/31/2012 | 6/29/2014 |
| 11714 Fairfax Woods Way #22103, Fairfax, VA 22030 | TOMIK TOM, INC. | 7/18/2012 | 7/17/2013 |
| 11704 Fairfax Woods Way #20208, Fairfax, VA 22030 | G.F. | 6/1/2012 | 5/31/2013 |
| 11702 Fairfax Woods Way #20203, Fairfax, VA 22030 | COHEN | 7/6/2012 | 7/25/2014 |
| 11614 Fairfax Meadows Circle #18311, Fairfax, VA 22030 | TOMIK TOM INC. | 10/28/2012 | 10/27/2013 |
| 11606 Fairfax Meadows Circle #17307, Fairfax, VA 22030 | TOMIK TOM INC. | 3/1/2013 | 2/28/2014 |
| 11600 Fairfax Meadows Circle #16101, Fairfax, VA 22030 | TOMIK TOM INC. | 10/20/2012 | 10/19/2013 |
| 11600 Fairfax Meadows Circle #16203, Fairfax, VA 22030 | TOMIK TOM INC. | 10/28/2012 | 10/27/2013 |

29.     From in and around 2011 through in and around December 2013, COHEN and/or Enterprise personnel operating on his behalf, leased mall kiosk and store locations in Virginia and Maryland. COHEN and/or his associates served as owner or contact person on the leases and maintained contact with all of the malls. COHEN and other Enterprise personnel communicated with the mall management regularly via email regarding lease agreements, day to day operations, sales reports, and complaints. The Enterprise's Bank of America accounts were used to pay rent for the retail locations at malls.

30.     From in and around 2012 through in and around December 2013, COHEN and/or his associates owned or leased a fleet of vehicles in Virginia used to transport themselves and illegal workers. These vehicles were registered by Enterprise personnel using the residential addresses at the apartment complexes leased by the Enterprise. Enterprise bank and/or credit card accounts paid for the vehicles and for the vehicle registrations, maintenance, and fuel costs.

31.     From in and around 2012 through in and around December 2013, the Enterprise utilized a recruiting service known as JOBANK (a/k/a Job Overseas or Giovenco), based in Tel Aviv, Israel to secure B-1/B-2 and other non-employment visa workers. COHEN and other Enterprise personnel operating on his behalf communicated via email regularly with this recruiting service regarding all aspects of recruiting, hiring, and making arrangements for illegal workers to come to and reside in the United States.

32.     From in and around 2012 through in and around December 2013, international transfers were made from Enterprise bank accounts in the United States to the JOBANK bank account in Israel. In total, approximately $30,427.11 in international transfers were sent from Enterprise Bank of America accounts ending in 9695, 7862 and 7600 in the name of Tomik Tom Inc. and STR Cosmetics Inc. to the JOBANK account. These transfers by the Enterprise were to pay the fees for JOBANK's recruiting services, including its retainer fees and payments for the successful placement of illegal workers.

33.     From in and around 2012 through in and around December 2013, JOBANK and the Enterprise utilized Israel-based foreign travel agencies, including ISSTA. JOBANK personnel, COHEN and his Enterprise associates communicated via email regularly with these travel agencies regarding airline reservations for employees. The travel agencies assisted with making international airline reservations for some of the employees' travel to and from the United States.

34.     From in and around 2012 through in and around December 2013, numerous international transfers were made from Enterprise bank accounts in the United States to the bank accounts of foreign travel agencies in Israel. In total, at least approximately $15,151.00 in international transfers was sent from Enterprise Bank of America accounts to the foreign travel agency accounts. These transfers by the Enterprise were to pay the fees for booked airline tickets.

During the period of the conspiracy, total Enterprise bank account expenditures for airfare were approximately $56,788.00.

35.     From in and around 2012 through in and around December 2013, numerous transfers were sent from Enterprise Bank of America bank accounts filled with proceeds generated by its retail operations, specifically the STR Consultation Inc. c/o TOMIK TOM *6969 and Tomikom Inc. *6888 accounts, to Payoneer Payment Solutions ("Payoneer") to fund stored value payment cards used to pay the Enterprise's illegal workforce. In total, approximately $275,367.00 in transfers was sent from the specified Enterprise accounts to Payoneer. At least twenty-nine (29) known B-1/B-2 or other non-employment visa employees were paid by the Enterprise via the stored value cards.

