

**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CASE NUMBER: 1:16-CR-114** |
| v. | |
| **SHAI COHEN** | **SUPPLEMENTAL AFFIDAVIT**<br>**IN SUPPORTOF REQUEST**<br>**FOR EXTRADITION** |

I, Matthew Grimm, being duly sworn, depose and state:

1.  I am a citizen of the United States and a resident of the Commonwealth of Virginia.

2.  This supplemental affidavit complements the original affidavit I executed on September 29, 2017, in support of the extradition request for SHAI COHEN (COHEN).

3.  The investigation revealed that COHEN knowingly conspired with others to defraud the United States.  The purpose of the fraud was to allow COHEN and his coconspirators to benefit financially from an illegal work force from Israel.  COHEN and his coconspirators took advantage of the tourist/visitor visa program and helped prospective workers obtain permission to enter the United States by misrepresenting the true purpose for the visit, which was illegal employment.

4.  While COHEN organized and led the conspiracy, he was aided and abetted by others including his business partners and subordinate managers, T.A., R.G. and G.F.  T.A. and R.G. pleaded guilty to their role in the conspiracy and are cooperating witnesses against COHEN.  Many of the illegal workers told investigating authorities that they agreed to enter the United States understanding that their entry was at the direct or directed behest of COHEN.  The COHEN enterprises employed an estimated 60 illegal workers and the enterprise realized at least US $3.96 million in gross proceeds from 2011-2013 in debit and

1

credit card receipts for sales. COHEN would not have had those gross proceeds coming into his businesses but for the use of the illegal labor workforce he obtained and encouraged through visa fraud.

5.   The investigation revealed evidence that COHEN used several Israeli recruiting firms to find workers for his U.S. retail businesses. Investigators learned that COHEN persuaded prospective employees to come to the United States for the express purpose of employment, knowing in all cases that the employee prospects would be entering the United States on tourist/visitor visas. R.G. told agents that, prior to her departure from Israel, she knew that she was entering with a tourist/visitor visa and that COHEN knew this at the time he recruited her. R.G. described a conversation with COHEN prior to her planned flight to the United States, where COHEN reminded her not to tell U.S. immigration officials that she was coming to work for COHEN. The evidence revealed that COHEN or his coconspirators coached other Israelis to lie on their visa applications about the purpose of their travel to the United States. If the workers stayed beyond the period permitted by the tourist/visitor visa (normally, 90 days), COHEN directed the workers to lie to U.S. authorities about the reason for requesting extensions of time to remain in the United States as a tourist/visitor.

6.   An examination of financial records revealed that COHEN's enterprises benefited by avoiding the payment of taxes. Taxes on employers and employees would ordinarily include payroll taxes, federal taxes, state taxes, and local taxes. The illegal workers also benefitted from not paying taxes. In fact, investigators found that the financial benefits to the workers was a major selling point for COHEN to convince Israelis to enter the United States and work illegally. T.A. and R.G. confirmed that the principal benefit of using

2

illegal Israeli workers instead of U.S. workers was that both COHEN's business and the workers benefited financially from not paying taxes.

7.     The COHEN enterprises, like other United States employers, was required to report the income of their employees and to remit payroll taxes to tax authorities. However, it was part of the conspiracy that the COHEN enterprises did not report the wages earned by its illegal workers, remit any tax payments to the government, or withhold any amounts from the pay of illegal workers. T.A. told investigators that during the course of the conspiracy, neither he nor COHEN filed accurate corporate income tax returns.

8.     The COHEN enterprise, like other retail businesses that accept credit and debit cards as methods of payment, utilized merchant services accounts. Such merchant services accounts are provided by financial service clearinghouses for the purpose of accumulating payments from credit and debit card companies related to individual card swipes at "points of sale," which is when a consumer makes a payment in exchange for the goods received. On a periodic basis, the balances in each merchant service account would be automatically transferred by the merchant service account provider into regular business bank accounts held in the name of, and designated by, the seller. In December 2013, the U.S. government seized approximately US $292,000 from a total of 36 bank and merchant services accounts traceable to COHEN and his co-conspirators.

9.     Agents identified a pattern of transactions that revealed how the COHEN enterprises paid all of its workers. It is clear that COHEN was aware that some of the workers were paid illegally as he used two types of payment methods: (1) ADP Payroll Services, for his employees who had U.S. work authorization, and (2) Payoneer, for the illegal employees. Investigators obtained ADP records that showed that taxes were deducted from the wages

for the legal employees. The payment system for the illegal workers of COHEN's retail

businesses was complicated and designed to create multiple layers of accounts to hide the

payments to the illegal workers. Additionally, the Payoneer payment method avoided the

need to pay those illegal workers in cash.

10. The bank records showed regular payments by the COHEN enterprise to Payoneer.

Payoneer is a firm specializing in providing payroll solutions to employees that do not have

or use bank accounts. Payoneer enables employers to periodically load funds, via

electronic transfers, onto stored-value, Mastercard-branded debit cards which are then

issued to and in the name of employees.

11. Two Bank of America accounts -- connected to COHEN and/or his co-conspirators --

regularly transferred funds to Payoneer. One account was in the name of STR

CONSULTATION INC. and the other was in the name of TOMIKOM INC. Each account

was held by a correspondingly-named corporate entity, established by or in the name of

COHEN, T.A., and/or G.F. Investigators later confirmed with T.A. and R.G. that these

Bank of America accounts served no legitimate business purpose and only existed to

receive the illegally-derived revenue and to then transfer funds to Payoneer to pay

COHEN's illegal workforce. The funds were received from other bank accounts held by

the COHEN enterprise.

12. STR CONSULTATION, INC was a Nevada firm registered by COHEN. A Bank of

America checking account ending in 6969 was held by STR CONSULTATION INC. C/O

TOMIK TOM. That account, ending in 6969, received funds transferred from other

COHEN enterprise accounts held by STR GRATIAE COSMETICS with account number

ending in 7023, STR COSMETICS with account number ending in 6781, and TORA

4

ANKAVE with account number ending in 7532.  From October 1, 2012, to on or about October 23, 2013, approximately US $211,751.17 was moved into the STR CONULTATION INC account and then subsequently transferred to Payoneer.

13. TOMIKOM was a Florida firm registered to COHEN and G.F.  A Bank of America checking account ending in 6888 was held by TOMIKOM INC.  That account received funds transferred from other COHEN enterprise accounts, held by TOMIK TOM INC, with account numbers ending in 9695 and 7749.  From October 1, 2012 to July 31, 2013, approximately US $63,616 was moved into the TOMIKTOM account and then subsequently transferred to PAYONEER.


MATTHEW M. GRIMM
Special Agent
U.S. Department of Labor
Office of Inspector General


Sworn and subscribed to before me

this 25th day of July, 2018.


/s/

Michael S. Nachmanoff
United States Magistrate Judge

The Honorable Michael S. Nachmanoff
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF VIRGINIA


5

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NUMBER: 1:16-CR-114 |
| v. | |
| SHAI COHEN | AFFIDAVIT IN SUPPORT OF REQUEST FOR EXTRADITION |

I, J. Michael Sheckels being duly sworn, depose and state:

1. I am a citizen of the United States and a resident of the Commonwealth of Virginia.

2. I graduated from the Catholic University of America, Columbus School of Law, in 2009. I was admitted to practice law in the State of Maryland in 2010. From 2010 to the present, I have been employed by the United States Department of Justice (DOJ) as a Trial Attorney for the Human Rights and Special Prosecutions Section. My duties are to prosecute persons charged with criminal violations of the laws of the United States. During my practice as a DOJ Trial Attorney, I have become knowledgeable about the criminal laws and procedures of the United States.

3. In the course of my duties, I have become familiar with the charges and evidence in the case of SHAI COHEN (COHEN) entitled United States of America v. Shai Cohen, Case Number 1:16-CR-114 (also referred to as 1:16CR114 and 1:16-cr-00114-CMH). This prosecution arose from an investigation by the U.S. Department of Homeland Security's Immigration and Customs Enforcement Homeland Security Investigations Division (ICE/HSI), the U.S. Department of State Diplomatic Security Service (DSS), and the U.S.

1

Department of Labor Office of Inspector General (DOL OIG). That investigation revealed that from between approximately February 2011 and December 2013, COHEN, a citizen of Israel, was the leader of an organized criminal group.

4. COHEN, a former resident of Fairfax, Virginia, managed the operation of a number of local cosmetic retail kiosks and stores under various companies that he owned (the COHEN Enterprise). The kiosks and stores were staffed almost entirely by young Israeli Nationals that COHEN and his associates brought illegally into the United States. The offenses involved in conspiracy to defraud the United States government's lawful ability to administer and enforce its visa program and to encourage, entice, transport, conceal, and harbor foreign nationals to work illegally in the United States and then to conspire to launder the proceeds of this criminal activity. The object and primary purpose of the conspiracy was to profit from foreign nationals (aliens) who were illegally employed in the United States.

## PROCEDURAL HISTORY OF THE CASE

5. On May 12, 2016, an indictment was filed in the United States District Court for the Eastern District of Virginia, charging COHEN with violating U.S. law. The same day, the Court issued an arrest warrant for COHEN. That warrant is outstanding.

### The Charging Process

6. Under federal law of the United States, a criminal prosecution may commence when a grand jury files an indictment. Institutionally, a grand jury, though an arm of the court, is an independent body composed of private citizens -- not less than 16 and not more than 23

2

people -- whom the United States District Court selects at random from the residents of the judicial district in which the court resides. The purpose of the grand jury is to review the evidence of crimes presented to it by United States law enforcement authorities. After independently reviewing this evidence, each member of the grand jury must determine whether there is probable cause to believe that a crime has been committed and that a particular person committed that crime. If at least 12 jurors find that the evidence they have reviewed provides probable cause to believe that a particular person committed the crime, the grand jury may return an indictment. An indictment is a formal written accusation that charges the particular person, now a defendant, with a crime, identifies the specific laws that the defendant is accused of violating, and specifies the date and place where the charged crime occurred.

7. The grand jury initiates the criminal prosecution when it files the indictment with the United States District Court. Thereafter, the clerk of the court, at the direction of a United States District Judge or Magistrate Judge, normally issues a warrant for the defendant's arrest in accordance with United States law.

8. In addition to imprisonment and a criminal fine, depending on the charged offense, United States law provides for the seizure and forfeiture of property of the defendant that constitutes the proceeds of the offense or that facilitates such offense. A criminal forfeiture may be alleged in an indictment, and merely provides notice to the defendant of the government's intention to forfeit property associated with the offense and is not a separate criminal offense. If specific property is listed in the forfeiture allegation, the grand jury must find probable cause to believe that the property is forfeitable. Upon a showing of

probable cause, a United States District Court Judge or Magistrate Judge may issue a seizure warrant for the seizure of the property.

9.  On May 12, 2016, shortly after completion of the investigation, a grand jury sitting in the Eastern District of Virginia returned an indictment charging COHEN with criminal offenses against the laws of the United States and filed this indictment with the United States District Court for the Eastern District of Virginia.  It is the practice of the United States District Court for the Eastern District of Virginia to retain the original indictment and file it with the records of the court.  Therefore, I have obtained a copy of the indictment from the clerk of the court and attached it to this affidavit as **Exhibit A.**

## The Warrant of Arrest

10.  On May 12, 2016, based on the indictment filed by the grand jury, and with the approval of the United States District Court for the Eastern District of Virginia, a deputy clerk of the court issued a warrant of arrest for COHEN.  Pursuant to Rule 9 of the Federal Rules of Criminal Procedure, the clerk of the court is the authority competent to sign arrest warrants and deliver them for execution to law enforcement authorities competent to make arrests. This function "to sign and deliver arrest warrants" also resides in, and is appropriately, customarily, and lawfully exercised by, deputy clerks of the court.  In fact, in nearly every case in this district, a deputy clerk, and not the appointed clerk, signs and delivers arrest warrants.  It is the practice of the United States District Court for the Eastern District of Virginia to retain the original arrest warrant and file it with the records of the court. Therefore, I have obtained a copy of the arrest warrant from the clerk of the court and

attached it to this affidavit as **Exhibit B**.  The warrant remains valid and executable to apprehend COHEN to stand trial for the crimes with which he is charged in the indictment.

The Charges and Pertinent United States Law

11.  The indictment charges that COHEN committed the following offenses:

| | |
|---|---|
| Count 1: | Conspiracy to defraud and to commit offenses against the United States, in violation of Title 18, United States Code (U.S.C.), Section 371; |
| Counts 2-8: | Bringing aliens to the United States for financial gain in violation of 8 U.S.C., Section 1324(a)(2)(B)(ii), and aiding and abetting in violation of 18 U.S.C., Section 2; |
| Counts 9-18: | Encouraging and inducing aliens to unlawfully come to, enter, and reside in the United States for financial gain, in violation of 8 U.S.C., Sections 1324(a)(1)(A)(iv) and 1324(a)(1)(B)(i), and aiding and abetting in violation of 18 U.S.C., Section 2; |
| Counts 19-28: | Harboring illegal aliens, in violation of 8 U.S.C., Section 1324(a)(1)(A)(iii), and aiding and abetting in violation of 18 U.S.C., Section 2; and |
| Count 29: | Money laundering conspiracy, in violation of 18 U.S.C., Section 1956(h). |

12.  The United States requests the extradition of COHEN for all of these offenses.  Each count charges a separate offense.  Each offense is punishable under a statute that (1) was the duly enacted law of the United States at the time the offenses were committed, (2) was the duly enacted law of the United States at the time the indictment was filed, and (3) is currently in effect.  Each offense is punishable under United States law by more than one year of

5

imprisonment. Copies of the pertinent sections of these statutes are included in the relevant legal provisions attached as **Exhibit C.**

Count 1

13. Count 1 charges COHEN with conspiracy to commit offense or to defraud the United States, specifically, to induce aliens to illegally enter and work in the United States after committing visa fraud, and to conceal, harbor, or shield from detection, and illegally employ the visa violators for commercial advantage or private financial gain contrary to United States law in violation of 18 U.S.C. Section 371(conspiracy to commit offense), and 8 U.S.C. Sections 1324(a)(1)(A)(iii)(concealing, harboring, or shielding illegal alien from detection), 1324(a)(1)(A)(iv)(encouraging and inducing aliens to unlawfully enter), 1324(a)(1)(B)(i)(enhanced penalty of 10 years in prison if the concealing, harboring, or shielding or the encouraging and inducing was done for financial gain), and 1324(a)(2)(B)(ii)(knowingly, or in reckless disregard of the fact, bringing an unauthorized alien into the United States for the purpose of commercial advantage or private financial gain). Conspiracy to commit visa fraud and to harbor and illegally employ visa violators is a conspiracy for which the United States may extradite under its laws.

14. Under United States law, a conspiracy is simply an agreement to violate another criminal statute, in this case, the statutes prohibiting visa fraud and harboring and illegally employing a visa violator. Under United States law, the act of combining and agreeing with one or more persons to violate a law of the United States is a crime in and of itself. The agreement on which the conspiracy is based need not be written or even verbal. It may be simply a tacit understanding by two or more persons to do something illegal. The conspirators enter into a partnership for a criminal purpose in which each member or

6

participant becomes a partner or agent of every other member. A person may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the identities of all the other members of the conspiracy. If a person has an understanding of the unlawful nature of a plan and knowingly and willfully agrees to it, joining in the plan, that is enough to convict him for conspiracy even though he did not participate previously and/or played only a minor part. In fact, a conspirator can be held criminally responsible for all reasonably foreseeable actions undertaken by other conspirators in furtherance of the criminal partnership. Moreover, because of this partnership, statements made by a conspirator in the course of and while he is a member of the criminal conspiracy are admissible in evidence not only against that conspirator, but also against all other members of the conspiracy. This is so because, as stated earlier, a conspirator acts as an agent or representative of the other conspirators when he is acting in furtherance of their illegal scheme. Therefore, statements of conspirators made in furtherance of the conspiracy may be deemed to be the statements of all conspirators.

15. Under United States law, the crime of conspiracy is an independent offense, separate and distinct from the commission of any specific "substantive crimes." Consequently, a conspirator can be found guilty of a crime of conspiracy to commit an offense even where the substantive crime that was the purpose of the conspiracy is not committed. The Congress of the United States has deemed it appropriate to make conspiracy, standing alone, a separate crime, even if the conspiracy is not successful, because collective criminal planning poses a greater threat to the public safety and welfare than individual conduct and increases the likelihood of success of a particular criminal venture.

16. To satisfy its burden of proof to convict COHEN on Count 1, the government, at trial, must establish beyond a reasonable doubt each of the following essential elements: (1) That two or more persons entered an agreement to commit the underlying offenses of inducing aliens to illegally enter the United States based on false visa pretenses, and to harbor and illegally employ the aliens in the United States; (2) that COHEN knowingly became a member of the conspiracy to commit the underlying offenses; and (3) that at least one co-conspirator committed at least one overt act in furtherance of the conspiracy. An overt act is any action taken to further the objective of the conspiracy, and need not itself be a criminal act.

17. The maximum penalty for a conspiracy to commit offense or to defraud the United States, specifically, to induce aliens to illegally enter and work in the United States after committing visa fraud, and to conceal, harbor, or shield from detection, and illegally employ the visa violators for commercial advantage or private financial gain contrary to United States law is 5 years in prison.

18. The United States, at trial, will establish these elements primarily through the testimony of cooperating witnesses, evidence that corroborates the testimony of the witnesses, documents including travel records, bank statements, and other physical evidence. The evidence will show that COHEN was a leader and organizer of the criminal scheme that involved recruiting foreign nationals primarily from Israel to enter the United States on tourist/visitor visas which prohibited employment in the United States, for the express purpose of illegal employment selling the conspirators' Israeli based line of cosmetic products at kiosk and store locations in U.S. shopping malls, without reporting the wages to the appropriate U.S. employment or taxing authorities for the purpose of financial gain. This will be shown at trial by the testimony of agents involved in the investigation and

cooperators T.A. and R.G.,[1] establishing how COHEN and his conspirators set up and managed the COHEN Enterprise, recruited the alien workers, facilitated the aliens' obtaining visitor/tourist visas and travelling to the United States, housed the workers in apartments and shuttled them in COHEN Enterprise vehicles to and from the work locations, and paid the illegal alien workers via stored value cards as a means to avoid reporting their wages, as well as records that corroborate the testimony of these witnesses obtained through open source searches, subpoenas, and search warrants.

