IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:16-CR-114 |
| SHAI COHEN, | |
| Defendant. | |

FILED IN OPEN COURT
NOV -7 2023
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

STATEMENT OF FACTS

The United States and the defendant, SHAI COHEN, agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

1. As set forth in greater detail below, beginning in and around 2011, and continuing through in and around December 2013, in the Eastern District of Virginia and elsewhere, the defendant did knowingly and willfully combine, conspire, and agree with others to commit one or more offenses against the United States, including by:

    a. encouraging and inducing aliens to come to, enter, and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence in the United States was and would be in violation of law, for the purpose of commercial advantage and private financial gain, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv);

    b. concealing, harboring, and shielding from detection aliens, knowing and in reckless disregard of the fact that they came to, entered, and remained in the United States in violation of law, in buildings and other places, including any means of transportation,

1

for the purpose of commercial advantage and private financial gain, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iii); and

  c. transporting and moving aliens by means of transportation and otherwise in furtherance of such violation of law, knowing and in reckless disregard of the fact that they came to, entered, and remained in the United States in violation of law, for the purpose of commercial advantage and private financial gain, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii).

 2. Additionally, beginning in and around 2011, and continuing through at least in and around December 2013, in the Eastern District of Virginia and elsewhere, the defendant and co-conspirators knowingly conducted financial transactions affecting interstate and foreign commerce, which involved the proceeds of specified unlawful activity, that is, conspiracy to bring in and harbor aliens, and the bringing in and harboring of aliens, as set forth in Counts 1-28 of the Indictment, with the intent to promote the carrying on of the specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

 3. The defendant and his co-conspirators further agreed to transport, transmit, and transfer, and attempt to do the same, a monetary instrument or funds, from a place in the United States to or through a place outside the United States, with the intent to promote the carrying on of the specified unlawful activity, that is, conspiracy to bring in and harbor aliens, and the bringing in and harboring of aliens, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

**A. The defendant and the Enterprise**

 4. The defendant is a native of the State of Israel and had status as a Lawful Permanent Resident of the United States. He first entered the United States in and around October 2006 via

an H-2B visa. At various times from in and around 2011 through in and around December 2013, he served as the President, Vice President, Registrant, Officer, Principal, and/or Owner, and otherwise controlled, owned, registered, managed, and/or operated, with the assistance of others, various related United States business entities, including: STR Cosmetics Inc.; STR Gratiae Cosmetics Inc.; STR Consultation; Tomik Tom Inc.; Tomikom Inc.; Tora Ankave Inc.; SCO Investments LLC; Gena Investments LLC; SYR Cosmetics Inc.; SSC Elite LLC; RSE International Inc.; and Tomik Tom DBA Premier Skin Care. The aforementioned business entities listed on official documents a Fairfax, Virginia address as either its principal place of business or the address of its director or trustee, or both.

5. These business entities marketed and sold retail beauty and skin care products, some purportedly from the Dead Sea region of Israel. The business entities sold these products from retail space – including kiosks, carts, and a retail store – that was leased by the defendant and his co-conspirators and located at various mall-type locations in the Eastern District of Virginia and elsewhere. The retail outlets used by the business entities to sell the products had various names, including Mica Beauty, Mica Bella, Gratiae, Oro Gold, DFI Aging, and Premier. Collectively, these business entities and associated outlet operations are hereinafter referred to as "the Enterprise."

6. Beginning in 2011, the defendant and/or his associates filed articles of incorporation/organization for the aforementioned business entities with, among others, the Florida State Division of Corporations, the Commonwealth of Virginia State Corporation Commission, and the Nevada Secretary of State. Some of the business entities were then registered with the Internal Revenue Service (IRS) to obtain Employer Identification Numbers.

7. On or about April 6, 2011, the defendant incorporated Tomik Tom Inc. in Florida, using as the corporate registration address 11704 Fairfax Woods Way, #20208, Fairfax, Virginia, an apartment leased by the defendant and a co-conspirator.