## COUNT ONE

### (Conspiracy to Defraud and to Commit Offenses Against the United States)

THE GRAND JURY CHARGES THAT:

1.      The factual allegations contained in the General Allegations section are incorporated herein by reference as if set out in full.

2.      Beginning in and around 2011, and continuing through in and around December 2013, the exact dates being unknown to the Grand Jury, in the Eastern District of Virginia and elsewhere, SHAI COHEN, the defendant (COHEN), and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, and agree with each other and others known and unknown to the Grand Jury, to:

a. defraud the United States of America concerning one or more of its lawful government functions and rights hereafter described, that is:

i. To defraud the United States by impeding, impairing, and obstructing the lawful governmental functions of the DOL to administer, regulate and enforce the regulations and laws relating to the implementation of the H-2B nonimmigrant visa program;

ii. To defraud the United States by impeding, impairing, and obstructing the lawful governmental functions of DHS to administer, regulate and enforce the regulations and laws related to the hiring, employment and presence of aliens in nonimmigrant status and immigrant status in the United States;

iii. To defraud the United States by impeding, impairing, and obstructing the lawful governmental functions of DOS to administer, regulate and enforce the regulations and laws related to the application, processing, and approval of visas in the United States;

iv. To defraud the United States by impeding, impairing, and obstructing the lawful governmental functions of DHS to regulate and enforce violations, regulations and laws

14

relating to transporting, harboring, unlawfully employing, and encouraging and inducing illegal aliens;

b. commit one or more of the following offenses, that is:

i. To encourage and induce aliens to come to, enter and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence in the United States is and will be in violation of Title 8, United States Code, Section 1324(a)(l)(A)(iv);

ii. To conceal, harbor and shield from detection aliens illegally present in the United States in buildings and other places, including any means of transportation for purpose of commercial advantage and private financial gain, in violation of Title 8, United States Code, Section 1324(a)(l)(A)(iii); and

iii. To transport and move illegal aliens within the United States by means of transportation and otherwise in furtherance of such violation of law for the purpose of commercial advantage and private financial gain, in violation of Title 8, United States Code, Section 1324(a)(l)(A)(ii).

<u>OBJECT OF THE CONSPIRACY</u>

3.     The primary purpose of the conspiracy was to profit from illegally employing foreign nationals who were in the United States on visitor visas.

<u>WAYS, MANNER AND MEANS OF THE CONSPIRACY</u>

The ways, manner and means by which the foregoing objective of the conspiracy to defraud the United States and commit offenses against the United States was to be accomplished included the following:

5.     It was part of the conspiracy that the conspirators provided airplane tickets and travel itineraries for B-1/B-2 and other non-employment visa holders, who were visa violators due

15

to their arranged employment in the United States, to travel to and within the United States for the purpose of illegal employment with the Enterprise.

6.      It was further a part of the conspiracy that conspirators and others provide the visa violators with transportation by automobile or other means upon their arrival in the United States to the conspirators' places of employment and to the apartments where the visa violators would be residing while employed.

7.      It was further a part of the conspiracy that conspirators and others at the behest of the conspirators, to provide housing to the visa violators to whom the conspirators had provided employment.  Such housing consisted of apartments that were leased by conspirators or under the name of related Enterprise business entities.  Conspirators would thereafter pay the rent for the residence as well as the utilities.

8.      It was further a part of the conspiracy that the conspirators used their illegal Israeli employees to market and sell conspirators' Israeli based line of beauty and skin care products at kiosk and store locations in malls.

9.      It was further a part of the conspiracy that conspirators paid the Enterprise employees who were visa violators in cash and/or stored value payment cards, or other means without reporting such payments to the appropriate employment or taxing authorities.

10.     It was further a part of the conspiracy that conspirators deducted often substantial sums of money from the pay of the employees for housing, transportation, and other related expenses.

11.     It was further a part of the conspiracy that the conspirators employed visa violators contrary to the regulations set forth by the DOS, DHS, and DOL.

## OVERT ACTS

16

In furtherance of the conspiracy and  to bring about the objects and goals of the conspiracy to defraud and to commit offenses against the United States, SHAI COHEN, along with other known and unknown conspirators, committed overt acts in the Eastern District of Virginia, and elsewhere, including but not limited to the following:

1.      On or about April 6, 2011, COHEN incorporated Tomik Tom Inc. in Florida, using the address of a residence leased by himself and a conspirator at the Reserve at Fairfax Corner apartment complex, 11704 Fairfax Woods Way #20208 Fairfax, Virginia, as the corporate registration address.