Counts 2-8

19.  Counts 2-8 charge COHEN with seven specific incidents of bringing an alien into the United States for financial gain and aiding and abetting conspirators to do so, in violation of Title 8, United States Code, Section 1324(a)(2)(B)(ii) and Title 18, United States Code, Section 2.  Title 18, United States Code, Section 2 provides that a person who aids and abets the commission of a crime — in these instances the bringing of aliens into the United States for financial gain — is as guilty as the person who actually performs the criminal act.  To satisfy its burden of proof and convict COHEN on these counts, the government, at trial, must establish beyond a reasonable doubt, with respect to each count, each of the following four essential elements: (1) that COHEN brought to or attempted to bring to the United States in any manner whatsoever; (2) an alien who had not received prior official authorization to come to, enter, or reside in the United States; (3) that COHEN knew, or recklessly disregarded the fact that the alien had not received prior official authorization to come to, enter, or reside in the United States; and (4) that COHEN acted for the purpose of commercial advantage or private financial gain.

---

[1] The identity of these individuals, their guilty pleas, and their cooperation in relation to this investigation are not a matter of public record at this time.  We have used their initials in order to protect their identities.

20. The maximum penalty for bringing an alien into the United States for financial gain and aiding and abetting conspirators to do so is 15 years in prison.

21. The United States, at trial, will establish these elements primarily through the testimony of cooperating witnesses, evidence that corroborates the testimony of the witnesses, documents including travel records, bank statements, and other physical evidence.   The evidence will show that COHEN was involved in bringing into the United States each of the seven aliens identified by their initials in the indictment, Counts 2 through 8, on fraudulently obtained B-2 visitor/tourist visas for the express illegal purpose of employing the aliens as sales workers for the COHEN Enterprise for the purpose of private financial gain.   This will be shown at trial by the testimony of agents involved in the investigation and cooperators T.A. and R.G., establishing how COHEN and his conspirators set up and managed the COHEN Enterprise, recruited the alien workers, facilitated the aliens' obtaining visitor/tourist visas and travelling to the United States, housed the workers in apartments and shuttled them to and from the work locations in vehicles, and paid the illegal alien workers via stored value cards as a means to avoid reporting their wages, as well as records that corroborate the testimony of these witnesses obtained through open source searches, subpoenas, and search warrants.

Counts 9-18

22. Counts 9-18 charges COHEN with 10 specific incidents of encouraging and inducing aliens to unlawfully come to, enter, and reside in the United States for financial gain, and aiding and abetting conspirators to do so, in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(iv) and 1324(a)(1)(B)(i), and Title 18, United States Code, Section 2.   To satisfy its burden of proof and convict COHEN on these counts, the government, at trial,

10

must establish beyond a reasonable doubt, with respect to each count, each of the following four essential elements: (1) that COHEN encouraged or induced an alien; (2) to come to, enter, or reside in the United States in violation of law; (3) that COHEN knew or acted in reckless disregard of the fact that the alien's coming to, entry, or residence in the United States was or would be in violation of law; and (4) that COHEN acted for the purpose of commercial advantage or private financial gain.

23. The maximum penalty for the offense of encouraging and inducing aliens to unlawfully come to, enter, and reside in the United States for financial gain, and aiding and abetting conspirators to do so is 10 years in prison.

24. The United States, at trial, will establish that COHEN was involved in encouraging and inducing each of the 10 aliens identified by their initials in the indictment, Counts 9 through 18, to come to the United States on B-2 visitor/tourist visas for the express illegal purpose of employing the aliens as sales workers for the COHEN Enterprise in violation of their visa status for the purpose of private financial gain. This will be shown at trial by the testimony of agents involved in the investigation and cooperators T.A. and R.G., establishing how COHEN and his conspirators set up and managed the COHEN Enterprise, recruited the alien workers, facilitated the aliens' obtaining visitor/tourist visas and travelling to the United States, housed the workers in apartments and shuttled them to and from the work locations in vehicles, and paid the illegal alien workers via stored value cards as a means to avoid reporting their wages, as well as records that corroborate the testimony of these witnesses obtained through open source searches, subpoenas, and search warrants.

Counts 19-28

25. Counts 19-28 charge COHEN with 10 specific incidents of harboring illegal aliens and aiding and abetting conspirators to do so, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iii) and Title 18, United States Code, Section 2. To satisfy its burden of proof and convict COHEN on these counts, the government, at trial, must establish beyond a reasonable doubt, with respect to each count, each of the following five essential elements: (1) that the alien had come to, entered, or remained in the United States in violation of law; (2) that COHEN knew or acted in reckless disregard of the fact that the alien had come to, entered, or remained in the United States in violation of law; (3) that COHEN concealed, harbored , or shielded from detection, or attempted to conceal, harbor, or shield from detection, the aliens in any place, including any building or any means of transportation; (4) that COHEN's conduct tended to substantially facilitate the alien remaining in the United States illegally; and (5) that COHEN acted for the purpose of commercial advantage or private financial gain.

26. The maximum penalty for the offense of harboring illegal aliens and aiding and abetting conspirators to do so, is 10 years in prison.

27. The government's evidence will establish that COHEN was involved in harboring each of the 10 aliens identified by their initials in the indictment, Counts 19 through 28, by providing them with vehicle transportation and apartments to live in while they illegally worked for the COHEN Enterprise in the United States for the purpose of private financial gain. This will be shown at trial by the testimony of agents involved in the investigation and cooperators T.A. and R.G., establishing how COHEN and his conspirators set up and managed the COHEN Enterprise, recruited the alien workers, facilitated the aliens' obtaining visitor/tourist visas and travelling to the United States, housed the workers in

apartments and shuttled them to and from the work locations in vehicles, and paid the illegal alien workers via stored value cards as a means to avoid reporting their wages, as well as records that corroborate the testimony of these witnesses obtained through open source searches, subpoenas, and search warrants.

Count 29

28. Count 29 charges COHEN with money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h). To satisfy its burden of proof and convict COHEN on this count, the government, at trial, must establish beyond a reasonable doubt, each of the following three essential elements: (1) that a conspiracy, agreement, or understanding to commit money laundering was formed or entered into by two or more persons at or about the time alleged; (2) at some time during the existence or life of the conspiracy, agreement, or understanding, COHEN knew that the property involved represented the proceeds of some form of specified unlawful activity, and (3) COHEN knowingly and voluntarily joined the conspiracy, agreement, or understanding.

29. The maximum penalty for the offense of money laundering conspiracy is 20 years in custody.

30. The property involved in the transaction – in this case, sales revenues by the illegal workforce – must represent the proceeds of an already completed offense, or a completed phase of an ongoing offense. The government need not prove that all of the money involved in the transaction constituted the proceeds of the criminal activity; it is sufficient if the government proves that at least part of the money represented such proceeds.

31. That COHEN was involved in a money laundering conspiracy will be shown at trial by the testimony of agents regarding financial and other records associated with the COHEN

13

Enterprise, email communications between COHEN and his domestic and international conspirators, including email traffic relating to Payoneer accounts, JoBank recruiting, contractual agreements for recruits and related receipts, and the testimony of cooperators, T.A. and R.G.  Various COHEN Enterprise bank accounts were used to fund the payments to Payoneer, the apartment leases, the vehicle leases, airfare, and other costs associated with the illegal employment scheme, including recruiting the foreign workers.  These accounts were all funded, at least in part, by Merchant Services Accounts used to collect and process payments for sales made at the kiosks (by a predominantly illegal workforce). As a result, all of these bank accounts – both the COHEN Enterprise bank accounts and the Merchant services Accounts – facilitated the illegal scheme to recruit/bring to/encourage/induce, harbor and employ unauthorized workers, in violation of Title 8, United States Code, Section 1324, by providing the source of funds for the workers' recruitment, travel to the United States, salaries, living expenses, and transportation while in the United States, which in turn promoted the carrying on of the specified unlawful activity.

Statute of Limitations

32.  The indictment is dated May 12, 2016.  The statute of limitations applicable to the offenses charged in counts 1 and 29 is Title 18, United States Code, Section 3282, which allows prosecution to commence within five (5) years after the offense is committed.  Counts 1 and 29 charge offenses that began in 2011 and continued until December 2013.  The statute of limitations applicable to the offenses charged in counts 2 through 28 is Title 18, United States Code, Section 3298, which allows prosecution to commence within ten (10) years

14

after the offense is committed. Counts 2 through 28 occurred between 2012 and 2013. The indictment was filed on May 12, 2016. Once an indictment has been filed in a federal district court, as with the charges against COHEN, the statute of limitations is tolled and no longer runs. Therefore, all of the charges were filed within the prescribed time. A copy of the statutes of limitation are included within **Exhibit C**.

33.   COHEN has not been tried or convicted for the offense charged in the indictment, nor has he been ordered to serve any sentence in connection with this case.


Efforts to Arrest Fugitive

34.   From the time COHEN left the United States in December 2013, he has not returned to the United States, and his exact location was not known, but he was believed at various times to be located in the United Kingdom, Israel, or elsewhere in Europe. On December 8, 2016, law enforcement officials verified COHEN was living and working in the Haifa, Israel-area, with a listed residence of 4 Habrosh St., Kiryat Motzkin, Apartment 37, and a business address of 63 Ben Gurion Ave., Kiryat Bialik. The exact location of COHEN in Israel is known by DOL OIG Special Agent Matthew Grimm based on review of information from open source and law enforcement databases.


**SUMMARY OF THE FACTS**

U.S. Immigration and Employment Regulations Background

35.   Under U.S. laws and regulations, a visa is generally required for any non-U.S. citizen or national (alien) residing in a foreign country to enter the United States.  An alien may apply for and be granted a U.S. visa if he or she qualifies under the U.S. Immigration and

15

associates under false visa pretenses, posing as tourists visiting on a short-term basis, for the express purpose of illegal employment in shopping mall kiosks controlled by COHEN.

39. The investigation further showed that COHEN and his associates, all Israeli nationals who were once illegal kiosk workers and who now have permanent resident status in the United States, have formed various companies which sell beauty products out of these mall kiosks, and those new companies perpetuate the same criminal immigration and employment scheme the former workers/now owners were previously involved in as entry-level sales workers. These companies also engage in activities that constitute money laundering violations relating to the methods by which they transmit payments to overseas staffing companies for the recruitment of unauthorized alien workers, and based on the mechanisms by which they route money through various shell company bank accounts to fund stored value cards that are used as a means to hide payments being made to their illegal workforce, avoiding U.S. tax obligations in the process.

40. Between approximately February 2011 and December 2013, COHEN, a former resident of Fairfax, Virginia, managed the operation of a number of local cosmetics retail kiosks and stores under various companies that he owned referred to as the COHEN Enterprise. The kiosks and stores were staffed almost entirely by Israeli nationals that COHEN and his associates illegally brought to the United States and harbored using primarily a B-2 "tourist" visa scheme. Evidence of COHEN's role as a leader/organizer of the criminal scheme, and the roles of various associates that he partnered with in the scheme, was developed through physical surveillance, open source internet and Facebook searches, the subpoena and analysis of business, corporate and financial records, email search warrants, and the fruits of a multi-district law enforcement premises search warrant and

administrative arrest operation in December 2013. That operation produced more documentary and electronic evidence against COHEN and his associates, the administrative arrest of 12 aliens who were engaged in unauthorized employment for COHEN, and the development of two conspirator cooperators – T.A. and R.G. T.A, R.G., and a number of the unauthorized workers living in the apartments searched on the day of the operation provided statements to the agents executing the search warrants, admitting the existence of the criminal scheme and providing information about their roles as well as the roles of others involved in the scheme, including COHEN.

41. T.A. and R.G. pleaded guilty via pre-indictment plea agreements in October 2014, to federal violations associated with unlawfully employing at least 10 aliens during a 12-month period, and testified to facts supporting the government's charges against COHEN in the grand jury in November 2014. Both continue to cooperate with the U.S. government in this prosecution. To date, the cooperators have identified over 60 people employed by the COHEN Enterprise for several years leading up to and including December 2013, only a small fraction of which were authorized to work in the United States legally.

42. The way the illegal employment scheme worked was that the COHEN Enterprise sent money to a job search company in Israel to locate aliens willing to come to the United States and work in its kiosks and stores. The COHEN Enterprise assisted the aliens in obtaining their "tourist" visas based on false representations in their visa applications as to the purpose of their trip to the United States, in violation of U.S. law. Once in the United States, the unauthorized alien workers were shuttled to and from work at the retail outlets in vehicles leased or owned by the COHEN Enterprise, and lived in apartments leased by the COHEN Enterprise.

43.   The unauthorized alien workers were paid by the COHEN Enterprise initially in cash, then

later using prepaid stored value cards funded through accounts in the names of corporations

slightly different than the legal names of the companies that make up the COHEN

Enterprise, as a means of creating distance between the COHEN Enterprise and the

payments to the illegal workforce.  The profit of the COHEN Enterprise was greater than it

would have been had it hired authorized employees.  For instance, the COHEN Enterprise

avoided complying with minimum wage laws and paying employment taxes and other

costs for its illegal workforce.  Bank records show that the COHEN Enterprise generated

revenues from approximately November 2011 through December 2013 totaling at least US

$3.96 million.

44.   In addition to revenues traceable to retail sales made by the COHEN Enterprise's illegal

workforce,  records also illustrated expenditure streams related to the payment of mall

kiosk and apartment leases, vehicle leases, various utilities, and vehicle insurance; for retail

point of sale hardware/software, personal finance, and telecommunications services; for

international airline tickets for the recruited unauthorized alien workers and overseas

recruitment services; and for the payment to the illegal workforce via stored value cards.

45.   Through subpoenas served on Bank of America for COHEN Enterprise bank account

records, agents identified numerous payments made from the accounts to an overseas

employment staffing/recruiting firm, Job Overseas/JoBank.com (Jobank).  Email search

warrants were later obtained that showed associated email traffic between COHEN and his

U.S. based conspirators and various contacts at JoBank who assisted with the illegal worker

recruitment efforts.  The JoBank website identified several of its staff recruiters, whose

names correspond to email addresses identified in the search warrant material, and each of

whom cooperator T.A. has admitted corresponding with via email and/or meeting in person about the recruitment of unauthorized workers for the COHEN Enterprise. T.A. has related to agents that JoBank staffers knew that aliens were being recruited to work illegally in the United States and that many of the staff at JoBank had, themselves, worked illegally in the United States.

46. The cooperators further explained the role of JoBank within the scheme and preparations that were made to receive JoBank recruited workers destined for the United States. The local conspirators would plan to recruit four workers to staff each COHEN Enterprise retail outlet. If there were not enough living accommodations on hand for the incoming workers, additional apartments would be leased and furnished by the COHEN Enterprise. When incoming workers were scheduled to fly to the United States, the COHEN Enterprise would often make ruse hotel reservations for the incoming alien at a local hotel so that the alien could show immigration officials at the airport an emailed reservation confirmation as proof that they were only visiting, as opposed to living and working in the United States. The hotel reservations would then be cancelled before any charges were actually incurred for the unused rooms. Instead, when a new unauthorized alien worker arrived at a local airport, COHEN or another conspirator designated to work logistics would pick up the worker and take them to a COHEN Enterprise leased apartment where they had been assigned to live.

47. From the evidence gathered, agents also identified a pattern of transactions which showed how the COHEN Enterprise paid its employees. Regular payments to Automatic Data Processing, Inc. (ADP) Payroll Services were noted in the bank records. ADP subsequently produced records that showed wages paid, including payroll tax withholding

21

amounts, corresponding to the small portion of COHEN's workforce that was authorized to work in the United States. Regular payments to a company called Payoneer were also noted in the bank records. Cooperators T.A. and R.G. described to agents how the COHEN Enterprise came to rely on Payoneer to compensate its illegal workforce. Another kiosk owner employing an illegal workforce explained to T.A. and COHEN that he established a shell company and bank account to pool money from his kiosk operating accounts, which he then used to pass money through to Payoneer to fund stored value card accounts held by his unauthorized alien workers. This other kiosk owner structured his Payoneer account in that manner because Payoneer did business through a bank overseas, thereby making it difficult, if not impossible, for U.S. law enforcement to seize the money in the event of an enforcement operation directed against his businesses. According to T.A., the COHEN Enterprise in turn established its Payoneer structure in a similar fashion.

48. Additional facts and attachments are presented in more detail in the affidavit of Department of Labor Office of Inspector General Special Agent Matthew M. Grimm, which is attached to this affidavit as **Exhibit D.**


## IDENTIFICATION AND LOCATION INFORMATION

49. SHAI COHEN is a citizen of Israel, born on March 27, 1984 in Israel. He is described as a white male, standing approximately six feet and weighing approximately 170 pounds with black hair and brown eyes. He holds an Israeli passport number 21336234. He has an Israeli identity number of 039551825. COHEN has been located in Haifa, Israel, with a residence of 4 Habrosh St., Kiryat Motzkin, Apartment 37, and a business address of 63 Ben Gurion Ave., Kiryat Bialik.

50. A photograph of COHEN is attached to Special Agent Grimm's affidavit as Attachment 6 and made part of this extradition request. This photograph has been identified as COHEN by case agents, including the agent affiant, S.A. Grimm, who personally surveilled COHEN at locations including his businesses and apartment complexes where he lived and housed aliens, and by cooperating witnesses in the case including T.A. and R.G.