8. On or about February 1, 2012, February 1, 2013, March 1, 2013, and May 1, 2013, the defendant signed leases (on behalf of RSE International Inc. and STR Consultation Inc. c/o Tomik Tom) with Tysons Corner Center in Fairfax County, Virginia for Mica Beauty retail locations.

9. On or about March 28, 2012, the defendant emailed co-conspirators T.A. and R.G. a message containing a management proposal for 2012 for an Enterprise venture later identified as STR Inc. The management structure detailed in the message describes the functions and responsibilities of each Enterprise partner, salary and profit sharing, bank accounts, work schedules and time off, management of workers at the kiosks, and vehicles and residences paid for by the Enterprise.

10. On or about April 30, 2012, the defendant signed a lease on behalf of RSE International Inc. with Tysons Corner Center for an Oro Gold retail location.

11. On or about July 6, 2012, the defendant registered Tomik Tom Inc. to do business in Virginia, using as the corporate mailing address 11350 Random Hills Rd., Suite 872, Fairfax, Virginia.

12. On or about May 1, 2013, the defendant signed a lease on behalf of STR Cosmetics Inc. with Fashion Centre at Pentagon City in Arlington, Virginia for a Mica Beauty retail location.

13. On or about November 14, 2013, the defendant signed a lease on behalf of SSC Elite, LLC with Fair Oaks Mall in Fairfax, Virginia for a Mica Beauty retail location.

### B. Types of nonimmigrant visa statuses in the United States

14. A citizen of a foreign country who wishes to enter the United States must first obtain a visa, either a non-immigrant visa for temporary stay, or an immigrant visa for permanent residence. Under United States laws and regulations, non-citizens of the United States—i.e., "aliens"—are not permitted to work in the United States unless they obtain employment authorization from the United States government. Aliens living outside of the United States can apply for a non-immigrant employment-based visa, referred to as an H-2B visa. The H-2B visa allows foreign nationals to work in the United States for a specified, temporary period of time for a specific employer. Securing an H-2B visa requires an employer to get approval from the U.S. Department of Labor (DOL), the U.S. Department of Homeland Security (DHS) and the U.S. Department of State (DOS). The H-2B visa program is subject to stringent requirements and only a limited number of such visas are issued each year.

15. Visitor visas, known as B-1 and/or B-2 visas, are non-immigrant visas for persons who want to enter the United States temporarily for certain activities, such as tourism, pleasure, or medical treatment, and are issued by DOS. A B-1/B-2 visa holder is not permitted to work or be paid while in the United States.

16. Similarly, a non-immigrant visa classification F-1 allows an alien to enter the United States as a full-time student at an accredited academic institution or in a language training program. Generally, F-1 students may not seek off-campus employment during the first academic year, and only with DHS authorization and subject to restrictive conditions during any subsequent year.

17. Certain foreign nationals may also enter the United States through the Visa Waiver Program (VWP). The VWP provides for visa-free travel by nationals of designated countries

coming to the United States for tourism or business (i.e., B visa purposes) for a temporary period. However, admission to the United States under the VWP expressly does not authorize the holder to work for a U.S. employer.

### C. The Enterprise's scheme to recruit foreign workers and illegally employ them in the United States

18. From in and around 2011 through in and around December 2013, the defendant and his co-conspirators agreed and understood that the Enterprise would recruit, hire, and employ foreign nationals primarily from Israel to work as employees in its kiosks and stores in malls in the United States, including within the Eastern District of Virginia. The defendant and his co-conspirators knew or recklessly disregarded that many of their recruited foreign nationals lacked the requisite authorization to work in the United States and, therefore, were in violation of their immigration visa status.