2.      In and around May 2011, COHEN and an Israel-based recruiting company named MAKA reached an agreement for MAKA to begin recruiting workers for the Enterprise.

3.      In and around January 2012, COHEN and JOBANK reached an agreement for JOBANK to begin recruiting workers for the Enterprise.

4.      On January 20 and 21, 2012, emails were exchanged between COHEN and conspirator T.A., where COHEN directed T.A. to select the name for a new business they were preparing to establish.  T.A. responded that "TORA" was the choice.  COHEN replied that he would check to see if the name was available and stated that he was leaving the next day to visit friends in Florida, subsequently identified as Florida-based business associates of the Enterprise.

5.      On or about February 1, 2012, Enterprise entity Tora Ankave Inc. was incorporated in Florida, under T.A.'s name, but listing as T.A.'s Florida address a residence associated with COHEN, in Jacksonville, Florida.   The corporate registration address was the address of a residence leased by COHEN at an Enterprise-leased apartment complex, 11704 Fairfax Woods Way #20306 Fairfax, Virginia.

6.      On or about February 1, 2012, February 1, 2013, March 1, 2013 and May 1, 2013, COHEN signed leases on behalf of RSE International Inc. and STR Consultation Inc. c/o Tomik Tom with Tysons Corner Mall in McLean, Virginia for Mica Beauty Cosmetics retail locations.

7.      On March 28, 2012, COHEN emailed T.A. and R.G. a message which was originally sent to COHEN by a business associate.  The message content contained a management proposal for 2012 for an Enterprise venture later identified as STR Inc.  The management structure detailed in the message describes the functions and responsibilities of each Enterprise partner, salary and profit sharing, bank accounts, work schedules and time off, management of workers at the kiosks and vehicles and residences paid for by the Enterprise.

8.      On or about April 30, 2012, COHEN signed a lease on behalf of RSE International Inc. with Tysons Corner Mall in McLean, Virginia for an Oro Gold retail location.

9.      On or about June 13, 2012, COHEN, on behalf of STR Cosmetics Inc., signed an authorization for automatic bill payment of its lease fees from Enterprise Bank of America account ending in 6781 with Tysons Corner Mall in McLean, Virginia for an Oro Gold retail location.

10.     On or about August 9, 2012, COHEN emailed an unknown individual information about his company and photographs that depict Enterprise conspirators, illegal workers, retail locations and apartment complexes; COHEN included his phone number and an offer for the individual to call with any questions.

11.     On or about July 6, 2012, COHEN registered Tomik Tom Inc. to do business in Virginia, using as the corporate mailing address 11350 Random Hills Rd, Suite 872, Fairfax, Virginia.

12.     On or about February 21, 2013, a lease was signed in the name of T.A., on behalf of Tora Ankave Inc., with Westfield Montgomery Mall, in Bethesda, Maryland for a Mica Beauty retail location.  From on or about August 22, 2013 through September 19, 2013, COHEN

communicated via email with Westfield Montgomery Mall management about topics including the design of a kiosk, terms of the lease and approval of the lease for a Mica Beauty retail location.

13. On or about May 1, 2013, COHEN signed a lease on behalf of STR Cosmetics Inc. with Fashion Centre at Pentagon City in Arlington, Virginia for a Mica Beauty retail location.

14. On or about November 14, 2013, COHEN signed a lease on behalf of SSC Elite, LLC with Fair Oaks Mall in Fairfax, Virginia for a Mica Beauty retail location.

15. Between in and around June 2012 and in and around October 2013, Enterprise personnel including COHEN signed at least 19 apartment and storage unit leases extending into 2014, with several apartment complexes in Fairfax, Virginia.

16. Between in and around June 2011 through in and around March 2013, the Enterprise purchased and leased various vehicles, including vans, SUVs and sedans, used during the dates of the conspiracy to transport recruited alien employees from the airport upon their arrival in the United States, and to transport such employees to and from the apartments where they were housed to the mall locations where they were illegally employed. COHEN was the registrant on at least eight of the vehicles.