## CONCLUSION

51. I have attached to this affidavit the following documents:

**Exhibit A:**     Copy of indictment

**Exhibit B:**     Copy of arrest warrant

**Exhibit C:**     Relevant legal provisions

**Exhibit D:**     Affidavit of DOL OIG Special Agent Matthew M. Grimm

   **Attachment 1:** Articles of incorporation for Tomik Tom in Florida and later corporate registration in Virginia

   **Attachment 2:** Photograph examples of COHEN Enterprise kiosks, including with SHAI COHEN present and/or identified illegal workers

   **Attachment 3:** Corporate registration for STR Cosmetics

   **Attachment 4:** Fake hotel reservation emails

   **Attachment 5:** September 2, 2013, email from COHEN

   **Attachment 6:** Photograph of SHAI COHEN

52. This affidavit, including its exhibits, contain sufficient evidence to support the request of the United States of America that COHEN be extradited from Israel to the United States of

America, Eastern District of Virginia, for prosecution for the offenses described above and that he be detained pending the determination of his extradition including any appeal.

53. This affidavit and the affidavit of DOL OIG Special Agent Matthew M. Grimm were each sworn to before a United States Magistrate Judge for the Eastern District of Virginia, who is a person authorized to administer an oath for this purpose.

J. MICHAEL SHECKELS, Senior Trial Attorney
U.S. Department of Justice, Criminal Division
Human Rights & Special Prosecutions Section

Sworn and subscribed to before me
this 29th day of Sept. 2017.

JOHN F. ANDERSON
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF VIRGINIA

24

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division



| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **FILED UNDER SEAL** |
| | ) | |
| v. | ) | CRIMINAL NO. 1:16-CR-114 |
| | ) | |
| SHAI COHEN, | ) | 18 U.S.C. § 371 |
| | ) | Conspiracy to Defraud and to Commit |
| Defendant. | ) | Offenses Against the United States |
| | ) | (Count 1) |
| | ) | |
| | ) | 8 U.S.C § 1324(a)(2)(B)(ii), 18 U.S.C. § 2 |
| | ) | Bringing Aliens to the United States for |
| | ) | Financial Gain |
| | ) | (Counts 2 – 8) |
| | ) | |
| | ) | 8 U.S.C § 1324(a)(1)(A)(iv), (a)(1)(B)(i), |
| | ) | 18 U.S.C. §2 |
| | ) | Encouraging and Inducing Aliens to |
| | ) | Unlawfully Come to, Enter and Reside in |
| | ) | the United States for Financial Gain |
| | ) | (Counts 9 – 18) |
| | ) | |
| | ) | 8 U.S.C. § 1324(a)(1)(A)(iii), 18 U.S.C.§ 2 |
| | ) | Harboring Illegal Aliens |
| | ) | (Counts 19 – 28) |
| | ) | |
| | ) | 18 U.S.C. § 1956(h) |
| | ) | Money Laundering Conspiracy |
| | ) | (Count 29) |
| | ) | |
| | ) | 8 U.S.C. § 1324(b), 18 U.S.C. |
| | ) | §§ 981(a)(1)(C), 982(a)(1), |
| | ) | 982(a)(6)(A), 28 U.S.C. § 2461 |
| | ) | Asset Forfeiture |

## INDICTMENT

May 2016 Term – At Alexandria, Virginia

1

## GENERAL ALLEGATIONS

At all times relevant to the Indictment:

A.    The Defendant and Associated Business Entities

1.    SHAI COHEN ("COHEN"), the defendant, a native of the State of Israel, had status as a Lawful Permanent Resident of the United States. He first entered the United States via an H-2B visa. At various times from in and around 2011 through in and around December 2013, he served as the President, Vice President, Registrant, Officer, Principal and/or Owner, and otherwise controlled, owned, registered, managed and/or operated, with the assistance of others both known and unknown to the Grand Jury, various related United States business entities/companies, including: STR Cosmetics Inc., STR Gratiae Cosmetics Inc., STR Consultation, Tomik Tom Inc., Tomikom Inc., Tora Ankave Inc., SCO Investments LLC, Gena Investments LLC, SYR Cosmetics Inc., SSC Elite LLC, RSE International Inc., and Tomik Tom Dba Premier Skin Care.

2.    These business entities marketed and sold retail beauty and skin care products, with an emphasis on products allegedly from the Dead Sea region of Israel. The business entities sold these products from retail space leased by COHEN and his associates, including kiosks, carts and a retail store, at various mall-type locations in Virginia and Maryland. The retail outlets used by the business entities to sell the products operated under various names, including Mica Beauty, Mica Bella, Gratiae, Oro Gold, DFI Aging and Premier. Collectively, these business entities and associated retail outlet operations are hereinafter referred to as "the Enterprise."

3.    Beginning in 2011, COHEN and/or his associates filed Articles of Incorporation with the Florida State Division of Corporations, the Commonwealth of Virginia State Corporation Commission (SCC), the Nevada Secretary of State, and elsewhere. Some of the companies were then established with the Internal Revenue Service (IRS) to obtain EINs (Employee Identification

Numbers).  The table below depicts the ownership structure of the companies that are known to comprise the Enterprise, with listed addresses leased by the Enterprise:

| Business Entity/FEIN | Chartered | Officer(s) | Address on Corporate Documentation |
|---|---|---|---|
| STR COSMETICS INC. 45-2829547 | VA/2011 | SHAI COHEN, T.A. | 11704 Fairfax Woods Way #20208 Fairfax, VA 4231 Monument Wall Way #242 Fairfax, VA |
| STR GRATIAE COSMETICS INC. 45-4953899 | VA/2012 FL/2012 | T.A. | 11704 Fairfax Woods Way #20208 Fairfax, VA 11704 Fairfax Woods Way #20306 Fairfax, VA |
| STR CONSULTATION INC. NONE | NV/2012 | T.A. | Nevada Address |
| TOMIK TOM INC. 45-1510921 | FL/2011 VA/2012 | SHAI COHEN, G.F. | 11704 Fairfax Woods Way #20208 Fairfax, VA |
| TOMIKOM INC. NONE | FL/2012 | SHAI COHEN, G.F. | 11704 Fairfax Woods Way #20208 Fairfax, VA |
| TORA ANKAVE INC. 45-4448752 | FL/2012 | T.A., A.K. | 11704 Fairfax Woods Way #20306 Fairfax, VA |
| SCO INVESTMENTS LLC 45-2889609 | FL/2011 | SHAI COHEN | Florida Address |
| GENA INVESTMENTS LLC 45-4438922 | FL/2012 | G.F. | 11704 Fairfax Woods Way #20208 Fairfax, VA 11730 Fairfax Woods Way #1108 Fairfax, VA |
| SYR COSMETICS INC. NONE | FL/2012 | SHAI COHEN | 11704 Fairfax Woods Way #20208 Fairfax, VA |
| PREMIER SKIN CARE FICTITIOUS NAME FILING | VA/2012 | TOMIK TOM INC. FAIRFAX CO. | 11704 Fairfax Woods Way #20208 Fairfax, VA FILED USING VA SCC ID# for TOMIK TOM |
| SSC ELITE LLC 45-3250908 | VA/2013 | S.A. | 4231 Monument Wall Way #242 Fairfax, VA |

**B.**     The Visa Program and Nonimmigrant Employment in the United States

4.     A citizen of a foreign country who wishes to enter the United States must first obtain a visa, either a nonimmigrant visa for temporary stay, or an immigrant visa for permanent residence. Under United States laws and regulations, non-citizens of the United States ("aliens") are not permitted to work in the United States unless they obtain employment authorization from the United States Government.

5.     Aliens living outside of the United States can apply for a nonimmigrant employment-based visa, referred to as an H-2B visa.  The H-2B visa permits aliens to work in the United States for a specified, temporary period of time for a specific employer.  An employer seeking to employ temporary alien employees via the H-2B visa must apply via an application process involving at least three steps and at least three government entities:  the United States

Department of Labor (DOL), the United States Department of Homeland Security (DHS), and the United States Department of State (DOS). The H-2B visa program is subject to stringent requirements and only a limited number of such visas are issued each year.

6.      Visitor visas, known as B-1 and/or B-2 visas, are nonimmigrant visas for persons who want to enter the United States temporarily, for business activities - excluding United States employment - tourism, pleasure, or medical treatment. The B-1/B-2 visas are issued by the DOS. A nonimmigrant visa is intended for an alien to enter the United States for a temporary stay. There are some activities which are prohibited for B-1/B-2 visa recipients. As indicated, one of these prohibited activities is employment. A B-1/B-2 visa holder is not permitted to work or be paid while in the United States.

7.      As part of the B-1/B-2 nonimmigrant visa application process, applicants complete the Form DS-160, Online Nonimmigrant Visa Application with the DOS. Form DS-160 is submitted electronically to the DOS website via the internet. Consular Officers use the information entered on the DS-160 to process the visa application and, combined with a personal interview, determine an applicant's eligibility for a nonimmigrant visa. Applicants certify with their electronic signature that the applicant has read and understood the questions in the application and that the answers are true and correct. They also certify that all declarations made on the application are unsworn declarations made under the penalty of perjury. In general, if a nonimmigrant alien applying to enter the United States under a B-1/B-2 or other non-employment visa classification declared their intention to work in the United States on the DS-160, doing so would render the alien inadmissible and would consequently result in a denial of entry into the United States.

8.      United States Citizenship and Immigration Services (USCIS), a component of the DHS, is the government agency that oversees lawful immigration to the United States. USCIS

adjudicates the petitions and applications of potential immigrants and is therefore responsible for administrating and regulating the various visa programs, petitions and applications available to aliens desiring to come to or currently in the United States, including the H-2B temporary non-agricultural worker visa, the B-1/B-2 temporary visitor visa, and the Form I-539 Application to Extend/Change Nonimmigrant Status.

9.      Once DOS approves the B-1/B-2 visa, aliens enter the United States via a port of entry to the United States and are subject to inspection by U.S. Customs and Border Protection (CBP), part of the DHS.  Aliens seeking to lawfully enter into the United States must establish their admissibility to the satisfaction of the CBP officer.  This is done as part of the inspection process.  As part of this process, aliens travelling on a nonimmigrant visa complete a Form I-94 Arrival/Departure Record.

10.     A B-1/B-2 visa is valid only for a certain period of time for a stay in the United States, determined by CBP at entry, but not to exceed six months.  In order to extend the authorized stay on a B-1/B-2 visa, a Form I-539 Application to Extend/Change Nonimmigrant Status must be filed with and approved by USCIS.  Applicants certify under the penalty of perjury with their signature that the applicant has read and understood the questions in the application and that the answers and supporting evidence submitted are true and correct.  Some of the material questions in the Form I-539 include:  address where the applicant will stay, source of economic support during stay, whether the applicant has done anything to violate the terms of their current visa status and whether the applicant has been employed in the United States.

11.     A B-1/B-2 visa holder that enters the United States as part of an arrangement to illegally work in the United States, or engages in such work while within the United States, has violated the terms of his or her B-1/B-2 visa and is not eligible to enter and/or remain in the United States.

12.     The Visa Waiver Program (VWP) provides for visa-free travel by nationals of designated countries coming to the United States for tourism or business (B visa purposes) for a period not to exceed 90 days, provided the national is from a designated country.  Admission to the United States under the VWP prohibits the holder to work for a United States employer.

13.     A VWP holder that enters the United States as part of an arrangement to illegally work in the United States, or engages in such work while within the United States, has violated the terms of the VWP and is not eligible to enter and/or remain in the United States.

14.     An F-1 visa permits the visa holder to engage in academic study in the United States if certain requirements are met and only permits employment under limited circumstances in relation to the student's course of academic study.

15.     An F-1 visa holder that enters the United States as part of an arrangement to illegally work in the United States, or engages in such work while within the United States, under circumstances that are not authorized by the F-1 program, has violated the terms of the F-1 visa and is not eligible to enter and/or remain in the United States.

C.     The Enterprise's Scheme to Obtain Illegal Foreign Workers and Employ them in the United States

16.     From in and around 2011 through in and around December 2013, the Enterprise recruited, hired, and employed foreign nationals from primarily Israel to work as employees in its kiosks and stores in malls in the United States.  The Enterprise secured the services of many of its illegal workers using the assistance of Israel-based recruiting services on retainer for a monthly service charge.  First, various communications occurred between Enterprise personnel (to include COHEN, his kiosk/store managers, office assistants, and other employees) and contacts at the recruiting service and prospective recruits.  Then, after an agreement was reached for an alien's U.S. employment, including travel, housing and other subjects of negotiation, the Enterprise paid a fee to the recruiting service for a successful placement.  The fee ranged in price depending on the

6

U.S. immigration status of the recruit, with the least expensive recruits being those persons who held or would obtain B-1/B-2 visitor visas. If prospective employees did not already have a visa, the recruiting service would assist individuals in obtaining one for travel to the United States, even though such visas would not allow for employment. Since 2011, many such persons entered the United States via B-1/B-2 visitor visas to work for the Enterprise.

17. From in and around 2011 through in and around December 2013, the Enterprise also hired and employed illegal workers who had previously come to the United States on B-1/B-2 or other non-employment visas, and had illegally worked for similar Dead Sea product retail operations prior to their employment with the Enterprise.

18. A small number of Enterprise personnel, including COHEN and his associates who served as managers of retail locations, had immigration status in the United States that allowed for their employment. Only for this category of personnel did the Enterprise engage in some reporting of wages and employees to the Internal Revenue Service and state employment agencies, as well as applying for and reporting such employees to the Department of Labor (DOL), Department of State (DOS) and the Department of Homeland Security (DHS). When and if wages were reported for the small percentage of Enterprise employees that had legal status to work in the United States, the reports were, at times, inaccurate.

19. The Enterprise used B-1/B-2 and other non-employment visa holders as its primary foreign workforce in the United States, rather than attempt to obtain workers through the legal means provided by the H-2B visa process. As such, the Enterprise did not disclose its B-1/B-2 or other non-employment visa holding foreign workforce to any government agency. The Enterprise did not withhold employment or income taxes from the compensation it provided to its B-1/B-2 or other non-employment visa holding employees, and did not report those employees to the IRS or state employment agencies.

7

20.     Following the recruitment of foreign nationals in Israel to work in the United States, Enterprise personnel entered into employment contracts with such individuals, whereby the Enterprise would agree to pay for some or all of the transportation costs to bring them to and within the United States. This included assistance with international travel arrangements and providing for housing and transportation to and from work in the United States, and also providing pickup from the airport upon arrival in the United States. The Enterprise also agreed to pay employees on a commission basis for sales conducted in the United States. However, employees were required to reimburse the Enterprise for transportation, housing and other related expenses via deductions from the employees' pay, significantly reducing what they were paid for their work.

21.     Prior to an employee's arrival in the United States, Enterprise and recruiting service personnel in Israel exchanged via e-mail certain documents and information related to the pending arrival, including, at times, a biographical summary, travel itinerary, and the aforementioned employment contract. Such emails were sent to and circulated amongst various Enterprise personnel, including COHEN, his assistants, and retail location managers. In certain situations, employees were provided with addresses to use on their Form I-94 Arrival/Departure records and briefed on how to act and what to say and do during the CBP inspection process. In some instances, employees were also provided with copies of hotel reservations that were subsequently cancelled before any charges were incurred, for use on their immigration forms and to show immigration authorities in order to make their status as visiting tourists appear more credible.

22.     In violation of their B-1/B-2 visitor or other visa status, Enterprise employees traveled to the United States and worked at the various kiosks in malls in Virginia and Maryland. Enterprise workers engaged in illegal employment were primarily compensated for their work via under the table cash payments or the transfer of money to stored value payment cards, rather than a legitimate payroll system.

D.   The Enterprise's Financial Structure and Transactions in Furtherance of the Criminal Scheme

23.    From in and around November 2011 through in and around December 2013, the Enterprise maintained various merchant service accounts used for the collection and deposit of payments for products sold at Enterprise retail locations.   During the same time period, the Enterprise also maintained various bank accounts with Bank of America.   Funds from the Enterprise-controlled merchant service accounts were moved into these Bank of America accounts.  Specific Enterprise Bank of America accounts were then used for making payments to COHEN and other managers and employees (including via transferring funds onto stored value payment cards); rental payments for office space, apartments, mall kiosks and store locations; airline tickets, vehicles and local transportation costs; recruiting costs, utility payments for apartment locations, point of sale software used at the retail locations and other business costs.

24.    The table below depicts the ownership structure of bank accounts which were held in the name of and used by the Enterprise, with listed addresses leased by the Enterprise:

| Bank of America Account/Owner | Account # | Address on Account |
|---|---|---|
| STR COSMETICS INC.<br>*Shai COHEN, T.A.* | \*\*\*\*\*\*\*\* 6781 | 11704 Fairfax Woods Way #20208<br>Fairfax, VA 22030 |
| STR COSMETICS C/O TOMIK TOM INC. | (as of 10/1/12) | 11350 Random Hills Rd. Suite 800,<br>Fairfax, VA 22030 |
| STR COSMETICS<br>*Shai COHEN, T.A.* | \*\*\*\*\*\*\*\* 7862 | 11704 Fairfax Woods Way #20208<br>Fairfax, VA 22030 |
| STR GRATIAE COSMETICS<br>*Shai COHEN, T.A.* | \*\*\*\*\*\*\*\* 7023 | 11704 Fairfax Woods Way #20306<br>Fairfax, VA 22030 |
| STR CONSULTATION INC. C/O TOMIK TOM<br>*Shai COHEN, T.A.* | \*\*\*\*\*\*\*\* 6969 | 11350 Random Hills Rd. Suite 800<br>Fairfax, VA 22030 |
| TOMIK TOM INC. | \*\*\*\*\*\*\*\* 7749 | 11704 Fairfax Woods Way #20208<br>Fairfax, VA 22030 |
| TOMIK TOM INC. | (as of 10/1/12) | 11350 Random Hills Rd. Suite 800,<br>Fairfax, VA 22030 |
| TOMIK TOM INC.<br>*Shai COHEN, G.F.* | \*\*\*\*\*\*\*\* 9695 | 11704 Fairfax Woods Way #20208<br>Fairfax, VA 22030 |
| TORA ANKAVE<br>*Shai COHEN, T.A.* | \*\*\*\*\*\*\*\* 7532 | 4231 Monument Wall Way #135<br>Fairfax, VA 22030 |
| TOMIK TOM INC.<br>*(G.F. individual account)* | \*\*\*\*\*\*\*\* 7914 | 11704 Fairfax Woods Way #20208<br>Fairfax, VA 22030 |
| TOMIK TOM INC.<br>*Shai COHEN, G.F.* | \*\*\*\*\*\*\*\* 7600 | 11704 Fairfax Woods Way #20208<br>Fairfax, VA 22030 |
| TOMIK TOM INC. | \*\*\*\*\*\*\*\* 9750 | 11350 Random Hills Rd. Suite 800 |

| | | |
|---|---|---|
| *(Shai COHEN individual account)* | | Fairfax, VA 22030 |
| TOMIK TOM INC. | ******** 6943 | 11350 Random Hills Rd. Suite 800 Fairfax, VA 22030 |
| TOMIKOM INC. *Shai COHEN, G.F.* | ******** 6888 | 11704 Fairfax Woods Way #20208 Fairfax, VA 22030 |
| SCO INVESTMENTS LLC | ******** 7930 | 11704 Fairfax Woods Way #20208 Fairfax, VA 22030 |
| Shai COHEN | ******** 1052 | 11704 Fairfax Woods Way #20208 Fairfax, VA 22030 |
| G.F. | ******** 7546 | 4162 Monument Hill Way #13202 Fairfax, VA 22030 |

26.   From in and around November 2011 through in and around December 2013, Enterprise accounts with Bank of America took in approximately $3.96 million through merchant services accounts and credit card processing accounts for sales occurring at Enterprise kiosks and stores.