19. The Enterprise secured the services of many of its illegal workers using the assistance of Israel-based recruiting services on retainer for a monthly service charge. After an agreement was reached for an alien's U.S. employment, including travel, housing, and other subjects of negotiation, the Enterprise paid a fee to the recruiting service for a successful placement. The fee ranged in price depending on the U.S. immigration status of the recruit, with the least expensive recruits being those persons who held or would obtain B-1/B-2 visitor visas. If prospective employees did not already have a visa, the recruiting service would assist individuals in obtaining one for travel to the United States, even though such visas would not allow for employment.

20. From in and around 2011 through in and around December 2013, the Enterprise also employed illegal workers who had previously come to the United States on B-1/B-2 or other

non-employment visas and had illegally worked for similar Dead Sea product retail operations prior to their employment with the Enterprise.

21.     Some Enterprise personnel, including the defendant and his associates who served as managers of retail locations, had immigration status in the United States that allowed for their employment. Only for this category of personnel did the Enterprise engage in some reporting of wages and employees to the IRS and state employment agencies and reporting of employees to DOL, DOS, and DHS. When wages were reported for the Enterprise employees who had legal status to work in the United States, the reports were, at times, inaccurate insofar as they underreported the number of employees working for the Enterprise and the wages earned by the Enterprise employees.

22.     The Enterprise used B-1/B-2 and other non-employment visa holders as its primary workforce in the United States, a fact that it did not disclose to any U.S. government agency. As well, the Enterprise did not withhold employment or income taxes from the compensation it provided to its B-1/B-2 or other non-employment visa holding employees and did not report those employees to the IRS or state employment agencies.

**D. Employment and travel process for the Enterprise's employees**

23.     Enterprise personnel entered into employment contracts with the foreign nationals that it recruited to work in the United States, pursuant to which the Enterprise would agree to front some or all of the workers' transportation costs, including the expenses of traveling to and within the United States. The Enterprise also agreed to pay employees on a commission basis for sales conducted in the United States. However, employees were required to reimburse the Enterprise for transportation, housing, and other related expenses via deductions from their pay.

7

24. Prior to an employee's arrival in the United States, Enterprise and recruiting service personnel in Israel exchanged via email certain documents and information related to the employee's impending arrival, including, at times, a biographical summary, travel itinerary, and employment contract. Such emails were sent by and/or to various Enterprise personnel, including the defendant, his assistants, and his retail location managers. In certain situations, prospective employees were provided with addresses to use on their Form I-94 Arrival/Departure records and briefed on how to act and what to say and do during the Customs and Border Protection inspection process for entry into the United States. In some instances, employees were also provided with copies of hotel reservations (that were subsequently cancelled before any charges were incurred) for use on their immigration forms and to show immigration authorities to make their status as visiting tourists appear more credible.

25. In violation of their status as B-1/B-2 visitors or other non-employment visa holders, Enterprise employees traveled to the United States and worked at the various kiosks and stores in malls, including in the Eastern District of Virginia. Enterprise workers engaged in illegal employment were primarily compensated for their work via under the table cash payments or the transfer of money to stored value payment cards, rather than via a legitimate payroll system.

### E. Recruitment, employment, and harboring of specific foreign national employees

26. In and around January 2012, the defendant and JOBANK (a/k/a Job Overseas or Giovenco), a recruiting service based in Tel Aviv, Israel, reached an agreement for JOBANK to begin recruiting workers for the Enterprise.

27. From in and around 2012 through in and around December 2013, the Enterprise utilized JOBANK to enlist B-1/B-2 and other non-employment visa workers.

28. The defendant and his co-conspirators regularly communicated with JOBANK regarding recruitment efforts. Through email, JOBANK and the defendant and his co-conspirators exchanged messages that contained background summaries on and photos of potential recruits, arranged for the defendant to speak with recruits, confirmed the booking of airline tickets and hotel reservations, reviewed terms of labor agreements with recruits, and included receipts and invoices from JOBANK for recruited workers and from a foreign travel agency for airline ticket fees.

29. Among the employees the Enterprise recruited through and communicated about with JOBANK were the following 10 individuals who traveled to the United States to live in the Eastern District of Virginia for the purpose of employment with the Enterprise: S.B.(1), S.B.(2), A.G., S.M., A.P., N.P., L.P., D.B., M.V., and M.A.