17. During the dates of the conspiracy, COHEN and recruiting service personnel from JOBANK sent numerous email communications regarding the status of recruiting efforts, exchange of photos, biographical and background summaries on potential recruits; arrangements for COHEN to speak with recruits, booking of airline tickets including via foreign travel agencies such as ISSTA, booking of hotel reservations, terms of labor agreements with recruits, receipts and invoices from JOBANK for recruited workers and from ISSTA for airline ticket fees, and related topics, including but not limited to emails regarding the following individuals who would subsequently be transported to the United States to live in Virginia for the purpose of employment with the Enterprise: S.B.(1), S.B.(2), A.G., S.M., A.P., N.P., L.P., D.B., M.V. and M.A.

18. On or about September 3, 2013, JOBANK personnel emailed COHEN airline ticket reservations procured for S.B.(1), an incoming illegal worker, reflecting scheduled travel from Tel Aviv, Israel to Washington Dulles International Airport in Virginia on September 20, 2013.

19. On or about September 17, 2013, COHEN sent an email to S.B.(1) attaching a reservation for a hotel in Alexandria, Virginia.

20. On or about September 20, 2013, S.B.(1) entered the United States using a B-1/B-2 visitor visa.

21. From at least on or about September 25, 2013 through on or about December 16, 2013, S.B.(1) worked at Enterprise retail locations in Fairfax, Virginia.

22. On or about March 5, 2013, COHEN and T.A. received an email from JOBANK personnel relating to incoming recruited illegal workers N.P. and S.B.(2). The message provided COHEN with photos and biographical details for N.P. and S.B.(2), and also included an update that JOBANK had procured their visas and the details of their recruitment by JOBANK staffers, including information given to the recruits about the terms and conditions of their employment by the Enterprise in the United States.

23. On or about March 11, 2013, JOBANK personnel emailed COHEN airline ticket reservations procured for S.B.(2) and N.P., reflecting scheduled travel from Tel Aviv, Israel to Baltimore Washington International Airport in Maryland in April 2013. The emails conveyed to COHEN that JOBANK had "closed" the deal with N.P. and S.B.(2) and confirmed their airline tickets were booked, with the prospective workers paying for half and the Enterprise paying for the other half of their flight costs to the United States.

24. On or about April 24, 2013, S.B.(2) and N.P. entered the United States using B-1/B-2 visitor visas.

25.     From on or about May 1, 2013 through on or about July 25, 2013, S.B.(2) worked at Enterprise retail locations in Fairfax, Virginia.

26.     From on or about May 1, 2013 through in and around November 2013, N.P. worked at Enterprise retail locations in Virginia and Maryland.

27.     On or about May 30, 2013, N.P. was issued a Payoneer stored value card by the Enterprise.

28.     From on or about June 13, 2013 through in and around December 2013, the Enterprise transferred money to N.P. using the card on various occasions.

29.     On or about August 26, 2013, JOBANK personnel emailed COHEN airline ticket reservations procured for A.G., reflecting scheduled travel from Tel Aviv, Israel to Washington Dulles International Airport in September 2013.

30.     On or about September 20, 2013, A.G. entered the United States using a B-1/B-2 visitor visa.

31.     From in and around September 2013 through in and around October 2013, A.G. worked at Enterprise retail locations in Virginia and Maryland.

32.     On or about August 25, 2013, JOBANK personnel emailed COHEN airline ticket reservations procured for S.M., reflecting scheduled travel from Tel Aviv, Israel to Washington Dulles International Airport in October 2013.

33.     On or about September 9, 2013, COHEN received an email from JOBANK personnel about the labor agreement for S.M.'s employment, which was attached to the email, requesting COHEN to contact S.M. about it; COHEN then forwarded the email to another Enterprise email account.

34.     On or about October 16, 2013, S.M. entered the United States using a B-2 visitor visa.

35. From in and around October 2013 through in and around December 2013, S.M. worked at Enterprise retail locations in Virginia.

36. On or about October 30, 2012, JOBANK personnel emailed COHEN airline ticket reservations procured for A.P., reflecting scheduled travel from Tel Aviv, Israel to Washington Dulles International Airport in November 2012.

37. On or about November 7, 2012, A.P. entered the United States via the Visa Waiver Program.

38. From in and around December 2012 through in and around March 2013, A.P. worked at Enterprise retail locations in Virginia.

39. On or about August 7, 2013, JOBANK personnel emailed COHEN airline ticket reservations procured for L.P., reflecting scheduled travel from Tel Aviv, Israel to Washington Dulles International Airport in October 2013.