27.   From in and around 2011 through in and around 2013, COHEN leased business office space located at 11350 Random Hills Rd. Suite 800 in Fairfax, Virginia where he oversaw the activities of the Enterprise, along with several of his assistants and subordinate employees. The office was leased in the name of STR Consultation.

28.   From in and around 2012 through in and around December 2013, apartments were leased by Enterprise personnel, including COHEN, to house employees. The apartments were leased in the names of business entities and/or individuals associated with the Enterprise. Along with the employees, COHEN and other Enterprise personnel resided in the leased apartment complexes. Approximately $309,654.00 was paid from the Enterprise Bank of America accounts on rent and utilities for employee housing at these apartments. The apartment lease structure was as follows:

| APARTMENT ADDRESS | RESIDENT/LESSEE | START | END |
|---|---|---|---|
| 11602 Fairfax Meadows Circle #16108, Fairfax, VA 22030 | TOMIK TOM INC. | 10/8/2013 | 10/5/2014 |
| 11600 Fairfax Meadows Circle #16003, Fairfax, VA 22030 | TOMIK TOM INC. | 10/23/2012 | 1/22/2014 |
| 11600 Fairfax Meadows Circle, Detached Garage #11606-6 | TOMIK TOM INC. | 10/23/2012 | 1/22/2014 |
| 11704 Fairfax Woods Way #20306, Fairfax, VA 22030 | COHEN | 7/26/2012 | 7/25/2014 |
| 11704 Fairfax Woods Way, Detached Garage #11618-1 | COHEN | 7/26/2012 | 7/25/2014 |
| 11717 Fairfax Woods Way #14012, Fairfax VA 22030 | TOMIK TOM/COHEN | 10/27/2013 | 10/26/2014 |
| 11730 Fairfax Woods Way #1308, Fairfax, VA 22030 | TOMIK TOM/COHEN | 8/28/2012 | 8/28/2014 |
| 11730 Fairfax Woods Way #1108, Fairfax, VA 22030 | TOMIK TOM./COHEN | 5/20/2013 | 5/19/2014 |
| 4231 Monument Wall Way #421 Fairfax, VA 22030 | COHEN, Y.H. | 9/16/2013 | 3/30/2014 |
| 4231 Monument Wall Way, Closet Storage Unit #C403 | COHEN, Y.H. | 9/16/2013 | 3/30/2014 |
| 4231 Monument Wall Way #242 Fairfax, VA 22030 | COHEN, S.A. | 8/14/2012 | 5/25/2014 |
| 4231 Monument Wall Way #135 Fairfax, VA 22030 | T.A. | 10/31/2012 | 6/29/2014 |
| 11714 Fairfax Woods Way #22103, Fairfax, VA 22030 | TOMIK TOM, INC. | 7/18/2012 | 7/17/2013 |
| 11704 Fairfax Woods Way #20208, Fairfax, VA 22030 | G.F. | 6/1/2012 | 5/31/2013 |
| 11702 Fairfax Woods Way #20203, Fairfax, VA 22030 | COHEN | 7/6/2012 | 7/25/2014 |
| 11614 Fairfax Meadows Circle #18311, Fairfax, VA 22030 | TOMIK TOM INC. | 10/28/2012 | 10/27/2013 |
| 11606 Fairfax Meadows Circle #17307, Fairfax, VA 22030 | TOMIK TOM INC. | 3/1/2013 | 2/28/2014 |
| 11600 Fairfax Meadows Circle #16101, Fairfax, VA 22030 | TOMIK TOM INC. | 10/20/2012 | 10/19/2013 |
| 11600 Fairfax Meadows Circle #16203, Fairfax, VA 22030 | TOMIK TOM INC. | 10/28/2012 | 10/27/2013 |

29.     From in and around 2011 through in and around December 2013, COHEN and/or Enterprise personnel operating on his behalf, leased mall kiosk and store locations in Virginia and Maryland.  COHEN and/or his associates served as owner or contact person on the leases and maintained contact with all of the malls.  COHEN and other Enterprise personnel communicated with the mall management regularly via email regarding lease agreements, day to day operations, sales reports, and complaints.  The Enterprise's Bank of America accounts were used to pay rent for the retail locations at malls.

30.     From in and around 2012 through in and around December 2013, COHEN and/or his associates owned or leased a fleet of vehicles in Virginia used to transport themselves and illegal workers.  These vehicles were registered by Enterprise personnel using the residential addresses at the apartment complexes leased by the Enterprise.  Enterprise bank and/or credit card accounts paid for the vehicles and for the vehicle registrations, maintenance, and fuel costs.

11

31.     From in and around 2012 through in and around December 2013, the Enterprise utilized a recruiting service known as JOBANK (a/k/a Job Overseas or Giovenco), based in Tel Aviv, Israel to secure B-1/B-2 and other non-employment visa workers.   COHEN and other Enterprise personnel operating on his behalf communicated via email regularly with this recruiting service regarding all aspects of recruiting, hiring, and making arrangements for illegal workers to come to and reside in the United States.

32.     From in and around 2012 through in and around December 2013, international transfers were made from Enterprise bank accounts in the United States to the JOBANK bank account in Israel.   In total, approximately $30,427.11 in international transfers were sent from Enterprise Bank of America accounts ending in 9695, 7862 and 7600 in the name of Tomik Tom Inc. and STR Cosmetics Inc. to the JOBANK account.   These transfers by the Enterprise were to pay the fees for JOBANK's recruiting services, including its retainer fees and payments for the successful placement of illegal workers.

33.     From in and around 2012 through in and around December 2013, JOBANK and the Enterprise utilized Israel-based foreign travel agencies, including ISSTA.   JOBANK personnel, COHEN and his Enterprise associates communicated via email regularly with these travel agencies regarding airline reservations for employees.   The travel agencies assisted with making international airline reservations for some of the employees' travel to and from the United States.

34.     From in and around 2012 through in and around December 2013, numerous international transfers were made from Enterprise bank accounts in the United States to the bank accounts of foreign travel agencies in Israel.   In total, at least approximately $15,151.00 in international transfers was sent from Enterprise Bank of America accounts to the foreign travel agency accounts.   These transfers by the Enterprise were to pay the fees for booked airline tickets.

During the period of the conspiracy, total Enterprise bank account expenditures for airfare were approximately $56,788.00.

35.     From in and around 2012 through in and around December 2013, numerous transfers were sent from Enterprise Bank of America bank accounts filled with proceeds generated by its retail operations, specifically the STR Consultation Inc. c/o TOMIK TOM *6969 and Tomikom Inc. *6888 accounts, to Payoneer Payment Solutions ("Payoneer") to fund stored value payment cards used to pay the Enterprise's illegal workforce.  In total, approximately $275,367.00 in transfers was sent from the specified Enterprise accounts to Payoneer.  At least twenty-nine (29) known B-1/B-2 or other non-employment visa employees were paid by the Enterprise via the stored value cards.

## COUNT ONE

### (Conspiracy to Defraud and to Commit Offenses Against the United States)

THE GRAND JURY CHARGES THAT:

1.      The factual allegations contained in the General Allegations section are incorporated herein by reference as if set out in full.

2.      Beginning in and around 2011, and continuing through in and around December 2013, the exact dates being unknown to the Grand Jury, in the Eastern District of Virginia and elsewhere, SHAI COHEN, the defendant (COHEN), and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, and agree with each other and others known and unknown to the Grand Jury, to:

a. defraud the United States of America concerning one or more of its lawful government functions and rights hereafter described, that is:

i. To defraud the United States by impeding, impairing, and obstructing the lawful governmental functions of the DOL to administer, regulate and enforce the regulations and laws relating to the implementation of the H-2B nonimmigrant visa program;

ii. To defraud the United States by impeding, impairing, and obstructing the lawful governmental functions of DHS to administer, regulate and enforce the regulations and laws related to the hiring, employment and presence of aliens in nonimmigrant status and immigrant status in the United States;

iii. To defraud the United States by impeding, impairing, and obstructing the lawful governmental functions of DOS to administer, regulate and enforce the regulations and laws related to the application, processing, and approval of visas in the United States;

iv. To defraud the United States by impeding, impairing, and obstructing the lawful governmental functions of DHS to regulate and enforce violations, regulations and laws

14

relating to transporting, harboring, unlawfully employing, and encouraging and inducing illegal aliens;

b. commit one or more of the following offenses, that is:

i. To encourage and induce aliens to come to, enter and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence in the United States is and will be in violation of Title 8, United States Code, Section 1324(a)(l)(A)(iv);

ii. To conceal, harbor and shield from detection aliens illegally present in the United States in buildings and other places, including any means of transportation for purpose of commercial advantage and private financial gain, in violation of Title 8, United States Code, Section 1324(a)(l)(A)(iii); and

iii. To transport and move illegal aliens within the United States by means of transportation and otherwise in furtherance of such violation of law for the purpose of commercial advantage and private financial gain, in violation of Title 8, United States Code, Section 1324(a)(l)(A)(ii).

<div align="center">OBJECT OF THE CONSPIRACY</div>

3.       The primary purpose of the conspiracy was to profit from illegally employing foreign nationals who were in the United States on visitor visas.

<div align="center">WAYS, MANNER AND MEANS OF THE CONSPIRACY</div>

The ways, manner and means by which the foregoing objective of the conspiracy to defraud the United States and commit offenses against the United States was to be accomplished included the following:

5.       It was part of the conspiracy that the conspirators provided airplane tickets and travel itineraries for B-1/B-2 and other non-employment visa holders, who were visa violators due

<div align="center">15</div>

to their arranged employment in the United States, to travel to and within the United States for the purpose of illegal employment with the Enterprise.

6.    It was further a part of the conspiracy that conspirators and others provide the visa violators with transportation by automobile or other means upon their arrival in the United States to the conspirators' places of employment and to the apartments where the visa violators would be residing while employed.

7.    It was further a part of the conspiracy that conspirators and others at the behest of the conspirators, to provide housing to the visa violators to whom the conspirators had provided employment.  Such housing consisted of apartments that were leased by conspirators or under the name of related Enterprise business entities.  Conspirators would thereafter pay the rent for the residence as well as the utilities.

8.    It was further a part of the conspiracy that the conspirators used their illegal Israeli employees to market and sell conspirators' Israeli based line of beauty and skin care products at kiosk and store locations in malls.

9.    It was further a part of the conspiracy that conspirators paid the Enterprise employees who were visa violators in cash and/or stored value payment cards, or other means without reporting such payments to the appropriate employment or taxing authorities.

10.   It was further a part of the conspiracy that conspirators deducted often substantial sums of money from the pay of the employees for housing, transportation, and other related expenses.

11.   It was further a part of the conspiracy that the conspirators employed visa violators contrary to the regulations set forth by the DOS, DHS, and DOL.

<u>OVERT ACTS</u>

16

In furtherance of the conspiracy and  to bring about the objects and goals of the conspiracy to defraud and to commit offenses against the United States, SHAI COHEN, along with other known and unknown conspirators, committed overt acts in the Eastern District of Virginia, and elsewhere, including but not limited to the following:

1.      On or about April 6, 2011, COHEN incorporated Tomik Tom Inc. in Florida, using the address of a residence leased by himself and a conspirator at the Reserve at Fairfax Corner apartment complex, 11704 Fairfax Woods Way #20208 Fairfax, Virginia, as the corporate registration address.

2.      In and around May 2011, COHEN and an Israel-based recruiting company named MAKA reached an agreement for MAKA to begin recruiting workers for the Enterprise.

3.      In and around January 2012, COHEN and JOBANK reached an agreement for JOBANK to begin recruiting workers for the Enterprise.

4.      On January 20 and 21, 2012, emails were exchanged between COHEN and conspirator T.A., where COHEN directed T.A. to select the name for a new business they were preparing to establish.  T.A. responded that "TORA" was the choice.  COHEN replied that he would check to see if the name was available and stated that he was leaving the next day to visit friends in Florida, subsequently identified as Florida-based business associates of the Enterprise.

5.      On or about February 1, 2012, Enterprise entity Tora Ankave Inc. was incorporated in Florida, under T.A.'s name, but listing as T.A.'s Florida address a residence associated with COHEN, in Jacksonville, Florida.  The corporate registration address was the address of a residence leased by COHEN at an Enterprise-leased apartment complex, 11704 Fairfax Woods Way #20306 Fairfax, Virginia.

17

6.     On or about February 1, 2012, February 1, 2013, March 1, 2013 and May 1, 2013, COHEN signed leases on behalf of RSE International Inc. and STR Consultation Inc. c/o Tomik Tom with Tysons Corner Mall in McLean, Virginia for Mica Beauty Cosmetics retail locations.

7.     On March 28, 2012, COHEN emailed T.A. and R.G. a message which was originally sent to COHEN by a business associate. The message content contained a management proposal for 2012 for an Enterprise venture later identified as STR Inc. The management structure detailed in the message describes the functions and responsibilities of each Enterprise partner, salary and profit sharing, bank accounts, work schedules and time off, management of workers at the kiosks and vehicles and residences paid for by the Enterprise.

8.     On or about April 30, 2012, COHEN signed a lease on behalf of RSE International Inc. with Tysons Corner Mall in McLean, Virginia for an Oro Gold retail location.

9.     On or about June 13, 2012, COHEN, on behalf of STR Cosmetics Inc., signed an authorization for automatic bill payment of its lease fees from Enterprise Bank of America account ending in 6781 with Tysons Corner Mall in McLean, Virginia for an Oro Gold retail location.

10.     On or about August 9, 2012, COHEN emailed an unknown individual information about his company and photographs that depict Enterprise conspirators, illegal workers, retail locations and apartment complexes; COHEN included his phone number and an offer for the individual to call with any questions.

11.     On or about July 6, 2012, COHEN registered Tomik Tom Inc. to do business in Virginia, using as the corporate mailing address 11350 Random Hills Rd, Suite 872, Fairfax, Virginia.

12.     On or about February 21, 2013, a lease was signed in the name of T.A., on behalf of Tora Ankave Inc., with Westfield Montgomery Mall, in Bethesda, Maryland for a Mica Beauty retail location. From on or about August 22, 2013 through September 19, 2013, COHEN

communicated via email with Westfield Montgomery Mall management about topics including the design of a kiosk, terms of the lease and approval of the lease for a Mica Beauty retail location.

13.     On or about May 1, 2013, COHEN signed a lease on behalf of STR Cosmetics Inc. with Fashion Centre at Pentagon City in Arlington, Virginia for a Mica Beauty retail location.

14.     On or about November 14, 2013, COHEN signed a lease on behalf of SSC Elite, LLC with Fair Oaks Mall in Fairfax, Virginia for a Mica Beauty retail location.

15.     Between in and around June 2012 and in and around October 2013, Enterprise personnel including COHEN signed at least 19 apartment and storage unit leases extending into 2014, with several apartment complexes in Fairfax, Virginia.

16.     Between in and around June 2011 through in and around March 2013, the Enterprise purchased and leased various vehicles, including vans, SUVs and sedans, used during the dates of the conspiracy to transport recruited alien employees from the airport upon their arrival in the United States, and to transport such employees to and from the apartments where they were housed to the mall locations where they were illegally employed. COHEN was the registrant on at least eight of the vehicles.

17.     During the dates of the conspiracy, COHEN and recruiting service personnel from JOBANK sent numerous email communications regarding the status of recruiting efforts, exchange of photos, biographical and background summaries on potential recruits; arrangements for COHEN to speak with recruits, booking of airline tickets including via foreign travel agencies such as ISSTA, booking of hotel reservations, terms of labor agreements with recruits, receipts and invoices from JOBANK for recruited workers and from ISSTA for airline ticket fees, and related topics, including but not limited to emails regarding the following individuals who would subsequently be transported to the United States to live in Virginia for the purpose of employment with the Enterprise: S.B.(1), S.B.(2), A.G., S.M., A.P., N.P., L.P., D.B., M.V. and M.A.

18.     On or about September 3, 2013, JOBANK personnel emailed COHEN airline ticket reservations procured for S.B.(1), an incoming illegal worker, reflecting scheduled travel from Tel Aviv, Israel to Washington Dulles International Airport in Virginia on September 20, 2013.

19.     On or about September 17, 2013, COHEN sent an email to S.B.(1) attaching a reservation for a hotel in Alexandria, Virginia.

20.     On or about September 20, 2013, S.B.(1) entered the United States using a B-1/B-2 visitor visa.

21.     From at least on or about September 25, 2013 through on or about December 16, 2013, S.B.(1) worked at Enterprise retail locations in Fairfax, Virginia.