30. Sometime between June 2012 and October 2013, S.B.(1), S.B.(2), A.G., S.M., A.P., N.P., L.P., D.B., M.V., and M.A. entered the United States on a B-1/B-2 visitor visa or via the VWP. During this time period, each of these ten individuals worked at Enterprise retail locations in the Eastern District of Virginia. Of these 10 individuals, at least N.P., D.B., M.V., and M.A. were issued stored value payment cards by the Enterprise as a form of payment.

31. On or about August 9, 2013, the defendant picked up recruited illegal employee M.A., a B-1/B-2 visa holder, from an Enterprise-leased apartment complex in Fairfax, Virginia, and transported her to an Enterprise retail location using an Enterprise vehicle.

32. On or about November 12, 2013, JOBANK personnel emailed the defendant a labor agreement for certain recruited workers. The labor agreement detailed aspects of the employment arrangement including the pickup and transport of recruits from the airport upon arrival to the apartment where they would be housed, work locations at "wagons" (kiosks) in malls, work attire, reimbursement of airfare, apartment rent, and how the workers would be paid.

33. On or about November 13, 2013, the defendant and JOBANK personnel exchanged emails about how various recruited illegal workers, including S.M., L.P., and S.B.(1), were performing at Enterprise retail locations, including at Fair Oaks Mall. The defendant discussed the workers' English abilities, motivation, and sales figures.

34. On or about December 5, 2013, the defendant was present at Enterprise retail outlets in Virginia and supervised, led, and directed the activities of other workers, including employees he knew to be working in the United States illegally.

35. On or about December 17, 2013, the defendant was housing at least 13 illegal workers at Enterprise apartments leased by the defendant and/or his co-conspirators in Fairfax, Virginia, including the following:

| Non-Citizen Worker | Location |
|---|---|
| E.D. | 11717 Fairfax Woods Way, # 14012, Fairfax, VA 22030 |
| S.B. (1) S.B. (2) | 11730 Fairfax Woods Way, #1308, Fairfax, VA 22030 |
| Y.Y. | 11730 Fairfax Woods Way, #1308, Fairfax, VA 22030 |
| S.K. | 11730 Fairfax Woods Way, #1108, Fairfax, VA 22030 |
| B.M. | 11704 Fairfax Woods Way, #20306, Fairfax, VA 22030 |
| L.P. | 11730 Fairfax Woods Way, #1308, Fairfax, VA 22030 |
| S.M. | 11602 Fairfax Woods Way, #16108, Fairfax, VA 22030 |
| M.A. | 16000 Fairfax Meadows Cir., #16003, Fairfax, VA 22030 |
| N.P. | 11730 Fairfax Woods Way, #1108, Fairfax, VA 22030 |
| M.V. | 11600 Fairfax Meadows Cir., #16003, Fairfax, VA 22030 |
| Z.B. | 11730 Fairfax Woods Way, #1108, Fairfax, VA 22030 |
| Y.P. | 11602 Fairfax Meadows Cir., #16108, Fairfax, VA 22030 |

The defendant knew that these foreign nationals were in the United States on non-employment visas and were working for the Enterprise without authorization.

F. **The Enterprise's financial structure**

36. The Enterprise, including the defendant, generated proceeds through the retail sales of beauty products sold by the Enterprise's illegal workforce. Generally, the overall proceeds

earned by the Enterprise were inflated because the Enterprise was able to pay lower labor costs due to the illegal nature of its workforce, as well as earn profit based on the labor of its unlawfully employed workers.

37.    The proceeds of the unlawful activity were deposited into accounts at the following identified financial service providers: Global Payments, American Express Merchant Services, and Bank of America (collectively, the "Merchant Services Accounts"). The proceeds were then moved to various accounts—primarily direct deposit accounts held at Bank of America—controlled by the defendant and his co-conspirators.