40. On or about October 30, 2013, L.P. entered the United States using a B-1/B-2 visitor visa.

41. From in or around November 2013 through in or around December 2013, L.P. worked at Enterprise retail locations in Fairfax, Virginia.

42. On or about July 15, 2012, JOBANK personnel emailed COHEN airline ticket reservations procured for D.B., reflecting scheduled travel from Tel Aviv, Israel to Washington Dulles International Airport in July 2012.

43. On or about July 24, 2012, D.B. entered the United States using a B-2 visitor visa.

44. From in and around October 2012 through in and around July 2013, D.B. worked at Enterprise retail locations in Virginia.

45. On November 15, 2012, D.B. was issued a Payoneer stored value card by the Enterprise.

46.     From on or about October 31, 2012 through in and around August 2013, the Enterprise transferred money to D.B. using the card on various occasions.

47.     On or about July 17, 2013, D.B was interviewed by law enforcement officers prior to departing Washington Dulles International Airport in Virginia for Israel.  D.B. denied his employment in the United States.  D.B. was found to be in possession of approximately $8,000 in United States currency in denominations of $100 bills, and an "employee scorecard" in his name, generated by the point-of-sale software program used by the Enterprise, reflecting sales and commissions in September 2012.

48.     On or about June 20, 2012, M.V. entered the United States using a B-1/B-2 visitor visa.

49.     On or about July 11, 2012, JOBANK personnel emailed COHEN airline ticket reservations procured for M.V. reflecting scheduled travel from Washington Reagan National Airport to Tel Aviv, Israel in November 2012.  On the same date, an international transfer was sent from STR Cosmetics' Bank of America account ending in 7862 in the United States to "Issta Israel (Israeli Travel Co.)" in the amount of $1,456.74.

50.     From in and around October 2012 through in and around December 2013, M.V. worked at Enterprise retail locations in Virginia and Maryland.

51.     On or about October 11, 2012, M.V. was issued a Payoneer stored value card by the Enterprise.

52.     From on or about October 31, 2012 through in and around December 2013, the Enterprise transferred money to M.V. using the card on various occasions.

53.     On or about March 21, 2013, messages were exchanged between email accounts of COHEN and a conspirator discussing M.A.'s passport details and the need to cancel an associated hotel reservation by 6 p.m. on March 28, 2013.

54.     On or about March 21, 2013, M.A. entered the United States using a B-1/B-2 visitor visa.

55.     From in and around April 2013 through in and around December 2013, M.A. worked at Enterprise retail locations in Virginia and Maryland.

56.     On or about April 11, 2013, M.A. was issued a Payoneer stored value card by the Enterprise.

57.     From between in and around May 2013 through in and around December 2013, the Enterprise transferred money to M.A. using the stored value card on various occasions.

58.     During the dates of the conspiracy, numerous B-1/B-2 and other non-employment visa holders, including but not limited to S.B.(2), N.P., D.B., M.V. and M.A. walked out of Enterprise-leased apartments in Fairfax, Virginia and got into Enterprise vehicles to transit to various area malls for work at Enterprise retail locations.

59.     On or about August 9, 2012, COHEN emailed a prospective recruit information about his company, including photos of retail locations being worked by conspirators at Virginia malls and Fairfax, Virginia apartment complexes.

60.     On or about August 13, 2013, COHEN received an email from JOBANK personnel with a breakdown of dates and charges incurred for summer recruiting services, indicating every company was charged a $500 retainer, along with a breakdown of specific charges for Enterprise companies "STR" and "TOMIQ" relating to named recruits.

61.     On or about September 2, 2013, COHEN sent an email to JOBANK personnel regarding an incoming recruited worker, N.A., who was concerned about his entry into the United States, and was considering flying to Canada first before flying into the United States. In COHEN's email, he indicated that he called the worker and told him it would be better to enter in Las Vegas.

62.     On or about September 17, 2013, COHEN and JOBANK personnel exchanged emails about incoming workers A.G. and S.B.(1); JOBANK personnel advised COHEN about the date the workers were scheduled to arrive via a British Airways flight, that the workers were instructed to enter separately, and asked COHEN to call the workers to give them a "flight briefing" and "relax them a bit." COHEN replied that he would call the workers soon.