22.     On or about March 5, 2013, COHEN and T.A. received an email from JOBANK personnel relating to incoming recruited illegal workers N.P. and S.B.(2).  The message provided COHEN with photos and biographical details for N.P. and S.B.(2), and also included an update that JOBANK had procured their visas and the details of their recruitment by JOBANK staffers, including information given to the recruits about the terms and conditions of their employment by the Enterprise in the United States.

23.     On or about March 11, 2013, JOBANK personnel emailed COHEN airline ticket reservations procured for S.B.(2) and N.P., reflecting scheduled travel from Tel Aviv, Israel to Baltimore Washington International Airport in Maryland in April 2013.  The emails conveyed to COHEN that JOBANK had "closed" the deal with N.P. and S.B.(2) and confirmed their airline tickets were booked, with the prospective workers paying for half and the Enterprise paying for the other half of their flight costs to the United States.

24.     On or about April 24, 2013, S.B.(2) and N.P. entered the United States using B-1/B-2 visitor visas.

25.     From on or about May 1, 2013 through on or about July 25, 2013, S.B.(2) worked at Enterprise retail locations in Fairfax, Virginia.

26.     From on or about May 1, 2013 through in and around November 2013, N.P. worked at Enterprise retail locations in Virginia and Maryland.

27.     On or about May 30, 2013, N.P. was issued a Payoneer stored value card by the Enterprise.

28.     From on or about June 13, 2013 through in and around December 2013, the Enterprise transferred money to N.P. using the card on various occasions.

29.     On or about August 26, 2013, JOBANK personnel emailed COHEN airline ticket reservations procured for A.G., reflecting scheduled travel from Tel Aviv, Israel to Washington Dulles International Airport in September 2013.

30.     On or about September 20, 2013, A.G. entered the United States using a B-1/B-2 visitor visa.

31.     From in and around September 2013 through in and around October 2013, A.G. worked at Enterprise retail locations in Virginia and Maryland.

32.     On or about August 25, 2013, JOBANK personnel emailed COHEN airline ticket reservations procured for S.M., reflecting scheduled travel from Tel Aviv, Israel to Washington Dulles International Airport in October 2013.

33.     On or about September 9, 2013, COHEN received an email from JOBANK personnel about the labor agreement for S.M.'s employment, which was attached to the email, requesting COHEN to contact S.M. about it; COHEN then forwarded the email to another Enterprise email account.

34.     On or about October 16, 2013, S.M. entered the United States using a B-2 visitor visa.

35.     From in and around October 2013 through in and around December 2013, S.M. worked at Enterprise retail locations in Virginia.

36.     On or about October 30, 2012, JOBANK personnel emailed COHEN airline ticket reservations procured for A.P., reflecting scheduled travel from Tel Aviv, Israel to Washington Dulles International Airport in November 2012.

37.     On or about November 7, 2012, A.P. entered the United States via the Visa Waiver Program.

38.     From in and around December 2012 through in and around March 2013, A.P. worked at Enterprise retail locations in Virginia.

39.     On or about August 7, 2013, JOBANK personnel emailed COHEN airline ticket reservations procured for L.P., reflecting scheduled travel from Tel Aviv, Israel to Washington Dulles International Airport in October 2013.

40.     On or about October 30, 2013, L.P. entered the United States using a B-1/B-2 visitor visa.

41.     From in or around November 2013 through in or around December 2013, L.P. worked at Enterprise retail locations in Fairfax, Virginia.

42.     On or about July 15, 2012, JOBANK personnel emailed COHEN airline ticket reservations procured for D.B., reflecting scheduled travel from Tel Aviv, Israel to Washington Dulles International Airport in July 2012.

43.     On or about July 24, 2012, D.B. entered the United States using a B-2 visitor visa.

44.     From in and around October 2012 through in and around July 2013, D.B. worked at Enterprise retail locations in Virginia.

45.     On November 15, 2012, D.B. was issued a Payoneer stored value card by the Enterprise.

46.     From on or about October 31, 2012 through in and around August 2013, the Enterprise transferred money to D.B. using the card on various occasions.

47.     On or about July 17, 2013, D.B was interviewed by law enforcement officers prior to departing Washington Dulles International Airport in Virginia for Israel.   D.B. denied his employment in the United States.   D.B. was found to be in possession of approximately $8,000 in United States currency in denominations of $100 bills, and an "employee scorecard" in his name, generated by the point-of-sale software program used by the Enterprise, reflecting sales and commissions in September 2012.

48.     On or about June 20, 2012, M.V. entered the United States using a B-1/B-2 visitor visa.

49.     On or about July 11, 2012, JOBANK personnel emailed COHEN airline ticket reservations procured for M.V. reflecting scheduled travel from Washington Reagan National Airport to Tel Aviv, Israel in November 2012.  On the same date, an international transfer was sent from STR Cosmetics' Bank of America account ending in 7862 in the United States to "Issta Israel (Israeli Travel Co.)" in the amount of $1,456.74.

50.     From in and around October 2012 through in and around December 2013, M.V. worked at Enterprise retail locations in Virginia and Maryland.

51.     On or about October 11, 2012, M.V. was issued a Payoneer stored value card by the Enterprise.

52.     From on or about October 31, 2012 through in and around December 2013, the Enterprise transferred money to M.V. using the card on various occasions.

53.     On or about March 21, 2013, messages were exchanged between email accounts of COHEN and a conspirator discussing M.A.'s passport details and the need to cancel an associated hotel reservation by 6 p.m. on March 28, 2013.

54.    On or about March 21, 2013, M.A. entered the United States using a B-1/B-2 visitor visa.

55.    From in and around April 2013 through in and around December 2013, M.A. worked at Enterprise retail locations in Virginia and Maryland.

56.    On or about April 11, 2013, M.A. was issued a Payoneer stored value card by the Enterprise.

57.    From between in and around May 2013 through in and around December 2013, the Enterprise transferred money to M.A. using the stored value card on various occasions.

58.    During the dates of the conspiracy, numerous B-1/B-2 and other non-employment visa holders, including but not limited to S.B.(2), N.P., D.B., M.V. and M.A. walked out of Enterprise-leased apartments in Fairfax, Virginia and got into Enterprise vehicles to transit to various area malls for work at Enterprise retail locations.

59.    On or about August 9, 2012, COHEN emailed a prospective recruit information about his company, including photos of retail locations being worked by conspirators at Virginia malls and Fairfax, Virginia apartment complexes.

60.    On or about August 13, 2013, COHEN received an email from JOBANK personnel with a breakdown of dates and charges incurred for summer recruiting services, indicating every company was charged a $500 retainer, along with a breakdown of specific charges for Enterprise companies "STR" and "TOMIQ" relating to named recruits.

61.    On or about September 2, 2013, COHEN sent an email to JOBANK personnel regarding an incoming recruited worker, N.A., who was concerned about his entry into the United States, and was considering flying to Canada first before flying into the United States. In COHEN's email, he indicated that he called the worker and told him it would be better to enter in Las Vegas.

24

62.     On or about September 17, 2013, COHEN and JOBANK personnel exchanged emails about incoming workers A.G. and S.B.(1); JOBANK personnel advised COHEN about the date the workers were scheduled to arrive via a British Airways flight, that the workers were instructed to enter separately, and asked COHEN to call the workers to give them a "flight briefing" and "relax them a bit." COHEN replied that he would call the workers soon.

63.     On or about October 1, 2013, COHEN received an email from a conspirator relating to an incoming illegal worker recruit, Y.Y., providing a hotel reservation and indicating that COHEN needed to forward the reservation and give Y.Y. a briefing before arrival on Friday. COHEN subsequently forwarded the email to Y.Y. and provided his phone number.

64.     On or about October 7, 2013, COHEN and JOBANK personnel exchanged emails regarding a potential incoming recruit who had "cold feet" and backed out of the arrangement the day before his flight was set to depart due to fear of entering the United States; COHEN inquired whether he should contact the individual.

65.     On or about November 19, 2013, COHEN received an email from JOBANK personnel indicating that after a discussion with COHEN, it was agreed that JOBANK would provide monthly summary invoices of charges incurred on the 28th of each month; COHEN confirmed receipt of the email and listed his title as "Chief Executive."

66.     On or about November 12, 2013, COHEN was sent a labor agreement for recruited workers via email from JOBANK personnel with a request for signatures. The labor agreement detailed aspects of the employment arrangement including the pickup and transport of recruits from the airport upon arrival to the apartment where they would be housed, work locations at "wagons" (kiosks) in malls; work attire, reimbursement of airfare, apartment rent, and how the workers would be paid.

67.     On or about November 13, 2013, COHEN and JOBANK personnel exchanged emails about how various recruited illegal workers, including S.M., L.P., and S.B.(1), were performing at Enterprise retail locations including Fair Oaks; COHEN advised about the workers' English abilities, motivation and sales figures.

68.     On or about December 2, 2013, COHEN forwarded to his business email address, via his personal email address, a copy of the STR Cosmetics 2013 operating agreement. COHEN's email signature listed himself as "President," and listed a business address of 11704 Fairfax Woods Way #20208.   This address is an Enterprise-leased apartment that doubled as COHEN's personal residence.

69.     On or about August 9, 2013, COHEN picked up recruited illegal employee M.A., a B-1/B-2 visa holder, from an Enterprise-leased apartment complex in Fairfax, Virginia and transported her to an Enterprise retail location using an Enterprise vehicle.

70.     On or about December 5, 2013, COHEN was present at Enterprise retail outlets in Virginia and supervised, led, and directed the activities of other workers, including known illegal employees.

71.     On or about December 17, 2013, COHEN was housing at least 13 illegal workers at Enterprise apartments leased by COHEN and other conspirators in Fairfax, Virginia, including the following:

| Alien | Location |
|---|---|
| E.D. | 11717 Fairfax Woods Way, Apt. 14012, Fairfax, VA 22030 |
| S.B.(1) S.B.(2) | 11730 Fairfax Woods Way, #1308, Fairfax, VA 22030 |
| Y.Y. | 11730 Fairfax Woods Way, #1308, Fairfax, VA 22030 |
| S.K. | 11730 Fairfax Woods Way, #1108, Fairfax, VA 22030 |
| B.M. | 11704 Fairfax Woods Way, #20306, Fairfax, VA, 22030 |
| L.P. | 11730 Fairfax Woods Way #1308, Fairfax, VA 22030 |
| S.M. | 11602 Fairfax Woods Way #16108, Fairfax, VA 22030 |
| M.A. | 16000 Fairfax Meadows Cir, #16003, Fairfax, VA 22030 |

| N.P. | 11730 Fairfax Woods Way, #1108, Fairfax, VA 22030 |
| M.V. | 11600 Fairfax Meadows Cir, #16003, Fairfax, VA 22030 |
| Z.B. | 11730 Fairfax Woods Way, #1108, Fairfax, VA 22030 |
| Y.P. | 11602 Fairfax Meadows Circle, #16108, Fairfax, VA 22030 |

**(All in violation of Title 18, United States Code, Section 371.)**

## COUNTS TWO THROUGH EIGHT

### (Bringing Aliens to the United States for Financial Gain)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      On or about the dates listed below, in the Eastern District of Virginia and elsewhere, SHAI COHEN, the defendant, and others known and unknown to the Grand Jury, aiding and abetting each other, did knowingly, and for the purpose of commercial advantage and private financial gain, bring certain aliens identified in the following Counts to the United States, in any manner whatsoever, knowing and in reckless disregard of the fact that such aliens had not received prior official authorization to come to, enter, and reside in the United States, regardless of any official action which may later be taken with respect to such aliens.  To wit, the visas used by the aliens to come to, enter and reside in the United States were procured and used under false pretenses.

| COUNT | ALIEN | APPROX. DATES |
|---|---|---|
| 2 | S.B. (1) | On or about 9/3/2013 through on or about 9/20/2013 |
| 3 | S.B. (2) | On or about 3/5/2013 through on or about 4/24/2013 |
| 4 | A.G. | On or about 8/11/2013 through on or about 9/20/2013 |
| 5 | S.M. | On or about 8/15/2013 through on or about 10/16/2013 |
| 6 | A.P. | On or about 10/18/2012 through on or about 11/7/2012 |
| 7 | N.P. | On or about 3/5/2013 through on or about 4/24/2013 |
| 8 | L.P. | On or about 7/31/2013 through on or about 10/30/2013 |

(In violation of Title 8, United States Code, Section 1324(a)(2)(B)(ii) and Title 18, United States Code, Section 2.)

28

## COUNTS NINE THROUGH EIGHTEEN

### (Encouraging and Inducing Aliens to Unlawfully Come to, Enter, and Reside in the United States for Financial Gain)

THE GRAND JURY FURTHER CHARGES THAT:

1.　　On or about the dates listed below, in the Eastern District of Virginia and elsewhere, SHAI COHEN, the defendant, and others known and unknown to the Grand Jury, aiding and abetting each other, did knowingly, and for the purpose of commercial advantage and private financial gain, encourage and induce certain aliens identified in the following Counts to come to, enter and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence in the United States was in violation of law:

| COUNT | ALIEN | DATES |
|:---:|:---:|:---:|
| 9 | S.B. (1) | On or about 9/3/2013 through in and around December 2013 |
| 10 | S.B. (2) | On or about 3/5/2013 through in and around December 2013 |
| 11 | A.G. | On or about 8/11/2013 through in and around October 2013 |
| 12 | S.M. | On or about 8/15/2013 through in and around December 2013 |
| 13 | A.P. | On or about 10/18/2012 through in and around April 2013 |
| 14 | N.P. | On or about 3/5/2013 through in and around December 2013 |
| 15 | L.P. | On or about 7/31/2013 through in and around December 2013 |

| 16 | D.B. | On or about 7/3/2012 through on or about 7/17/2013 |
|----|------|---------------------------------------------------|
| 17 | M.V. | On or about 6/20/2012 through in and around December 2013 |
| 18 | M.A. | On or about 3/21/2013 through in and around December 2013 |

**(In violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv), (a)(1)(B)(i) and Title 18, United States Code, Section 2.)**

30

COUNTS NINETEEN THROUGH TWENTY-EIGHT

(Harboring Illegal Aliens)

THE GRAND JURY FURTHER CHARGES THAT:

1.       On or about the following date ranges in the Eastern District of Virginia and elsewhere, SHAI COHEN, the defendant, along with others known and unknown to the Grand Jury, aiding and abetting each other, knowing and in reckless disregard of the fact that the following aliens had come to, entered and remained in the United States in violation of law, did conceal, harbor and shield, and did attempt to conceal, harbor and shield from detection such aliens in buildings and other places, and by means of transportation, for the purpose of commercial advantage and private financial gain:

| COUNT | ALIEN | DATES |
|-------|-------|-------|
| 19 | S.B. (1) | On or about 9/20/2013 through in and around December 2013 |
| 20 | S.B. (2) | On or about 4/24/2013 through in and around December 2013 |
| 21 | S.M. | On or about 10/16/2013 through in and around December 2013 |
| 22 | N.P. | On or about 4/24/2013 through in and around December 2013 |
| 23 | L.P. | On or about 10/30/2013 through in and around December 2013 |
| 24 | D.B. | On or about 7/24/2012 through on or about 7/17/2013 |
| 25 | M.V. | On or about 6/20/2012 through in and around December 2013 |
| 26 | M.A. | On or about 9/26/2013 through in and around December 2013 |

| 27 | B.M. | On or about 10/16/2012 through in and around December 2013 |
| 28 | Z.B. | In or around 2/8/2011 through in and around December 2013 |

**(In violation of Title 8, United States Code, Section 1324(a)(l)(A)(iii) and Title 18, United States Code, Section 2).**

## COUNT TWENTY-NINE

### (Money Laundering Conspiracy)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      The factual allegations contained in the General Allegations section are incorporated herein by reference as if set out in full.

2.      Beginning in and around 2011, and continuing through in and around December 2013, in the Eastern District of Virginia and elsewhere, SHAI COHEN, the defendant (COHEN), along with others known and unknown to the Grand Jury, did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, to wit:

a.      To knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of specified unlawful activity, that is conspiracy to bring in and harbor aliens in violation of Title 18, United States Code, Section 371, as set forth in Count One of this Indictment, and bringing in and harboring aliens in violation of Title 18, United States Code, Section 1324, as set forth in Counts Two through Twenty-Eight of this Indictment; with the intent to promote the carrying on of specified unlawful activity, that is bringing in and harboring certain aliens, and that while conducting and attempting to conduct such financial transactions, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity in violation of Title 18, United States Code, Section 1956(a)(l)(A)(i).

b.      To transport, transmit and transfer, and attempt to transport, transmit and transfer, a monetary instrument and funds, from a place in the United States to or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, that is

conspiracy to bring in and harbor aliens in violation of Title 18, United States Code, Section 371, as set forth and charged in Count One of this Indictment, and bringing in and harboring aliens in violation of Title 8, United States Code, Section 1324, as set forth in Counts Two through Twenty-Nine of this Indictment in violation of Title 18, United States Code, Section 1956(a)(2)(A).

## OBJECT OF THE CONSPIRACY

The object of the conspiracy was for COHEN and his conspirators to use the proceeds of their conspiracy to defraud and commit offenses against the United States to induce, recruit, hire for employment and transport foreign nationals on B-1/B-2 and other non-employment visas to the United States for the purpose of those foreign nationals illegally engaging in work, and to pay, house, and transport those foreign nationals once they were in the United States.

## WAYS, MANNER AND MEANS OF THE CONSPIRACY

1.    The Ways, Manner, and Means paragraphs 5 through 11, contained in Count One of this Indictment are incorporated herein by reference as if set out in full.

## OVERT ACTS

1.    The Overt Acts paragraphs 1 through 71 contained in Count One of this Indictment are incorporated herein by reference as if set out in full.

(In violation of Title 18, United States Code, Section 1956(h).)