38.    The defendant and his co-conspirators knowingly used the Enterprise accounts to pay themselves, as owners and managers, as well as to pay their employees. These bank accounts were also used to make regular transfers to Automated Data Processing Payroll Services to pay the Enterprise's subset of permanent resident and/or U.S. citizen employees. At least two Enterprise bank accounts were used to pool funds from other Enterprise accounts and then transfer those funds to Payoneer Payment Solutions (Payoneer), a firm that specialized in providing payroll solutions to employers whose employees did not have bank accounts. Payoneer then allowed the defendant and his co-conspirators to load funds onto stored value payment cards, which were then issued to the Enterprise's illegal workforce as their "salary."

39.    From in and around November 2011 through in and around December 2013, Enterprise Bank of America accounts took in approximately $3.96 million through the Merchant Services Accounts and credit card processing accounts for sales occurring at Enterprise kiosks and stores.

40.    The table below depicts the ownership structure and linked addresses of bank accounts which were held and used by the defendant and the Enterprise:

| Bank of America Account/*Owner* | Last 4 Digits of Account # | Address on Account |
|---|---|---|
| STR COSMETICS INC. *Shai Cohen, T.A.* | *6781 | 11704 Fairfax Woods Way, #20208 Fairfax, VA 22030 |
| STR COSMETICS C/O TOMIK TOM INC. | (as of 10/1/12) | 11350 Random Hills Rd., Suite 800 Fairfax, VA 22030 |
| STR COSMETICS *Shai Cohen, T.A.* | *7862 | 11704 Fairfax Woods Way, #20208 Fairfax, VA 22030 |
| STR GRATIAE COSMETICS *Shai Cohen, T.A.* | *7023 | 11704 Fairfax Woods Way, #20306 Fairfax, VA 22030 |
| STR CONSULTATION INC. C/O TOMIK TOM *Shai Cohen, T.A.* | *6969 | 11350 Random Hills Rd., Suite 800 Fairfax, VA 22030 |
| TOMIK TOM INC. | *7749 | 11704 Fairfax Woods Way, #20208 Fairfax, VA 22030 |
|  | (as of 10/1/12) | 11350 Random Hills Rd., Suite 800 Fairfax, VA 22030 |
| TOMIK TOM INC. *Shai Cohen, G.F.* | *9695 | 11704 Fairfax Woods Way, #20208 Fairfax, VA 22030 |
| TORA ANKAVE *Shai Cohen, T.A.* | *7532 | 4231 Monument Hill Way #135 Fairfax, VA 22030 |
| TOMIK TOM INC. *G.F. (individual account)* | *7914 | 11704 Fairfax Woods Way, #20208 Fairfax, VA 22030 |
| TOMIK TOM INC. *Shai Cohen, G.F.* | *7600 | 11704 Fairfax Woods Way, #20208 Fairfax, VA 22030 |
| TOMIK TOM INC. *Shai Cohen (individual account)* | *9750 | 11350 Random Hills Rd., Suite 800 Fairfax, VA 22030 |
| TOMIK TOM INC. | *6943 | 11350 Random Hills Rd., Suite 800 Fairfax, VA 22030 |
| TOMIKOM INC. *Shai Cohen, G.F.* | *6888 | 11704 Fairfax Woods Way, #20208 Fairfax, VA 22030 |

| SCO INVESTMENTS LLC | *7930 | 11704 Fairfax Woods Way, #20208 Fairfax, VA 22030 |
|---|---|---|
| SHAI COHEN | *1052 | 11704 Fairfax Woods Way, #20208 Fairfax, VA 22030 |
| G.F. | *7546 | 4162 Monument Hill Way, #13202 Fairfax, VA 22030 |

### G. Financial transactions made in furtherance of and to promote the criminal scheme

41.  The defendant and his co-conspirators knowingly used specific bank accounts for domestic and foreign transactions, including to make payments for: the Enterprise's leased locations (including rented office space, apartments, and mall kiosks and store locations); airline tickets, vehicles, and local transportation costs; recruiting costs; utility payments for apartment locations; point of sale software used at the retail locations; and other business costs that allowed the defendant and his co-conspirators to continue running the Enterprise businesses that employed illegal foreign workers.