63.     On or about October 1, 2013, COHEN received an email from a conspirator relating to an incoming illegal worker recruit, Y.Y., providing a hotel reservation and indicating that COHEN needed to forward the reservation and give Y.Y. a briefing before arrival on Friday. COHEN subsequently forwarded the email to Y.Y. and provided his phone number.

64.     On or about October 7, 2013, COHEN and JOBANK personnel exchanged emails regarding a potential incoming recruit who had "cold feet" and backed out of the arrangement the day before his flight was set to depart due to fear of entering the United States; COHEN inquired whether he should contact the individual.

65.     On or about November 19, 2013, COHEN received an email from JOBANK personnel indicating that after a discussion with COHEN, it was agreed that JOBANK would provide monthly summary invoices of charges incurred on the 28th of each month; COHEN confirmed receipt of the email and listed his title as "Chief Executive."

66.     On or about November 12, 2013, COHEN was sent a labor agreement for recruited workers via email from JOBANK personnel with a request for signatures. The labor agreement detailed aspects of the employment arrangement including the pickup and transport of recruits from the airport upon arrival to the apartment where they would be housed, work locations at "wagons" (kiosks) in malls; work attire, reimbursement of airfare, apartment rent, and how the workers would be paid.

67.     On or about November 13, 2013, COHEN and JOBANK personnel exchanged emails about how various recruited illegal workers, including S.M., L.P., and S.B.(1), were performing at Enterprise retail locations including Fair Oaks; COHEN advised about the workers' English abilities, motivation and sales figures.

68.     On or about December 2, 2013, COHEN forwarded to his business email address, via his personal email address, a copy of the STR Cosmetics 2013 operating agreement. COHEN's email signature listed himself as "President," and listed a business address of 11704 Fairfax Woods Way #20208.   This address is an Enterprise-leased apartment that doubled as COHEN's personal residence.

69.     On or about August 9, 2013, COHEN picked up recruited illegal employee M.A., a B-1/B-2 visa holder, from an Enterprise-leased apartment complex in Fairfax, Virginia and transported her to an Enterprise retail location using an Enterprise vehicle.

70.     On or about December 5, 2013, COHEN was present at Enterprise retail outlets in Virginia and supervised, led, and directed the activities of other workers, including known illegal employees.

71.     On or about December 17, 2013, COHEN was housing at least 13 illegal workers at Enterprise apartments leased by COHEN and other conspirators in Fairfax, Virginia, including the following:

| Alien | Location |
|---|---|
| E.D. | 11717 Fairfax Woods Way, Apt. 14012, Fairfax, VA 22030 |
| S.B.(1) S.B.(2) | 11730 Fairfax Woods Way, #1308, Fairfax, VA 22030 |
| Y.Y. | 11730 Fairfax Woods Way, #1308, Fairfax, VA 22030 |
| S.K. | 11730 Fairfax Woods Way, #1108, Fairfax, VA 22030 |
| B.M. | 11704 Fairfax Woods Way, #20306, Fairfax, VA, 22030 |
| L.P. | 11730 Fairfax Woods Way #1308, Fairfax, VA 22030 |
| S.M. | 11602 Fairfax Woods Way #16108, Fairfax, VA 22030 |
| M.A. | 16000 Fairfax Meadows Cir, #16003, Fairfax, VA 22030 |

| N.P. | 11730 Fairfax Woods Way, #1108, Fairfax, VA 22030 |
| M.V. | 11600 Fairfax Meadows Cir, #16003, Fairfax, VA 22030 |
| Z.B. | 11730 Fairfax Woods Way, #1108, Fairfax, VA 22030 |
| Y.P. | 11602 Fairfax Meadows Circle, #16108, Fairfax, VA 22030 |

(All in violation of Title 18, United States Code, Section 371.)

## COUNTS TWO THROUGH EIGHT

### (Bringing Aliens to the United States for Financial Gain)

THE GRAND JURY FURTHER CHARGES THAT:

1.      On or about the dates listed below, in the Eastern District of Virginia and elsewhere, SHAI COHEN, the defendant, and others known and unknown to the Grand Jury, aiding and abetting each other, did knowingly, and for the purpose of commercial advantage and private financial gain, bring certain aliens identified in the following Counts to the United States, in any manner whatsoever, knowing and in reckless disregard of the fact that such aliens had not received prior official authorization to come to, enter, and reside in the United States, regardless of any official action which may later be taken with respect to such aliens.  To wit, the visas used by the aliens to come to, enter and reside in the United States were procured and used under false pretenses.