34

## FORFEITURE ALLEGATION

THE GRAND JURY FURTHER ALLEGES AND FINDS PROBABLE CAUSE THAT:

1. The defendant, if convicted of any of the violations alleged in Counts One through Twenty-Nine of this Indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2:

   a. Any property, real or personal, which constitutes, is derived from, or is traceable to the proceeds obtained, directly or indirectly, as a result of the violation;

   b. Any conveyance, including any vessel, vehicle, or aircraft used in the commission of the violation; and

   c. Any property, real or personal, that is used to facilitate, or is intended to be used to facilitate, the commission of the violation.

2. The defendant, if convicted of the violation alleged in Count Twenty-Nine of this Indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any property, real or personal, involved in the violation, or any property traceable to that property.

3. If any property that is subject to forfeiture above, as a result of any act or omission of the defendant, (a) cannot be located upon the exercise of due diligence, (b) has been transferred to, sold to, or deposited with a third party, (c) has been placed beyond the jurisdiction of the Court, (d) has been substantially diminished in value, or (e) has been commingled with other property that cannot be divided without difficulty, it is the intention of the United States to seek forfeiture of any other property of the defendant, as subject to forfeiture under Title 21, United States Code, Section 853(p).

4. The property subject to forfeiture includes, but is not limited to, the following property:

a. A monetary judgment in the amount of not less than $3,960,000.00, representing the proceeds of Counts One through Twenty-Nine.

(In accordance with Title 8, United States Code, Section 1324(b);
Title 18, United States Code, Sections 98 l (a)(l)(C), 982(a)(l) and 982(a)(6)(A);
and Title 28, United States Code, Section 2461.)

UNITED STATES OF AMERICA v. SHAI COHEN, 1:16-CR-114

**A TRUE BILL:**

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

_____

**FOREPERSON**

Respectfully submitted,

DANA J. BOENTE
UNITED STATES ATTORNEY

By: _____

Angela Fiorentino-Rios
Special Assistant United States Attorney (LT)

LESLIE R. CALDWELL
ASSISTANT ATTORNEY GENERAL
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION

By: _____

Michael Sheckels
Trial Attorney
Human Rights & Special Prosecutions Section

Date: _____

A TRUE COPY, TESTE:
CLERK, U.S. DISTRICT COURT

_____
DEPUTY CLERK

37

# EXHIBIT B

AO 442 (Rev. 01/09) Arrest Warrant

#n27038

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

| | |
|---|---|
| United States of America<br>v.<br><br>Shai COHEN<br><br>_____<br>*Defendant* | )<br>)<br>)  Case No.  1:16CR114<br>)<br>)<br>) |

RECEIVED
UNITED STATES MARSHAL
2016 MAY 13  AM 10: 23
EASTERN DISTRICT
OF VIRGINIA
ALEXANDRIA DIVISION

## ARREST WARRANT

To:      Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*   Shai COHEN                                                                                    ,
who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment   ☐ Superseding Indictment   ☐ Information   ☐ Superseding Information   ☐ Complaint
☐ Probation Violation Petition   ☐ Supervised Release Violation Petition   ☐ Violation Notice   ☐ Order of the Court

This offense is briefly described as follows:
Conspiracy to defraud the United States related to visa fraud and alien harboring for profit among other charges.


Date: May 13, 2016

City and state:  Alexandria, VA

*Issuing officer's signature*

Judith Lanham, Deputy Clerk
*Printed name and title*

---

**Return**

This warrant was received on *(date)* _____, and the person was arrested on *(date)* _____
at *(city and state)* _____

Date: _____

*Arresting officer's signature*

_____
*Printed name and title*

INFORMATION COPY ONLY
NOTICE: BEFORE ARREST, VALIDATE THROUGH NCIC. ORIGINAL HELD BY U.S. MARSHAL.
A TRUE COPY, TESTE:
CLERK, U.S. DISTRICT COURT
BY _____ DEPUTY CLERK

# EXHIBIT C

**Exhibit C** contains the applicable portions of statutes describing the offenses with which SHAI COHEN is charged, the statute of limitations, and the penalties COHEN faces if convicted. Asterisks and ellipses are used to indicate portions of the statutes which are omitted because these portions do not apply to the case against COHEN.

## Federal Rules of Criminal Procedure
## Rule 9. Arrest Warrant or Summons on an Indictment or Information

(a) Issuance. The court must issue a warrant—or at the government's request, a summons—for each defendant named in an indictment or named in an information if one or more affidavits accompanying the information establish probable cause to believe that an offense has been committed and that the defendant committed it. The court may issue more than one warrant or summons for the same defendant. If a defendant fails to appear in response to a summons, the court may, and upon request of an attorney for the government must, issue a warrant. The court must issue the arrest warrant to an officer authorized to execute it or the summons to a person authorized to serve it.

(b) Form.

(1) Warrant. The warrant must conform to Rule 4(b)(1) except that it must be signed by the clerk and must describe the offense charged in the indictment or information.

(2) Summons. The summons must be in the same form as a warrant except that it must require the defendant to appear before the court at a stated time and place.

(c) Execution or Service; Return; Initial Appearance.

(1) Execution or Service.

(A) The warrant must be executed or the summons served as provided in Rule 4(c)(1), (2), and (3).

(B) The officer executing the warrant must proceed in accordance with Rule 5(a)(1).

(2) Return. A warrant or summons must be returned in accordance with Rule 4(c)(4).

(3) Initial Appearance. When an arrested or summoned defendant first appears before the court, the judge must proceed under Rule 5.

(d) Warrant by Telephone or Other Means. In accordance with Rule 4.1, a magistrate judge may issue an arrest warrant or summons based on information communicated by telephone or other reliable electronic means.

**<u>Title 8, United States Code, Section 1324</u>**
**Brining in and harboring certain aliens**

\* \* \*

(a)

    (1)

        (A) Any person who—

\* \* \*

        (iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, such alien in any place, including any building or any means of transportation;
        (iv) encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law;

\* \* \*

        shall be punished as provided in subparagraph (B).

        (B) A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs—

        (i) in the case of a violation of . . . subparagraph (A) . . . (iii) or (iv) . . . in which the offense was done for the purpose of commercial advantage or private financial gain, be . . . imprisoned not more than 10 years . . . .

\* \* \*

(2) Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, for each alien in respect to whom a violation of this paragraph occurs—

\* \* \*

        (B) in the case of—

\* \* \*

(ii) an offense done for purpose of commercial advantage or private financial gain,...

\* \* \*

. . . shall be imprisoned, . . . in the case of a first or second violation of subparagraph . . . (b)(ii), not less than 3 nor more than 10 years . . . .

\* \* \*

## <u>Title 18, United States Code, Section 2</u>
### Principals

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

## <u>Title 18, United States Code, Section 371</u>
### Conspiracy to commit offense or to defraud United States

If two or more persons conspire . . . to commit any offense against the United States . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be . . . imprisoned not more than five years . . . .

* * *

**Title 18, United States Code, Section 1956**
**Laundering of monetary instruments**

(a)

    (1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

<div align="center">* * *</div>

    (A)

        (i) with the intent to promote the carrying on of specified unlawful activity; . . .

<div align="center">* * *</div>

shall be sentenced to . . . imprisonment for not more than twenty years . . . . For purposes of this paragraph, a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement.

    (2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—

    (A) with the intent to promote the carrying on of specified unlawful activity . . . .

<div align="center">* * *</div>

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transportation, transmission, or transfer whichever is greater, or imprisonment for not more than twenty years, or both. . . .

<div align="center">* * *</div>

(h) Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

<div align="center">* * *</div>

## <u>Title 18, United States Code, Section 3282</u>
### Offenses not capital

(a) In general.— . . .  no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found . . . within five years next after such offense shall have been committed.

* * *

## Title 18, United States Code, Section 3298
### Trafficking-related offenses

No person shall be prosecuted, tried, or punished for any non- capital offense or conspiracy to commit a non-capital offense . . . ... under section 274(a) of the Immigration and Naturalization Act[1] unless the indictment is found or the information is instituted not later than 10 years after the commission of the offense.

---

[1] Section 274(a) of the INA is codified at 8 U.S.C. § 1324(a).

# EXHIBIT D

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NUMBER: 1:16-CR-114 |
| v. | |
| SHAI COHEN | AFFIDAVIT IN SUPPORT OF REQUEST FOR EXTRADITION |

I, Matthew Grimm being duly sworn, depose and state:

1.   I am a citizen of the United States and a resident of the Commonwealth of Virginia.

2.   I am a Special Agent of the Office of Investigations, Labor Racketeering and Fraud

     (OILRF) of the United States Department of Labor (DOL), Office of Inspector General

     (OIG), and am assigned to the Washington Region.  I have been so employed since

     September 2009.  My investigative assignments include money laundering as it relates to

     the proceeds of immigration benefit, government program, and wire fraud schemes.

3.   As a Special Agent, I have received training in Asset Forfeiture and Money Laundering

     investigative techniques at the National Advocacy Center, and I have completed the Digital

     Evidence Acquisition Specialist and Internet Investigations Training Programs at the

     Federal Law Enforcement Training Center.  I have previously been involved in criminal

     investigations of individuals who have engaged in immigration and document fraud,

     harboring and unauthorized employment of aliens, and other associated activities designed

     to circumvent federal labor statutes and regulations.  Prior to working at DOL OIG, I was

     employed as a Special Agent with the United States Department of State (DOS),

1

Diplomatic Security Service (DSS), where I conducted numerous and complex financial, visa, and passport fraud investigations.

4.   My duties as a Special Agent include the investigation of various types of transnational criminal enterprises.  Through my background and experience, I have become familiar with various types of fraud schemes perpetrated by criminal enterprises to include conspiracy to defraud and to commit offenses against the United States.

5.   I am one of the agents assigned to the investigation of the criminal activities of SHAI COHEN (COHEN) and his associates.  I am familiar with the charges and evidence in the case.  The facts set forth in this affidavit are based on my personal knowledge, information supplied to me by other law enforcement personnel, and other sources of information.  Although I am familiar with all aspects of this investigation, this affidavit does not reflect my entire knowledge of the investigation.  This affidavit contains a summary of some of the most important evidence collected during this investigation.  The evidence discussed in this affidavit does not represent all of the evidence collected during the investigation but only a portion of the key evidence, for purposes of providing sufficient evidence to establish the factual basis for the extradition request.

## SUMMARY OF THE INVESTIGATION

6.   In or around 2008, the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), Attaché in Rome, Italy, received information, which was developed through criminal intelligence trend analysis channels, from the ICE Compliance Enforcement Unit that young Israeli nationals, ranging in age from 18 to 30 years, were being systematically recruited by employment

agencies in Israel to obtain United States visitor and tourist visas for the purpose of working illegally in the United States.  In or around 2011, I joined an ad-hoc task force comprised of other agents and analysts from HSI, DSS, and the Federal Bureau of Investigation (FBI) for the purpose of investigating COHEN's criminal scheme.

7.   This investigation centered on COHEN's activities over an approximately two-year period between 2011 and 2013 in which at least US $3.96 million in revenue was received by COHEN and his related entities.  The object of COHEN's conspiracy was to profit from enticing non-U.S. citizens (also called aliens or foreign nationals in United State law) into coming to the United States to work by entering using non-immigrant visitor visas that expressly forbid working or being employed in the United States while visiting.[1] COHEN's scheme required the young Israelis to enter the United States for the express and knowingly unauthorized purpose of employment as shopping mall kiosk sales workers by U.S.-based Israeli émigré-owned businesses in violation of the purpose of the visitor and tourist visa.  COHEN would participate in the recruiting of the young workers and make arrangements for their air travel to the United States.  He would coach them on how to behave upon presenting themselves for admission to the United States.  Once in the United States, COHEN or associates would transport and provide living quarters for the illegal workers.  Additionally, COHEN established a system of payment for the illegal workers that avoided paying the appropriate employment taxes and made it more difficult for law enforcement authorities to detect the illegal employment.

8.   Through cooperator and witness interviews, undercover operations, judicially-authorized search warrants for email accounts, business premises, and residential premises, review of

---

[1] The indictment at page 3, paragraphs 4-15 outlines the U.S. visa system relevant to this investigation.

bank records, leasing records, and other lawfully obtained documents, the investigation

revealed that from at least January 2011 through December 2013, a business organization

led by COHEN, operating through various entities in the United States and Israel, recruited

young Israeli nationals to work, illegally, as employees of COHEN's business in its kiosks

and stores in shopping malls in the United States. If the prospective employees did not

have a visa to enter the United States, COHEN and/or his partners assisted them in

obtaining temporary nonimmigrant visas, such as an H-2B or B-1/B-2 tourist/visitor visas

to travel to the United States. Since 2011, many prospective employees came to the United

States using B-2 tourist visas. A foreign national who enters the United States using a B-2

tourist visa is not permitted to be employed in the United States.

9.  As part of the criminal scheme, COHEN operated several companies and entities in the

United States including STR Cosmetics, Inc., STR Gratiae Cosmetics Inc., STRr

Consultation, Tomik Tom Inc., Tomikom Inc., Tora Ankave Inc., SCO Investments LLC,

Gena Investments LLC, SYR Cosmetics Inc., SSC Elite LLC, RSE International Inc.,

Tomiq, and Tomik Tom DBA Premier Skin Care (collectively referred to as the COHEN

Enterprise). These COHEN Enterprise companies were owned, registered, managed and

operated by COHEN, along with individuals with the initials T.A., R.G., G.F. and others.

For example, on April 6, 2011, COHEN incorporated Tomik Tom in Florida, and listed

both himself and G.F. as officers and/or directors of the corporation. (See **Attachment 1**,

Article VII). The COHEN Enterprise was based in Fairfax, Virginia, and as of December

2013, operated approximately six retail cosmetics and skin care locations in Northern

Virginia and Maryland, using a sales workforce that was substantially comprised of illegal

alien workers. (See **Attachment 2** for photographs of some of the COHEN Enterprise employment locations in the Northern Virginia and Maryland area.)

10.    COHEN was the head of the COHEN Enterprise along with his co-conspirator and spouse, an individual with the initials S.A.  For example COHEN signed the leases for locations at the Tysons Corner Mall in Virginia, from February 2012 to June 2013, and the Westfield Montgomery Mall in Maryland, from April 2013 through March 2014.  Others, including T.A. and G.F., later held ownership stakes and managed the day-to-day sales and logistical operations of the COHEN Enterprise.  R.G., also held an ownership stake and was responsible for training and coaching COHEN Enterprise workers.

11.    Investigating law enforcement authorities determined there were at least 21 COHEN Enterprise locations, including residences, kiosks, stores and offices from the COHEN Enterprise housed its workers, made sales, and administered its operations.  The evidence collected also included the content found on numerous computers and telephones.  This evidence, along with other business records, was later used to obtain the cooperation of T.A. and R.G., who subsequently pled guilty for their role in the scheme (G.F. had earlier departed Virginia and was not an active coconspirator at the time of the enforcement operation.)  The operation also resulted in the seizure of the contents of 36 COHEN Enterprise financial accounts (containing approximately US $292,000.00) and the administrative arrest of 12 alien workers who were present in the United States under the B-2 visa classification. All of the 12 alien workers admitted to agents that COHEN illegally employed them, in knowing and willful violation of the law by both themselves and COHEN.

12. The investigation showed that prior to 2011, in addition to exploiting the B-2 visa program, the COHEN Enterprise also engaged in limited use of the H-2B visa program, which is an employment-based visa intended for temporary foreign workers to come to work in the United States for a specific job, specific location, and specific time period. During that time, T.A., R.G., and G.F., who were already in the United States on B-2 visas and who were then being illegally employed by COHEN in Tennessee, benefitted from the temporary change of visa status to H-2B based on a petition filed by COHEN to sponsor their employment, using a shell company called Green Cosmetics Corp. Also during that time, pursuant to disclosing the names of its intended H-2B beneficiaries to the Departments of Labor and Homeland Security during filing of the H-2B visa petition, the COHEN Enterprise reported wages and names of some workers to the Internal Revenue Service and state employment agencies, in particular those persons named on the H-2B petition filed by COHEN.

13. In or about 2011, the COHEN Enterprise relocated from Tennessee to Virginia and continued using primarily B-2 visa holders as its foreign workforce in the United States, thus circumventing the more complex and rigorous H-2B visa process. With some exceptions, such as the employment of a few dual U.S./Israeli citizens who were authorized to be employed in the United States as U.S. citizens, and for people such as COHEN, T.A., R.G. and G.F., who had, by that time managed, managed to obtain U.S. Legal Permanent Resident status after marrying U.S. citizens, the COHEN Enterprise did not disclose the wages or names of the majority of its workforce to any government agency. Law enforcement authorities conservatively estimate that the size of COHEN's unauthorized alien workforce was at least 60 individuals who were B-2 visa holders between January

2001 and December 2013. Investigators considered the scope of his business outside the Eastern District of Virginia and prior to the period covered by this investigation, along with firsthand surveillance of the workers, testimony from cooperators, and the analysis of various business records. For example, agents reviewed various filings with the Virginia State Corporation Commission which indicated COHEN had filed various articles of incorporation for Enterprise business entities from approximately 2011-2013. On June 14, 2011, COHEN, listed as Registered Agent and Officer, registered Tomik Tom, Inc. (noted as a Florida-incorporated business, which agents identified through Florida Secretary of State records to have been incorporated by COHEN and G.F. on April 6, 2011, using a principal place of business address in Fairfax, Virginia, to do business in Virginia). On July 26, 2011, COHEN, listed as Registered Agent and Director, incorporated STR Cosmetics Inc. at the same address in Fairfax, Virginia, noted on the Florida articles of incorporation for Tomik Tom, Inc. (See **Attachment 1**, article II, and **Attachment 3**). No payroll or income taxes were withheld from these employees or remitted to the government, nor was their employment reported to the Internal Revenue Service or state employment agencies.