42.  From in and around 2011 through in and around 2013, the defendant leased business office space located at 11350 Random Hills Rd., Suite 800, in Fairfax, Virginia, where he and several of his assistants and subordinate employees oversaw the activities of the Enterprise. The office was leased in the name of STR Consultation. The Enterprise used its Bank of America accounts to pay rent for its office space.

43.  From in and around 2012 through in and around December 2013, the Enterprise leased apartments in Fairfax, Virginia to house employees. The apartment leases were in the names of business entities and/or individuals associated with the Enterprise, including the defendant. Along with the employees, the defendant and other Enterprise personnel resided in the

leased apartments. The Enterprise used its Bank of America accounts to pay rent and utilities for employee housing at these apartments.

44. From in and around 2011 through in and around December 2013, the defendant and/or Enterprise personnel, leased mall kiosk and store locations in the Eastern District of Virginia and elsewhere. The defendant and his co-conspirators served as the owner or contact person on the leases with all the malls and regularly communicated with the malls' management via email regarding lease agreements, day-to-day operations, sales reports, and complaints. The Enterprise's Bank of America accounts were used to pay rent for the retail locations at the malls.

45. From in and around 2012 through in and around December 2013, the defendant and/or his associates owned or leased a fleet of vehicles in Virginia used to transport themselves and illegal workers. These vehicles were registered by Enterprise personnel and linked to residences leased by the Enterprise. The defendant was the registrant on at least eight of the vehicles. Additionally, Enterprise bank and/or credit card accounts paid for the vehicles and their registrations, maintenance, and fuel costs.

46. From in and around 2012 through in and around December 2013, international transfers were made from Enterprise bank accounts in the United States to JOBANK's bank account in Israel. In total, approximately $30,427.11 in international transfers were sent to JOBANK's bank account from at least three Enterprise bank accounts ending in *9695, *7862, and *7600 in the name of Tomik Tom Inc. and STR Cosmetics Inc. These transfers by the Enterprise were to pay the fees for JOBANK's recruiting services, including its retainer fees and payments for the successful placement of illegal workers.

47. Numerous international transfers were made from Enterprise bank accounts in the United States to the bank accounts of foreign travel agencies in Israel. In total, at least

approximately $15,151.00 in international transfers were sent from Enterprise bank accounts to the foreign travel agency accounts. These transfers by the Enterprise were to pay the fees for booked airline tickets. During the period of the conspiracy, total Enterprise bank account expenditures for airfare were approximately $56,788.00.

48. From in and around 2012 through in and around December 2013, the Enterprise, using the STR Consultation Inc. c/o TOMIK TOM *6969 and Tomikom Inc. *6888 accounts, transferred funds generated by its retail operations to Payoneer. In total, approximately $275,367.00 in transfers was sent from the specified Enterprise accounts to Payoneer to fund stored value payment cards given to at least 29 known B-1/B-2 or other non-employment visa employees.

49. On or about June 13, 2012, the defendant, on behalf of STR Cosmetics Inc., signed an authorization for automatic bill payment of its lease fees from the Enterprise Bank of America account ending in *6781 with Tysons Corner Center for an Oro Gold retail location.

50. This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

51.   The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

Jessica D. Aber
United States Attorney

Date: November 7, 2023        By: _____
Raizza K. Ty
Assistant United States Attorney

Nicole Argentieri
Acting Assistant Attorney General

By: _____
Clayton O'Connor
Trial Attorney
U.S. Department of Justice
Human Rights and Special Prosecutions Section

16

After consulting with my attorney and pursuant to the plea agreement entered into this day between me and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
SHAI COHEN

I am Brooke S. Rupert, the defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Brooke S. Rupert, Esq.
Attorney for the Defendant

17