| COUNT | ALIEN | APPROX. DATES |
|:-----:|:-----:|:-------------:|
| 2 | S.B. (1) | On or about 9/3/2013 through on or about 9/20/2013 |
| 3 | S.B. (2) | On or about 3/5/2013 through on or about 4/24/2013 |
| 4 | A.G. | On or about 8/11/2013 through on or about 9/20/2013 |
| 5 | S.M. | On or about 8/15/2013 through on or about 10/16/2013 |
| 6 | A.P. | On or about 10/18/2012 through on or about 11/7/2012 |
| 7 | N.P. | On or about 3/5/2013 through on or about 4/24/2013 |
| 8 | L.P. | On or about 7/31/2013 through on or about 10/30/2013 |

(In violation of Title 8, United States Code, Section 1324(a)(2)(B)(ii) and Title 18, United States Code, Section 2.)

## COUNTS NINE THROUGH EIGHTEEN

### (Encouraging and Inducing Aliens to Unlawfully Come to, Enter, and Reside in the United States for Financial Gain)

THE GRAND JURY FURTHER CHARGES THAT:

1.     On or about the dates listed below, in the Eastern District of Virginia and elsewhere, SHAI COHEN, the defendant, and others known and unknown to the Grand Jury, aiding and abetting each other, did knowingly, and for the purpose of commercial advantage and private financial gain, encourage and induce certain aliens identified in the following Counts to come to, enter and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence in the United States was in violation of law:

| COUNT | ALIEN | DATES |
|-------|-------|-------|
| 9 | S.B. (1) | On or about 9/3/2013 through in and around December 2013 |
| 10 | S.B. (2) | On or about 3/5/2013 through in and around December 2013 |
| 11 | A.G. | On or about 8/11/2013 through in and around October 2013 |
| 12 | S.M. | On or about 8/15/2013 through in and around December 2013 |
| 13 | A.P. | On or about 10/18/2012 through in and around April 2013 |
| 14 | N.P. | On or about 3/5/2013 through in and around December 2013 |
| 15 | L.P. | On or about 7/31/2013 through in and around December 2013 |

| 16 | D.B. | On or about 7/3/2012 through on or about 7/17/2013 |
| 17 | M.V. | On or about 6/20/2012 through in and around December 2013 |
| 18 | M.A. | On or about 3/21/2013 through in and around December 2013 |

(In violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv), (a)(1)(B)(i) and Title 18, United States Code, Section 2.)

## COUNTS NINETEEN THROUGH TWENTY-EIGHT

### (Harboring Illegal Aliens)

THE GRAND JURY FURTHER CHARGES THAT:

1.      On or about the following date ranges in the Eastern District of Virginia and elsewhere, SHAI COHEN, the defendant, along with others known and unknown to the Grand Jury, aiding and abetting each other, knowing and in reckless disregard of the fact that the following aliens had come to, entered and remained in the United States in violation of law, did conceal, harbor and shield, and did attempt to conceal, harbor and shield from detection such aliens in buildings and other places, and by means of transportation, for the purpose of commercial advantage and private financial gain:

| COUNT | ALIEN | DATES |
|:-----:|:-----:|:-----:|
| 19 | S.B. (1) | On or about 9/20/2013 through in and around December 2013 |
| 20 | S.B. (2) | On or about 4/24/2013 through in and around December 2013 |
| 21 | S.M. | On or about 10/16/2013 through in and around December 2013 |
| 22 | N.P. | On or about 4/24/2013 through in and around December 2013 |
| 23 | L.P. | On or about 10/30/2013 through in and around December 2013 |
| 24 | D.B. | On or about 7/24/2012 through on or about 7/17/2013 |
| 25 | M.V. | On or about 6/20/2012 through in and around December 2013 |
| 26 | M.A. | On or about 9/26/2013 through in and around December 2013 |

| 27 | B.M. | On or about 10/16/2012 through in and around December 2013 |
| 28 | Z.B. | In or around 2/8/2011 through in and around December 2013 |

(In violation of Title 8, United States Code, Section 1324(a)(l)(A)(iii) and Title 18, United States Code, Section 2).

<u>COUNT TWENTY-NINE</u>

<u>(Money Laundering Conspiracy)</u>

THE GRAND JURY FURTHER CHARGES THAT:

1.     The factual allegations contained in the General Allegations section are incorporated herein by reference as if set out in full.