14. Agents reviewed financial records and identified the comingling of funds from over a dozen Bank of America business and personal accounts held by the co-conspirators for the period 2011-2013. In addition to at least US $3.96 million in revenues traceable to retail sales made by the unauthorized alien workers, the records also illustrated expenditure streams related to the payment of expenses to operate, house and transport goods and people in furtherance of the scheme, including but not limited to mall kiosk leases (approximately US $129,000), apartment leases and utilities (approximately US $297,000),

vehicle leases (approximately US $27,000) and for international airline tickets (approximately US $55,700).

15. Investigators found that COHEN and his co-conspirators would pay a Tel Aviv-based placement firm (Job Overseas / http://www.jobank.co.il)(JoBank), which they hired to recruit, train and arrange travel for new employees coming to the U.S. from overseas. COHEN originally worked with another employment company in Israel called Maka in May of 2011 but used JoBank starting in January 2012. COHEN and his co-conspirators would plan to recruit four workers to staff each retail location. If there were not enough living accommodations on hand for the incoming workers, additional apartments would be leased and furnished by the COHEN Enterprise. COHEN encouraged workers with U.S. passports or green cards to obtain their own living accommodations in their own names, which the COHEN Enterprise sometimes subsidized, because COHEN believed that having too many apartments under the name of a company constituted a red flag and would be suspicious to immigration officials. When incoming employees were scheduled to fly to the U.S., it was the practice of the COHEN Enterprise to make a fake hotel reservation for the incoming employee at a local hotel, email the reservation to the employee, and brief the employee on how it should be used. (See **Attachment 4,** examples of the fake hotel reservations). COHEN and/or his co-conspirators would subsequently cancel the registration before any charges were incurred, while allowing the employee to be able to show U.S. immigration officials upon arrival at the airport what appeared to be a valid reservation document as proof that they were only visiting the U.S., and not arriving in the U.S. for the purpose of living and working in the U.S. Usually when a new employee arrived at Washington, D.C., area airport, COHEN or a co-conspirator designated to handle

the logistics would pick up the new employee and take them to the apartment where they were assigned to stay. The investigation identified at least US $30,427.11 in payments made between on or about May 2012 and on or about October 2013 from Bank of America Accounts held in the name of Tomik Tom Inc. and STR Cosmetics Inc. to JOB OVERSEAS.

16. Early in the investigation, agents identified a pattern of transactions that appeared to represent how the COHEN Enterprise paid its employees. Regular payments to ADP Payroll Services were noted in the bank records for those employees that were authorized to work in the U.S. ADP subsequently produced records that showed wages paid, including what appeared to be payroll tax withholding amounts, corresponding to the documented, legal workforce of the COHEN Enterprise. Regular payments to a company called PAYONEER were also noted. The investigation revealed that PAYONEER was a firm that specialized in providing payroll solutions to employers of international travelers and employees, without the need for the employees to have or use bank accounts.

17. Cooperating witnesses later described to agents how the COHEN Enterprise came to rely on PAYONEER Master Card-branded, stored-value cards to compensate its illegal workforce. Another Israeli kiosk owner recommended the COHEN Enterprise use PAYONEER as a method to pay illegal employees and reduce dependency on bulk cash, which was both scarce and which increased the risk of detection by authorities. The other owner explained to COHEN that he established a shell company and a bank account to pool money from his regular kiosk operating accounts, which he then used to pass money through to Payoneer to fund stored-value card accounts held by his unauthorized alien workers. The other owner structured the financial pass through to his Payoneer account in

9

that manner because he believed Payoneer did business through a bank in Belize, thereby making it more difficult, if not impossible, for U.S. law enforcement to seize the money in the event of an enforcement operation directed against his businesses. The COHEN Enterprise in turn established its Payoneer structure in a similar fashion to that of the other owner. The investigation found that the COHEN Enterprise transferred approximately US $248,000 through two shell companies, to Payoneer, for unauthorized worker wages in 2012-2013.

## EXPLANATION OF FRAUD SCHEME

Illegal Employment Scheme

18.  The way the illegal employment scheme worked was that the COHEN Enterprise sent money to a job search company in Israel to locate aliens willing to come to the United States and work in its kiosks and stores. The COHEN Enterprise assisted the aliens in obtaining their "tourist" visas based on false representations in their visa applications as to the purpose of their trip to the United States in violation of U.S. law. Once in the United States, the unauthorized alien workers were shuttled to and from work at the retail outlets in vehicles leased or owned by COHEN himself and/or the COHEN Enterprise and lived in apartments leased by COHEN himself and/or the COHEN Enterprise, and which were paid for using funds generated from the criminal scheme.

Money Laundering Scheme

19.  These companies also engage in activities that constitute money laundering violations relating to the methods by which they transmit payments to overseas staffing companies for the recruitment of unauthorized alien workers, and based on the mechanisms by which they

route money through various shell company bank accounts to fund stored value cards that are used as a means to hide payments being made to their illegal workforce, avoiding U.S. tax obligations in the process.

### EVIDENCE AGAINST SHAI COHEN

20. Since at least 2011, COHEN served as the President, Vice President, Registrant, Officer, Principal, and/or Owner, and otherwise controlled, owned, registered, managed and/or operated, with the assistance of others both known and unknown various COHEN Enterprise business entities/companies mentioned above. A review of sworn and unsworn witness testimony, as well as emails obtained from judicially-authorized searches, demonstrates COHEN was directly involved with recruiting new employees, the majority of whom were not authorized to work in the United States. The emails demonstrate his knowledge of details of the operation's management, structure, and illegality. (See, for example, **Attachment 5**, September 2, 2013 email from COHEN.)

21. COHEN used at least two email accounts: shai2703@gmail.com and str770@gmail.com. The email evidence revealed, among other things, that COHEN, using shai2703@gmail.com, instructed T.A. to select the name for a new business they were preparing to establish on January 20, 2012. T.A. responded that "TORA" was his choice. The next day, COHEN replied that he would check to see if the name was available and then subsequently met with Florida-based business associates of the COHEN Enterprise. Investigators found TORA ANKAVE INC was incorporated in Florida on February 1, 2012, under T.A.'s name, but initially listing as the firm's address a prior residence associated with COHEN in Jacksonville, Florida. T.A. admitted to agents that TORA

ANKAVE was one of the businesses under which the COHEN Enterprise later registered, operated and employed unauthorized alien workers in Northern Virginia.

22.   The email evidence further revealed that in March 2012, COHEN, using shai2703@gmail.com account, shared with T.A. and R.G. a management proposal for 2012 for a venture which has since been identified as STR Inc.. According to T.A., the acronym "STR" represents "Shai, [T.A.'s first name] and [R.G.'s first name]," or COHEN, T.A. and R.G.  The management structure detailed in the message described the functions and responsibilities of each partner, salary and profit sharing, bank accounts, work schedules and time off, management of workers at the kiosks and about vehicles and residences paid for by the COHEN Enterprise.  T.A. admitted to agents that STR Inc., which was incorporated by himself and COHEN in Virginia in approximately July 2011, was another one of the businesses under which the COHEN Enterprise employed unauthorized alien workers.

23.   In March 2013, JoBank recruiters "Shany Jobank" at jobank26@gmail.com and "Meital Niv" at jobank7@gmail.com sent COHEN, using str770@gmail.com and T.A. email messages about a pair of prospective female workers.  Another recipient on this stream of messages was "Maya Jobank" at jobank55@gmail.com.  The first message provided COHEN and T.A. with photographs and biographical details for two prospective workers, N.P. and S.B., and included an update on the visa application status and the details of their recruitment by JoBank staffers, including information given to the prospects about the terms and conditions of their employment by the COHEN Enterprise in the U.S.  The latter message conveyed to COHEN and T.A. that JoBank had "closed" the deal with N.P. and

12

S.B., and confirmed their flight tickets were booked, with the prospective workers paying for half and the COHEN Enterprise paying for the other half of their flight to the U.S.

24.   On or about March 7, 2013, a U.S. Consular Officer in Tel Aviv issued N.P. and S.B. B-1/B-2 visas.  They subsequently arrived at the John F. Kennedy International Airport in New York, New York, on or about April 24, 2013.  The entry form, called an I-94, for one of the workers indicated that he/she was authorized to stay in the United States until June 4, 2013 as a B2 visitor.  Agents subsequently observed N.P. and S.B. working at COHEN Enterprise retail outlets in Virginia and Maryland.  Prior to August 3, 2013, S.B. had departed the United States with several relatives to visit Canada.  On or about August 3, S.B. was arrested by U.S. Customs and Border Protection (USCBP) officers at the Detroit Border Crossing/Port of Entry.  Evidently, not realizing that her period of authorized stay in the United States had expired on June 24, she was temporarily detained, interviewed and released back into Canada.  S.B. told USCBP officers that prior to visiting the family members in Michigan, she had been staying with her friend in Fairfax, Virginia.  S.B. listed 11704 Fairfax, Fairfax Virginia 22030 as her Virginia address, which is a partial match to one of the apartment addresses where agents found that COHEN Enterprise harbored unauthorized workers.  S.B. told officers that she never worked while she was in the United States and that she was supporting herself from money in a bank account in Israel.  One of the people with whom S.B. was traveling back from Canada told USCBP officers that the fellow traveler believed S.B. was employed on a work permit in Virginia.

25.   N.P. was administratively arrested by DHS agents on December 17, 2013, at her COHEN Enterprise-furnished residence at 11730 Fairfax Woods Way, Apartment 1108, in Fairfax. N.P. told agents she worked for COHEN and T.A. as a cosmetics seller at their Tysons

Corner Center, Westfield Mall, and Pentagon City locations. N.P. confirmed that she was paid by the COHEN Enterprise using the Payoneer payroll method and that her recruiters at JoBank were "Shany and Maitel." N.P. related to agents that other coworkers who occupied Apartment 1108 during her time living there were Z.B., M.A., S.K., and M.V. Agents have since confirmed through T.A. and through their own investigative efforts that each of those people identified by N.P. were unauthorized alien workers.

26. In early December 2013, COHEN and S.A. departed the United States and returned to Israel for a family gathering. Agents later learned that COHEN was alerted to the execution of a search warrant operation by one or more of his co-conspirators and/or employees, while it was ongoing. Furthermore, T.A. later admitted that COHEN contacted one or more other individuals by telephone, from Israel, while law enforcement operations were underway, and sought to have those individuals assist in the destruction and/or deletion of electronic evidence of the scheme. Consequently, COHEN, who was a U.S. Legal Permanent Resident, and deprived of his workforce and tangible business assets, was forced out of business. Agents subsequently learned that COHEN had friends and other business associates in Virginia pack and ship COHEN's household effects back to Israel. Neither COHEN nor S.A. have returned to the U.S., reportedly in order to evade criminal prosecution for the instant offenses.

27. Investigating law enforcement authorities discovered that COHEN now operates an Israel-based kiosk worker recruiting and placement company known as Mesudarim. The company website found at http://www.msdr.co.il/ states that COHEN's "goal was to establish a manpower company whose sole purpose would be to locate employees for existing businesses and companies throughout the United States." The main page of the

website features a video of COHEN, saying in part: "Hello, I'm Shai Cohen, 32 years old,

mentor for success in sales.  If you were to tell me, back then, in 2005, when I landed in the

U.S. to sell Dead Sea products in malls, that 10 years after that will lead me to establish

companies worth millions of dollars each one, I would laugh in your face . . . .  In 2007 I

opened my first company . . . .  That year ended for me with 18 carts and over 60

employees that made a lot of money and 3 million dollars of sales.  Since then things

succeed more.  I opened more branches, we grew to 25 carts and over 100 employees.  In

between, I was nominated to be the head of training division of the worldwide company

"Premier" which is an empire, selling Dead Sea products in over than 500 locations around

the world.  My life completely changed.  I understood that to be rich is a method, like that

being poor is a method."

## IDENTIFICATION AND LOCATION INFORMATION

28.   SHAI COHEN is a citizen of Israel, born on March 27, 1984 in Israel.  He is described as a

white male, standing approximately six feet and weighing approximately 170 pounds with

black hair and brown eyes.  He holds an Israeli passport number 21336234.  He has an

Israeli identity number of 039551825.  COHEN has been located in Haifa, Israel, with a

residence of 4 Habrosh St., Kiryat Motzkin, Apartment 37, and a business address of 63

Ben Gurion Ave., Kiryat Bialik.

29.   A photographs of COHEN is attached to this affidavit as **Attachment 6**.  This is COHEN's

Virginia driver's license from 2013.  This photograph has been identified as that of

COHEN by Department of Labor and Department of Homeland Security agents, including

the affiant, based on physical surveillance of COHEN.

MATTHEW M. GRIMM
Special Agent
U.S. Department of Labor
Office of Inspector General


Sworn and subscribed to before me

this 29th day of Sept, 2017.


JOHN F. ANDERSON
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF VIRGINIA

16

# ATTACHMENT 1

# Electronic Articles of Incorporation
# For

TOMIK TOM INC

P11000033673
FILED
April 06, 2011
Sec. Of State
rdunlap

The undersigned incorporator, for the purpose of forming a Florida profit corporation, hereby adopts the following Articles of Incorporation:

## Article I

The name of the corporation is:

TOMIK TOM INC

## Article II

The principal place of business address:

11704 FAIRFAX WOODS WAY
STE 20208
FAIRFAX, VA. US  22030

The mailing address of the corporation is:

11704 FAIRFAX WOODS WAY
STE 20208
FAIRFAX, VA. US  22030

## Article III

The purpose for which this corporation is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The number of shares the corporation is authorized to issue is:

1000

## Article V

The name and Florida street address of the registered agent is:

SHAI  COHEN
843 ALDERMAN RD
STE 554
JACKSONVILLE, FL.  32211

I certify that I am familiar with and accept the responsibilities of registered agent.

Registered Agent Signature:  SHAI COHEN

P11000033673
FILED
April 06, 2011
Sec. Of State
rdunlap

# Article VI

The name and address of the incorporator is:

PAZ SHOHAM
2875 NE 191ST
STE 601
AVENTURA, FL 33180

Electronic Signature of Incorporator:   PAZ SHOHAM

I am the incorporator submitting these Articles of Incorporation and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S.  I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of this corporation and every year thereafter to maintain "active" status.

# Article VII

The initial officer(s) and/or director(s) of the corporation is/are:

Title:   P
SHAI  COHEN
11704 FAIRFAX WOODS WAY STE 20208
FAIRFAX, VA.  22030  US

Title:   VP
G       FI
11704 FAIRFAX WOODS WAY STE 20208
FAIRFAX, VA.  22030  US

**Please note: The SCC website will be unavailable Thursday, October 17, from 6-1 for system maintenance. We apologize for the inconvenience and appreciate y patience.**



Commonwealth of Virginia
**State Corporation Commission**

```
                                                                    10/15/13
        CISM0180              CORPORATE DATA INQUIRY                 14:00:31

     CORP ID:   F186418 - 2   STATUS: 00  ACTIVE          STATUS DATE: 07/16/12
     CORP NAME:  TOMIK TOM INC


DATE OF CERTIFICATE:  06/14/2011 PERIOD OF DURATION:        INDUSTRY CODE: 00
STATE OF INCORPORATION:  FL FLORIDA       STOCK INDICATOR:  S STOCK
MERGER IND:                         CONVERSION/DOMESTICATION IND:
GOOD STANDING IND: Y                MONITOR INDICATOR:
CHARTER FEE:  50.00     MON NO:         MON STATUS:  MONITOR DTE:
   R/A NAME:  SHAI COHEN

    STREET:  11350 RANDOM HILLS RD #872                  AR RTN MAIL:

       CITY:  FAIRFAX               STATE :  VA  ZIP:  22030
   R/A STATUS:  2  OFFICER         EFF. DATE:  07/19/12  LOC : 303
ACCEPTED AR#: 213 07 4725  DATE: 04/24/13                FAIRFAX CITY (F
CURRENT AR#: 213 07 4725  DATE: 04/24/13  STATUS: A  ASSESSMENT INDICATOR:  0
YEAR   FEES     PENALTY    INTEREST    TAXES      BALANCE      TOTAL SHARES
13     100.00                                                        1,000
```

(Screen Id:/Corp_Data_Inquiry)

# ATTACHMENT 2





Tue, Feb 26, 2013, 20:08



Wed, Nov 20, 2013, 14:53

Tysons upper

# ATTACHMENT 3



*Commonwealth of Virginia*
**State Corporation Commission**

10/04/13
09:57:27

CISM0180          CORPORATE DATA INQUIRY

CORP ID:  `0739803` - 5   STATUS: 00  ACTIVE          STATUS DATE: 07/26/11
CORP NAME:  S.T.R. COSMETICS INC.

DATE OF CERTIFICATE:  07/26/2011 PERIOD OF DURATION:          INDUSTRY CODE: 00
STATE OF INCORPORATION:  VA VIRGINIA       STOCK INDICATOR:  S STOCK
MERGER IND:                    CONVERSION/DOMESTICATION IND:
GOOD STANDING IND: Y             MONITOR INDICATOR:
CHARTER FEE:  50.00     MON NO:       MON STATUS:  MONITOR DTE:
   R/A NAME:  SHAI COHEN

   STREET:  11704 FAIRFAX WOODS WAY #20208          AR RTN MAIL:

       CITY:  FAIRFAX              STATE :  VA  ZIP:  22030
   R/A STATUS:  1  DIRECTOR      EFF. DATE:  07/26/11  LOC : 129
ACCEPTED AR#:  213 52 2695  DATE: 05/14/13          FAIRFAX COUNTY
CURRENT AR#:  213 52 2695  DATE: 05/14/13  STATUS: A  ASSESSMENT INDICATOR:  0
YEAR    FEES    PENALTY   INTEREST   TAXES    BALANCE       TOTAL SHARES
13    100.00                                               1,000

**(Screen Id:/Corp_Data_Inquiry)**

# ATTACHMENT 4

**From:** tal Jobank jobank26@gmail.com
**Subject:** יניב יובילר
**Date:** October 2, 2013 at 5:26 AM
**To:** shai cohen shai2703@gmail.com

שיוש,

אני מזכירה לך לגבי ווצ'ר וואצ'ר למלון ליניב יובילר...