2.     Beginning in and around 2011, and continuing through in and around December 2013, in the Eastern District of Virginia and elsewhere, SHAI COHEN, the defendant (COHEN), along with others known and unknown to the Grand Jury, did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, to wit:

a.     To knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of specified unlawful activity, that is conspiracy to bring in and harbor aliens in violation of Title 18, United States Code, Section 371, as set forth in Count One of this Indictment, and bringing in and harboring aliens in violation of Title 18, United States Code, Section 1324, as set forth in Counts Two through Twenty-Eight of this Indictment; with the intent to promote the carrying on of specified unlawful activity, that is bringing in and harboring certain aliens, and that while conducting and attempting to conduct such financial transactions, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity in violation of Title 18, United States Code, Section 1956(a)(l)(A)(i).

b.     To transport, transmit and transfer, and attempt to transport, transmit and transfer, a monetary instrument and funds, from a place in the United States to or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, that is

conspiracy to bring in and harbor aliens in violation of Title 18, United States Code, Section 371, as set forth and charged in Count One of this Indictment, and bringing in and harboring aliens in violation of Title 8, United States Code, Section 1324, as set forth in Counts Two through Twenty-Nine of this Indictment in violation of Title 18, United States Code, Section 1956(a)(2)(A).

## OBJECT OF THE CONSPIRACY

The object of the conspiracy was for COHEN and his conspirators to use the proceeds of their conspiracy to defraud and commit offenses against the United States to induce, recruit, hire for employment and transport foreign nationals on B-1/B-2 and other non-employment visas to the United States for the purpose of those foreign nationals illegally engaging in work, and to pay, house, and transport those foreign nationals once they were in the United States.

## WAYS, MANNER AND MEANS OF THE CONSPIRACY

1.      The Ways, Manner, and Means paragraphs 5 through 11, contained in Count One of this Indictment are incorporated herein by reference as if set out in full.

## OVERT ACTS

1.      The Overt Acts paragraphs 1 through 71 contained in Count One of this Indictment are incorporated herein by reference as if set out in full.


(In violation of Title 18, United States Code, Section 1956(h).)

## FORFEITURE ALLEGATION

THE GRAND JURY FURTHER ALLEGES AND FINDS PROBABLE CAUSE THAT:

1. The defendant, if convicted of any of the violations alleged in Counts One through Twenty-Nine of this Indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2:

    a. Any property, real or personal, which constitutes, is derived from, or is traceable to the proceeds obtained, directly or indirectly, as a result of the violation;

    b. Any conveyance, including any vessel, vehicle, or aircraft used in the commission of the violation; and

    c. Any property, real or personal, that is used to facilitate, or is intended to be used to facilitate, the commission of the violation.

2. The defendant, if convicted of the violation alleged in Count Twenty-Nine of this Indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any property, real or personal, involved in the violation, or any property traceable to that property.

3. If any property that is subject to forfeiture above, as a result of any act or omission of the defendant, (a) cannot be located upon the exercise of due diligence, (b) has been transferred to, sold to, or deposited with a third party, (c) has been placed beyond the jurisdiction of the Court, (d) has been substantially diminished in value, or (e) has been commingled with other property that cannot be divided without difficulty, it is the intention of the United States to seek forfeiture of any other property of the defendant, as subject to forfeiture under Title 21, United States Code, Section 853(p).

4. The property subject to forfeiture includes, but is not limited to, the following property:

a. A monetary judgment in the amount of not less than $3,960,000.00, representing the proceeds of Counts One through Twenty-Nine.

(In accordance with Title 8, United States Code, Section 1324(b);
Title 18, United States Code, Sections 98 l (a)(l)(C), 982(a)(l) and 982(a)(6)(A);
and Title 28, United States Code, Section 2461.)

UNITED STATES OF AMERICA v. SHAI COHEN, 1:16-CR-114

A TRUE BILL:

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

_____

FOREPERSON

Respectfully submitted,

DANA J. BOENTE
UNITED STATES ATTORNEY

By: _____
Angela Fiorentino-Rios
Special Assistant United States Attorney (LT)

LESLIE R. CALDWELL
ASSISTANT ATTORNEY GENERAL
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION

By: _____
Michael Sheckels
Trial Attorney
Human Rights & Special Prosecutions Section

Date: _____