אתם עושים את זה או שאתה רוצה שאני אעשה את זה ?

--

**טל שכטר**

**JOBank**

**Your Way 2 sucess**

**השמה לחו"ל**

יגאל אלון 112, בית מיקרודף, ת"א

טל' 03-6291637

ישיר 03-6038667

נייד 0524804749



**DAYS INN ALEXANDRIA**
110 SOUTH BRAGG STREET
ALEXANDRIA, VA 22312 US
Phone: (703) 354-4950
Fax: (703) 642-2873
Email: 06419@WYNHG.COM
Printed: 09/21/2013 5:30:27 PM

<u>Confirmation</u>

Name: YUBILER, YANIV

Date: Saturday, september 21, 2013

Dear Yubiler, Yaniv

Thank you for choosing the DAYS INN ALEXANDRIA for your next stay. The
following is the confirmation information that you requested.

| | |
|---|---|
| **Confirmation Number:** | 68204763 |
| **Account Number:** | 875-166897 |

| | |
|---|---|
| **Arrival Date:** | Friday, October 4, 2013 |
| **Departure Date:** | Wednesday, October 9, 2013 |
| **Number Of Nights:** | 5 |
| **Room Type Requested:** | ND3, UPGRADED 2 DOUBLES NS |
| **Rate Plan Requested:** | RACK - RATE OF THE DAY |
| **CXL Policy:** | CANCEL BEFORE 4PM |

**Room Rate:**

      10/4/2013 - 10/9/2013  $59.95 + Tax per night.

**Special Requests:**

**Total Estimated Stay Amount: $299.75 + Tax**

We hope that you enjoy your stay at the DAYS INN ALEXANDRIA and look
forward to seeing you again.
Thank You,

           **The Management of DAYS INN ALEXANDRIA**

**From:** shai cohen shai2703@gmail.com
**Subject:** Fwd: הזמנה לבית מלון ליניב מגיע ב4-אין לי את המייל שלו
**Date:** October 2, 2013 at 9:46 AM
**To:** nba77778@gmail.com



Shai Cohen

912-704-2999

Begin forwarded message:

**From:** ssc ssc <sscssc770@gmail.com>
**Date:** October 1, 2013 at 6:38:05 PM EDT
**To:** shai cohen <shai2703@gmail.com>
**Subject:** הזמנה לבית מלון ליניב מגיע ב4-אין לי את המייל שלו

צריך להעביר לו את זה ולעשות לו תדריך הוא מגיע בשישי



**From:** **Shai Cohen** shai2703@gmail.com
**Subject:** Fwd: sandra
**Date:** September 17, 2013 at 11:58 AM
**To:** S1a2n3d4ra@gmail.com



היי סנדרה,

אני מצרף לך את ההזמנה של המלון

בבקשה צרי איתי קשר

037636611
שלוחה-1

Shai Cohen

912-704-2999

Begin forwarded message:

**From:** ssc ssc <sscssc770@gmail.com>
**Date:** September 17, 2013, 10:51:14 AM EDT
**To:** shai cohen <shai2703@gmail.com>
**Subject: sandra**





**DAYS INN ALEXANDRIA**
110 SOUTH BRAGG STREET
ALEXANDRIA, VA 22312 US
Phone: (703) 354-4950
Fax: (703) 642-2873
Email: 06419@WYNHG.COM
Printed: 09/14/2013 9:22:28 AM

**Confirmation**

Name: BARABINSKI, SANDRA

Date: Saturday, september 14, 2013

Dear Barabinski, Sandra

Thank you for choosing the DAYS INN ALEXANDRIA for your next stay. The
following is the confirmation information that you requested.

| | |
|---|---|
| **Confirmation Number:** | 68207268 |
| **Account Number:** | 875-160143 |
| | |
| **Arrival Date:** | Friday, September 20, 2013 |
| **Departure Date:** | Wednesday, September 25, 2013 |
| **Number Of Nights:** | 5 |
| **Room Type Requested:** | ND3, UPGRADED 2 DOUBLES NS |
| **Rate Plan Requested:** | RACK - RATE OF THE DAY |
| **CXL Policy:** | CANCEL BEFORE 4PM |

**Room Rate:**

> 9/20/2013 - 9/25/2013  $59.95 + Tax per night.

**Special Requests:**

**Total Estimated Stay Amount: $299.75 + Tax**

We hope that you enjoy your stay at the DAYS INN ALEXANDRIA and look
forward to seeing you again.
Thank You,

**The Management of DAYS INN ALEXANDRIA**

# ATTACHMENT 5

| | |
|---|---|
| **From:** | Shai Cohen |
| **To:** | tal Jobank |
| **Subject:** | Re: הסכם נתי אסרף |
| **Date:** | Monday, September 2, 2013 11:05:43 AM |

היי טל,

לגבי טבלת הבונוסים נתי יקבל אלפיים דולר ברגע שימכור מעל 30אלף דולר.

לא יהיה לו בונוס מ20 אלף ו25 אלף.

הוא מקבל 35% מ-0

וברגע שהוא מגיע ל30אלף מכירות הוא בעצם מרוויח 41.6% בשכלול !!!! שזה מדהים

הלוואי שבכל חודש הוא יגיע ליעד ): 

המון הצלחה אני מצפה לראות אותך בקרוב

Shai Cohen

912-704-2999

On Sep 2, 2013, at 7:24 AM, tal Jobank <jobank26@gmail.com> wrote:

היי שי ונתי, שניכם מכותבים במייל זה.

מצורף ההסכם והתנאים של נתי בחברה (הוספתי את כל הסעיפים שדוברו בשיחת הטלפון).

נתי לא יכול להגיע הנה לחתום. הוא רוצה קודם כל לדעת שהוא נכנס לארה"ב., לכן שי לא ימכן

מראש את כרטיס הטיסה אבל הוספתי סעיף שנתי יקבל החזר מלא של הכרטיס במשכורת הראשונה.

אנא אישרו לי את ההסכם

נתי- תדפיס את ההסכם ותשמור בבית, אל תטוס איתו וגם תמחוק את המייל הזה וכל התכתבות

שהיא גם בפייסבוק, גם במייל וגם בסמסים איתי שנוגעים בעבודה.

המשך יום מקסים לשניכם,

טל

--

<נתי אסרף חוזה טומיק.docx>

Translate

Turn off instant translation

English Spanish French Hebrew - detected

From: Shai Cohen
To: tal Jobank
הסכם נתי אסרף :Subject: Re
Date: Monday, September 2, 2013 11:05:43 AM
היי טל,
לגבי טבלת הבונוסים נתי יקבל אלפיים דולר ברגע שימכור מעל 30 אלף דולר.
לא יהיה לו בונוס מ 20 אלף ו 25 אלף.
הוא מקבל 35% מ 0-
וברגע שהוא מגיע ל 30 אלף מכירות הוא בעצם מרוויח 41.6% בשכלול !!!! שזה מדהים
הלוואי שבכל חודש הוא יגיע ליעד :)
המון הצלחה אני מצפה לראות אותך בקרוב
Shai Cohen
912-704-2999
:On Sep 2, 2013, at 7:24 AM, tal Jobank <jobank26@gmail.com> wrote
היי שי ונתי, שניכם מכותבים במייל זה.
מצורף ההסכם והתנאים של נתי בחברה (הוספתי את כל הסעיפים שדוברו בשיחת הטלפון).
נתי לא יכול להגיע הנה לחתום. הוא רוצה קודם כל לדעת שהוא נכנס לארה"ב., לכן שי לא יממן
מראש את כרטיס הטיסה אבל הוספתי סעיף שנתי יקבל החזר מלא של הכרטיס במשכורת
הראשונה.
אנא אישרו לי את ההסכם
נתי- תדפיס את ההסכם ותשמור בבית, אל תטוס איתו וגם תמחוק את המייל הזה וכל התכתבות
שהיא גם בפייסבוק, גם במייל וגם בסמסים איתי שנוגעים בעבודה.
המשך יום מקסים לשניכם,
טל
--
נתי אסרף חוזה טומיק> .docx<

971/5000

English Spanish Arabic Translate

From: Shai Cohen
To: tal Jobank
Subject: Re: Agreement Nati Aseraf
Date: Monday, September 2, 2013 11:05:43 AM
Hi Tal,
For the bonus table, Nati will receive $ 2,000 when he sells over $ 30,000.
Will not have a bonus from 20 thousand and 25 thousand.
It receives 35%
And once he reaches 30 thousand sales he actually earns 41.6% perfecting !!!! That's amazing
I wish that every month he will reach the destination :)
Lots of success I look forward to seeing you soon
Shai Cohen
912-704-2999
On Sep 2, 2013, at 7:24 AM, tal Jobank <jobank26@gmail.com> wrote:
Hi Shai and Nati, both of you are subscribed to this email.
Attached is the agreement and the terms of Nati in the company (I have added all the items that were spoken on the phone).
Nati can not get here to sign. First of all, he wants to know that he is entering the US, so Shai will not pay for it
Advance the flight ticket but added an annual clause and will receive a full refund of the first salary card.
Please confirm the agreement
Nati - print the agreement and save at home, do not fly with him and delete this email and any correspondence
Which is also on Facebook, both in the mail and in sems with me that touch on work.
A lovely day for both of you,
Dew
-
Nati Aseraf Jose Tomik> .docx>

Suggest an edit

**From:** tal Jobank
**To:** shai cohen; netanelasraf@gmail.com; Meital Niv
**Subject:** הסכם נתי אסרף
**Date:** Monday, September 2, 2013 7:24:09 AM
**Attachments:** נתי אסרף חוזה טומיק.docx

היי שי ונתי, שניכם מכותבים במייל זה.
מצורף ההסכם והתנאים של נתי בחברה (הוספתי את כל הסעיפים שדיברו בשיחת הטלפון).
נתי לא יכול להגיע הנה לחתום. הוא רוצה קודם כל לדעת שהוא נכנס לארה"ב., לכן שי לא יממן מראש את כרטיס הטיסה אבל הוספתי סעיף שנתי יקבל החזר מלא של הכרטיס במשכורת הראשונה.
אנא אישרו לי את ההסכם
נתי- תדפיס את ההסכם ותשמור בבית, אל תטוס איתו וגם תמחוק את המייל הזה וכל התכתבות שהיא גם בפייסבוק, גם במייל וגם בסמסים איתי שנוגעים בעבודה.
המשך יום מקסים לשניכם,
טל
--

Translate

Turn off instant translation

English Spanish Hebrew Detect language

English Spanish Arabic Translate

היי שי ונטי, שניכם רשומים במייל הזה.

מצורף ההסכם ואת תנאי של נטי בחברה (הוספתי את כל הדברים שדובר עליהם בטלפון).
נטי לא יכול להגיע לכאן לחתום. קודם כל, הוא רוצה לדעת שהוא נכנס לארה"ב, אז שי לא ישלם על כרטיס הטיסה מראש, אבל אני הוספתי סעיף שנתי שיקבל החזר מלא על המשכורת הראשונה.
אנא אשרו לי את ההסכם
נטי – הדפיסו את ההסכם ותשמרו בבית, אל תטוסו איתו ותמחקו את המייל הזה וכל התכתובת שיש גם בפייסבוק, שניהם במייל ובכל ההתכתבויות שעובר איתי בנגיעה.

יום נעים לשניכם,
טל

477/5000

Hi Shai and Nati, both of you are subscribed to this email.
Attached is the agreement and the terms of Nati in the company (I have added all the items that were spoken on the phone).
Nati can not get here to sign. First of all, he wants to know that he is entering the US, so Shai will not pay the flight ticket in advance, but I added an annual clause that will receive a full refund on the first salary.
Please confirm the agreement
Nati - print the agreement and save at home, do not fly with him and delete this email and any correspondence that is also on Facebook, both in the email and sems with me that touch work.
A lovely day for both of you,
Dew

Suggest an edit

<u>**חוזה העסקה בחברת TOMIQ -2013**</u>

בתאריך__________נערך ונחתם חוזה לתנאי העסקה בין <u>TOMIQ</u> ("החברה"), לבין ("העובד"), לתקופה שבין ועד

מסמך זה נועד לסכם בכתב, קשר מחויבות בין עובד-מעביד, מעביד-עובד.

1. <u>**כללי**</u> :

בבסיס חוזה זה נמצאת הנחת היסוד כי <u>TOMIQ</u> מחויבת לספק תעסוקה לעובד וכי העובד מגיע בכוונה ברורה לעבוד.

2. <u>**הגדרת תפקיד:**</u>

עבודה כאיש מכירות בנקודות מכירה (עגלות) בקניונים.
שיבוץ העבודה יעשה ע"י החברה, שיבוץ זה הינו מחייב.

3. <u>**תנאי עבודה:**</u>

- העבודה הינה 5 ימים בשבוע.
- (ישנה אפשרות לעבודה 6 ימים בשבוע ).

- <u>**שעות העבודה ביום:**</u>
- *משעת פתיחת הקניון ועד לסגירתו
- *שעות פתיחת הקניון, שני-שישי 10:00-21:30
- *שעות פתיחת הקניון, ראשון 11:00-18:00
- השעות הנ"ל לא כוללות את תקופת החגים.
- שעות העבודה משתנות בין קניון לקניון
- יציאה מהבית שעה לפני התחלת העבודה

- שכר יקבע עפ"י אחוזים לפי המדרגות הבאות:

| עמלת מכירות | | |
|---|---|---|
| מכירות $ | אחוז עמלה | הערות |
| 0- ומעלה | 35% | Retro |

**RETRO- ממכירות הדולר הראשון**

6. **חובות העובד**

העובד מתחייב כלפי החברה כדלקמן:
למלא את תפקידו בחריצות, במיומנות רצינה ובמסירות, וזאת לשם ביצוע היעיל
והנכון של תפקידו, לתועלת החברה ולקידום עניניה, להשתמש בכל כישוריו,
ידיעותיו ונסיונו לתועלת החברה ולפעול בנאמנות מוחלטת כלפי החברה. לא
להעמיד עצמו בכל דרך שהיא במצב של ניגוד עניינים עם החברה, ובכל מקרה בו
יקלע למצב כזה או יעלה אצלו חשש סביר כי מצב כזה עלול לקרות - לדווח על כך
באופן מיידי לממונים עליו.
בנוסף מתחייב העובד לאמינות ויושר מוחלטים כלפי החברה.
אם העובד אינו עומד בתנאי החוזה ובחובותיו כלפי החברה, החברה שומרת
לעצמה את הזכות להפסיק באופן חד צדדי חוזה זה.


**אני העובד מצהיר בזאת כי אם חתמתי על מסמך זה אני מבין את תוכנו על כל**
**סעיפיו, אני מבין את**

**חובותיי וזכויותיי כרשום לעיל וכעובד בחברת-.TOMIQ**


שם המועמד/עובד – חתימה

———————————

On _____, a contract was signed for the terms of the transaction between TOMIQ
("the Company") and "
("The Employee"), for a period between two months

This document is intended to summarize in writing, linking commitment between
employer, employer and employee.

1. General :

Underlying this contract is the premise that TOMIQ is committed to providing
employee employment
And that the employee comes with a clear intention to work.

2. Defining a position:

Work as a salesperson at points of sale (carts) in malls.
The placement of the work will be done by the company, which is binding.

3. Working conditions:

• The work is 5 days a week.
• There is an option to work 6 days a week.

• Working hours per day:
* From the time the mall opens until it is closed
* * Opening hours of the mall, Monday - Friday 10: 00-21: 30
* * Opening hours of the mall, Sunday 11: 00-18: 00
• The above hours do not include the holiday period.
• Work hours vary between mall and mall
• Leave the house an hour before starting work

• Salary shall be determined according to percentages according to the following steps:

Sales commission
Sales $ Percent Commission Notes
0% and up 35% Retro

RETRO - from the first dollar sales

• Bonuses
In a month where the seller has sold over $ 20,000 in sales - the seller will receive a $ 1000 bonus !!!!!
In a month where the seller has sold over $ 25,000 in sales - the seller will receive a bonus of $ 1250 !!!!!!
In a month where the seller sold over $ 30,000 in sales - the seller would receive a $ 2000 bonus !!!!!!
Making our percentage in the company more than 30% of total sales.
We believe in excellence as you succeed more - you will get more !!

4. Residential-

The company will ensure that the employees will be housed in furnished furnished apartments that will include, among others: refrigerator, washing machine, television, microwave and internet connection.
The rent will be determined according to the location, the maximum deductible per employee is
$ 145 per week. Any rent beyond this amount will be paid by the Company.
If sold in the month over $ 15,000 sales does not pay rent

5. Refund of airfare cost

Full refund on first flight ticket

6. Payment of salary -

The salary will be paid once every two weeks

7. Mobility of workers -
Will be carried out according to the needs of the Company between the various points of sale.

1. Vacation-

At least one day per week or depending on the conditions and needs.

2. Clothing Code-

Trousers, black shirt and black shoes.

3. Pick-up from the airport-

The company will arrange transportation of the worker from the airport to the workers' apartment.

4. Professional-

The Company will arrange for the employee to be trained at the sales point by a close instructor who will accompany and train until the employee feels safe to sell independently.

5. Personal equipment-

The employee must take care of personal accessories such as bedding, towels and clothes.

6. Employee's obligations

The Employee undertakes towards the Company as follows:
Diligently and devotedly, in order to carry out the efficient and proper performance of his duties, to the benefit of the Company and to the advancement of its affairs, to use all his skills, knowledge and experience for the benefit of the Company and to act in absolute loyalty to the Company. Not to place itself in any situation in a conflict of interest with the Company, and in any event in which such a situation occurs or he reasonably fears that such a situation may occur - to report it immediately to his superiors.
In addition, the employee undertakes absolute reliability and integrity towards the Company.
If the employee does not meet the terms of the contract and his obligations towards the company, the company reserves the right to unilaterally terminate this contract.


I the employee hereby declare that if I signed this document I understand its contents and all its clauses, I understand the

My duties and rights are listed above and I am a member of TOMIQ

Name of applicant / employee – signature

_____

# ATTACHMENT 6

