IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>        v.<br><br>Shai Cohen,<br><br>        Defendant. | Case No. 1:16-CR-114-001<br><br>Hon. Claude M. Hilton<br><br>Hearing: January 19, 2024, 10:00 a.m. |

### **POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

The defendant, Shai Cohen, comes before the Court for sentencing after pleading guilty to one count of Conspiracy to Commit Offenses Against the United States in violation of 18 U.S.C. § 1324(a)(1)(A)(ii)-(iv), all in violation of 18 U.S.C. § 371 (Count 1), and one count of Conspiracy to Launder Money, in violation of 18 U.S.C. § 1956(h) (Count 29).

The United States recommends that the court adopt the findings and Guideline calculations in the amended Presentence Investigative Report ("PSR"), Dkt. 38. For the reasons stated herein, the United States respectfully requests the Court to impose a sentence of incarceration of 46 months, which is the low-end of the advisory Guideline range of 46 to 57 months[1], three years of

---

[1] As an initial matter, the parties' signed Plea Agreement does not include any agreements about the specific guidelines applicable in this case and further does not restrict either party from making arguments about the application or preclusion of certain guidelines. *See* Dkt. 31. The U.S. Sentencing Commission Guidelines Manual 2023, which was used to determine the guidelines calculations in this case, incorporated guideline amendments that took effect on November 1, 2023, one week before the defendant's entry of a plea in this case. Among the amendments is a Zero-Point Offender guideline, pursuant to U.S.S.G. §4C1.1(a)(10), which serves as a two-level downward adjustment if the defendant "did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848." Counsel for the United States acknowledges that, prior to the entry of the defendant's plea and filing of the Presentence Investigation Report, counsel had the belief – albeit a mistaken one – that the Zero-Point Offender Guideline pursuant to §4C1.1(a)(10) would "likely" be applicable to the defendant and communicated that representation to defense counsel. While the PSR did not so apply §4C1.1(a)(10) to the defendant's guideline calculation, the

supervised release[2], forfeiture, and a special assessment of $200. Such a sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing and appropriately accounts for each of the factors set forth in 18 U.S.C. § 3553(a).

I.  **FACTUAL AND PROCEDURAL BACKGROUND**

On May 12, 2016, the defendant was charged in a 29-count indictment returned by a grand jury in the Eastern District of Virginia, Alexandria Division. The 29 counts of the indictment included the following charges: Conspiracy to Defraud and to Commit Offenses Against the United States, in violation of 18 U.S.C. 371 (Count 1); Bringing Aliens to the United States for Financial Gain, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii), 18 U.S.C. § 2 (Counts 2-8); Encouraging and Inducing Aliens to Unlawfully Come to, Enter and Reside in the United States for Financial Gain (Counts 9-18); Harboring Illegal Aliens, in violation of 8 U.S.C. § 1324(a)(I)(A)(iii), 18 U.S.C. § 2 (Counts 19-28); and Money Laundering Conspiracy, in violation of 18 U.S.C. 1956(h).

On November 7, 2023, the defendant pled guilty to Counts 1 and 29 of the indictment.[3] As detailed in the PSR and Statement of Facts, the defendant's convictions stemmed from an extensive

---

United States notes that, had it been applied, the resulting advisory range would be 37-46 months, based on a base offense level of 21 and a Criminal History Category of I. Regardless of the calculation, the United States' ultimate recommendation of 46 months' imprisonment is a within-guidelines sentence in either advisory guidelines range.

[2] Supervised release is generally disfavored for deportable aliens, U.S.S.G. §5D1.1(c); however, the defendant currently maintains his U.S. lawful permanent resident status. Supervised release may be appropriate in the event the defendant remains in the United States and is not immediately returned to Israel, and if the Court determines supervised release is warranted after considering the appropriate factors. A term of supervised release would provide an added measure of deterrence to ensure the defendant refrain from engaging in criminal activities.

[3] The defendant was in Israel when law enforcement executed search warrants on his home and businesses on December 17, 2013. PSR ¶110. Following law enforcement's actions in the U.S., the defendant decided to stay in Israel. *Id.* He resided in Israel until his arrest and extradition to the United States in August 2023. *Id.*

scheme, by which he recruited, transported and harbored primarily Israeli nationals to work in various mall kiosks throughout the region marketing beauty products. During the scheme, the defendant served as the head of at least 12 business entities (collectively, the "Enterprise") through which these mall kiosks and stores operated. The defendant and others assisted foreign employees to come to the United States on visas that precluded them from working even though the expressed purpose of their coming to the United States was to work at the defendant's kiosks and stores. The defendant and his co-conspirators helped the individuals who made up their foreign workforce with travel logistics to enter the United States, lodging in nearby apartments, and transportation back and forth from their residences to the retail locations. As such, the defendant was not just a member of the conspiracy, but also a leader of the conspiracy that employed over 60 people to work in the stores and kiosks.

Through illegally employing foreign workers, the defendant ignored the stringent requirements set in place to employ foreign workers through the H2-B visa process, which requires approvals from the U.S. Department of Labor, U.S. Department of State, and U.S. Department of Homeland Security. In turn, this scheme allowed the defendant to realize greater profits from his business by not complying with minimum wage laws or paying employments taxes or other related costs. The illicit profits garnered through this scheme then allowed the defendant to promote its continuation and enhancement through paying for related expenses, including: the mall and kiosk leases, vehicle leases, utilities, vehicle insurance, payment systems, personal finance, telecommunications, airline tickets, recruitment services, and his employees.

## II.   SENTENCING LAW

Although the Supreme Court rendered the federal Sentencing Guidelines advisory in *United States v. Booker*, 543 U.S. 220 (2005), "a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing.'" *United States v. Clark*, 434 F.3d 684,

3

685 (4th Cir. 2006) (quoting *Booker*, 543 U.S. at 264). The Supreme Court has directed that district courts "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). However, the sentencing court "may not presume that the Guidelines range is reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009). The "[g]uidelines should be the starting point and the initial benchmark," but the sentencing court must also "consider all of the § 3553(a) factors" in determining the appropriate sentence. *Gall*, 552 U.S. at 49; *see also Clark*, 434 F.3d at 685.

### III.    THE SENTENCING GUIDELINES

As correctly noted in the PSR, Counts 1 and 29 are grouped for guideline calculation purposes. U.S.S.G. § 3D1.2(c); *see* PSR ¶82. The guideline for a violation of 18 U.S.C. § 1956(h) is U.S.S.G. § 2S1.1, which provides that the offense level for the underlying offense from which the laundered were derived applies if, "(A) the defendant committed the underlying offense (or would be accountable for the underlying offense under section (a)(1)(A) of §1B1.3 (Relevant Conduct)); and (B) the offense for that offense can be determined." Here, the underlying offense is the conspiracy to commit offenses against the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii)-(iv), all in violation of 18 U.S.C. § 371, which corresponds to the guideline § 2L1.1 and a base offense level of 12. U.S.S.G. § 2L1.1(a)(3).

As further described below, the United States concurs with the PSR that certain specific offense characteristics are applicable here. Here, the offense conduct involved the smuggling, transporting, or harboring of at least 25 to 99 unlawful aliens and supports a +6 increase to the base offense level. U.S.S.G. § 2L1.1(b)(2)(B). With respect to the money laundering conspiracy offense, the defendant was convicted under 18 U.S.C. § 1956, which increases the base offense +2. *Id.* § 2S1.1(b)(2)(B). Additionally, the offense involved sophisticated laundering and supports an additional +2 increase to the base offense level. *Id.* § 2S1.1(b)(3). Because the defendant was

4

the leader of criminal activity that involved five or more participants or was otherwise extensive, the base offense level is increased by +4. *Id.* § 3B1.1(a). Finally, the United States concurs that, by pleading guilty pursuant to an agreement and statement of facts, the defendant has accepted responsibility for the offense.[4] *Id.* § 3E1.1(a).

After application of the enhancements as determined by the PSR, as well as acceptance of responsibility, the total offense level calculation is 23. As the defendant has no prior criminal convictions, his Criminal History Category of I. As such, the corresponding advisory guidelines range is 46-57 months.

### A. Specific Offense Characteristics

The defendant makes certain legal objections to the application of the enhancements as outlined in the PSR. As a threshold matter, the defendant must do more than merely contest the information in the PSR. "The defendant has an affirmative duty to make a showing that the information in the presentence report is unreliable, and articulate the reasons why the facts contained therein are untrue or inaccurate." *See United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990) (citing *United States v. Mueller*, 902 F.2d 336, 346 (5th Cir. 1990) (finding that defendant presented no evidence in rebuttal to PSR)); *see also United States v. Randall*, 171 F.3d 195, 211 (4th Cir. 1990). Without an affirmative showing that the PSR is inaccurate, the Court is "free to adopt the findings of the [presentence report] without more specific inquiry or explanation." *Terry*, 916 F.2d at 162 (quoting *Mueller*, 902 F.2d at 346). The burden is on the defendant to establish inaccuracy or unreliability. *Id.*

---

[4] As noted in the parties' plea agreement, should the defendant qualify for acceptance of responsibility and his base offense level is 16 or greater, the government will make a separate motion at the time of sentencing for the additional one-level decrease in the defendant's offense level, pursuant to U.S.S.G. § 3E1.1(b).

> i. The defendant's smuggling, transporting and harboring offenses were committed for profit, precluding a three-level decrease under U.S.S.G. § 2L1.1(b)(1).

The defendant first contends that case law supports a reduction where there is no financial gain for the defendant. PSR at 30 (Addendum). However, there is simply no factual basis for this position because both the businesses and the defendant profited from the scheme. The U.S. Sentencing Guidelines allow for a three-point reduction if the defendant's smuggling, harboring or transporting "offense[s] w[ere] committed other than for profit." U.S.S.G. § 2L1.1(b)(1). The Guidelines further define this phrase to mean "there was no payment or expectation of payment for the smuggling, transporting or harboring of any of the unlawful aliens." U.S.S.G. § 2L1.1n.1. Courts that have addressed this subsection have interpreted this language as "expansive and broad enough" to cover conduct beyond the typical *quid pro quo* of an alien directly paying a smuggler for smuggling. *United States v. McClure-Potts*, 908 F.3d 30, 35 (3d Cir. 2018) (denying the three-level reduction for a defendant who claimed government benefits from harboring an alien); *see also United States v. Juan-Manuel*, 222 F.3d 480, 485 (8th Cir. 2000) (denying the three-level reduction for a defendant who benefited from debt forgiveness for transporting aliens); *United States v. Perez-Ruiz*, 169 F.3d 1075, 1076 (7th Cir. 1999) (denying the three-level reduction for defendant who benefited in-kind from transportation to city where he wanted to go for transporting aliens).

To support the proposition that §2L1.1(b)(1) is applicable here, the defendant (in his objection to the PSR) referred to a District of Maryland case in which the Court applied the two-level reduction where the parties had agreed to limit its applicability in the plea agreement. *See United States v. Sharvit, et al.*, 1:18-cr-00370-DKC (D.Md.). But the defendant admitted that his smuggling offenses were committed for profit through inflated proceeds from hiring an illegal workforce. PSR ¶61. At the outset, the defendant admitted the smuggling offenses he conspired

6

to commit, including encouraging and inducing, harboring and transporting aliens, were all committed for "the purpose of commercial advantage and private financial gain." (Statement of Facts ("Statement") ¶1, Dkt. 32.) The defendant further reiterated this profit motive in the money laundering conspiracy by admitting his intent to use proceeds from his specified unlawful activity ("the conspiracy to bring in and harbor aliens, and the bringing in and harboring of aliens") in order to promote that same specified unlawful activity. *Id.* ¶2. That is, the defendant used the profits from his use of an illegal workforce to continue profiting from the use an illegal workforce.

The defendant further explained how he derived profits from his smuggling offenses. Due to his illegal workforce, the defendant "did not withhold employment or income taxes from the compensation [he] provided" to these workers and "did not report those employees to the IRS state employment agencies." *Id.* ¶22. Consequently, these employees were compensated either through "under the table cash payments or the transfer of money to stored value payment cards." *Id.* ¶25. Following, the defendant realized inflated proceeds because he "was able to pay lower labor costs due to the illegal nature of [his] workforce, as well as earn profit based on the labor of [his] unlawfully employed workers. *Id.* ¶36. Moreover, the foreign workforce was required to reimburse the Enterprise for transportation, housing, and other expenses via deductions from their pay. *Id.* ¶23. The defendant profited, was paid, and expected to be paid for his smuggling activities through the increased profits he realized; indeed, that was the whole point of his smuggling conspiracy.

    ii. <u>Smuggling, transporting or harboring at least 25 to 99 unlawful aliens, U.S.S.G. §2L1.1(b)(2)(B).</u>

The defendant further objects to the application of a 6-level enhancement for smuggling, transporting, or harboring at least 25 to 99 unlawful aliens, pursuant to U.S.S.G. § 2L1.1(b)(2)(B), and contends that the three-level enhancement pursuant to § 2L1.1(b)(2)(A) is more appropriate

7

based on the "13 aliens working in violation of visa status" identified in the Indictment and Statement of Facts. PSR at 30 (Addendum).

The defendant has appropriately received this 6-point increase in his guideline calculation. PSR ¶ 86. Notably, the PSR cites two sources as a basis for this enhancement, including law enforcement's identification of over 60 people employed by the enterprise and 50 unauthorized alien employees whose names appear in correspondence and documents between the defendant and either JoBank and /or Payoneer Payment Solutions ("Payoneer"). PSR at 30-31 (Addendum)

In addition to these references, the defendant's admissions and additional evidence from the investigation further prove the applicability of this enhancement through the defendant's smuggling, harboring or transporting at least 41 aliens. The defendant himself admitted to smuggling and harboring at least 16 individuals in his statement of facts. Statement, ¶¶29-30, 35. Specifically, he admitted to recruiting ten individuals through JoBank who arrived on B1/B2 visitor visa to work at his kiosks and stores.[5] *Id.* ¶¶ 29-30. Additionally, he admitted to housing at least 13 illegal workers on or about Dec 17, 2013, when search warrants were executed on the Enterprise. *Id.* at ¶35. Of those 13 aliens, seven of them already listed in the same group of people the defendant illegally employed, and six individuals were not previously listed.[6] *Id.*

In addition to those 16 people, the investigation corroborated the defendant's involvement in smuggling, harboring or transporting at least 25 additional illegal workers. Notably, one of the cooperators identified over 60 people employed by the defendant and his co-conspirators as part of their scheme. *Id.* at ¶15. Additionally, the cooperator described how the conspiracy brought their illegal workforce to the U.S. to work at their stores, and how the defendant and his co-

---

[5] These ten aliens include: S.B(1), S.B(2), A.G., S.M., A.P., N.P., L.P., D.B., M.V. and MA
[6] The six additional aliens the defendant admitted to harboring include E.D., Y.Y., S.K, B.M., Z.B., and Y.P.

8

conspirators would then house the workers in Enterprise-leased apartments and provide them with transportation to and from the retail locations. *Id.* at ¶20.

As discussed in greater detail in the Attachment 1 Summary Addendum, the investigation uncovered evidence to corroborate the defendant's and co-conspirators' involvement in smuggling, harboring or transporting at least 25 additional individuals from a cooperator's list of 60 people employed by the Enterprise.[7] This evidence included statements from cooperators; interviews with individual aliens employed by the defendant; relevant aliens' travel records and visa status; records from Payoneer Payment Solutions; other business documents from NOVA Point of Sale ("NOVA"), a company that provides business management services; and paperwork seized from the defendant's office at Regus business and other locations in the execution of search warrants on the defendant's office, apartments and businesses.

Consequently, the defendant's own admissions and additional evidence uncovered by the investigation, show that the defendant smuggled, harbored and transported at least 41 aliens, warranting the six-point increase pursuant to U.S.S.G. § 2L1.1(b)(2)(B).

      iii.   <u>The defendant was convicted under 18 U.S.C. § 1956, U.S.S.G. §2S1.1(b)(2)(B)</u>.

The defendant pled guilty to Count 29 of the indictment, Conspiracy to Launder Money, in violation of § 1956(h). U.S.S.G. § 2S1.1(b)(2)(B). This enhancement accordingly applies.

      iv.   <u>The offense involved sophisticated money laundering, U.S.S.G. §2S1.1(b)(3)</u>.

The defendant additionally contends that the sophisticated laundering enhancement U.S.S.G. § 2S1.1(b)(3) does not apply, claiming that there is "no evidence" showing that "the

---

[7] These 16 individuals include Z.H., A.S., M.S., S.S., O.S.(1), Y.V., A.A., M.B., D.A.(1), D.A.(2), I.B., O.S.(2), A.K., G.A., D.B., H.A., O.K., S.A., R.P., B.H., Z.A., I.H., I.P., S.M., and M.P.

9

conduct involves a greater level of planning of concealment than a typical fraud case." PSR at 31 (Addendum). For purposes of subsection (b)(3), "'sophisticated laundering' means complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense" and "typically involves the use of – (i) fictitious entities; (ii) shell corporations; (iii) two or more levels (i.e., layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or (iv) offshore financial accounts." U.S.S.G. § 2S1.1, Appl. Note 5(A). As shown in the defendant's Statement of Facts, the defendant and his co-conspirators deposited into various financial service provider accounts money gained from the use of their illegal workforce. Statement at ¶37. The proceeds were then moved to various accounts, primarily direct deposit accounts with Bank of America. *Id.* The Enterprise held approximately 15 bank accounts with Bank of America. *Id.* at ¶ 39. The accounts themselves show a sophisticated scheme created to obfuscate their money through similarly named accounts (*e.g.* STR COSMETICS INC and STR COSMETICS; TOMIK TOM INC. and TOMIKOM INC).

    The conspirators paid themselves and their employees from these accounts. Statement at ¶38. They then used two of the accounts to pool funds from the others and transfer funds to Payoneer Payments Solutions. *Id.* Payoneer allowed the defendant and his coconspirators to load money onto stored value payment cars, which were then used to pay the Enterprise's illegal workforce. *Id.* As such, the defendant moved illegally gained proceeds spread throughout multiple accounts, pooled them into two accounts, and transferred funds into stored value cards to pay his illegal workforce. His admissions alone show multiple layers of banking, to include stored value cards to pay his illegal workforce, to hide his illegally gained proceeds gained from his Enterprise.

### B. Adjustment for Role in the Offense

The Information in the PSR and Statement of Facts supports the defendants four-point enhancement pursuant to U.S.S.G. § 3B1.1(a) as an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. The defendant's conspiracy involved at least five people. He admitted to conspiring with two people, T.A. and R.G., as part of his conspiracy Statement at ¶¶ 9, 14-15. Those two co-conspirators admitted to conspiring with at least five individuals, including themselves, S.C. (Shai Cohen, the defendant), A.K. and G.F., as part of the conspiracy. PSR at 31-32 (Addendum). .

Moreover, the defendant's actions show that he was a leader and organizer of the conspiracy. The defendant worked with JoBank to recruit the illegal workforce. He helped arrange travel logistics for the workers to come to the U.S. under fraudulent premises. He housed the workers at apartments he rented. He leased vehicles for his illegal work force to get back and forth from their residence to work. He set up a payment system through Payoneer to pay his illegal workforce. He managed bank accounts to pay for the ongoing operation of his enterprise, to include recruiting services, travel logistics, store and kiosk leases, apartment leases, vehicle leases. As such, the defendant was intricately involved in the operation of the illegal scheme consisting of at least 5 conspirators.

## IV.   ANALYSIS OF SENTENCING FACTORS AND RECOMMENDATION

After first calculating the Guidelines range, the court should then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors identified in 18 U.S.C. § 3553(a), "explaining any variance from the former with reference to the latter." *Nelson v. United States*, 129 S. Ct. 890, 891-92 (2009). Title 18, United States Code, Section 3553(a)(1) provides that, in determining a sentence, courts must consider the following factors: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need for

the sentence imposed to, among other things, reflect the seriousness of the offense and adequately deter criminal conduct; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) policy statements issued by the Sentencing Commission; and (6) the need to avoid unwarranted sentencing disparities among defendants with similar records found guilty of similar conduct. Ultimately, the sentence imposed must meet a standard of reasonableness. *See Booker*, 543 U.S. at 260-61. For the reasons set forth below, these factors weigh in favor of imposing a sentence of incarceration of 46 months, which is at the low-end of the properly calculated guidelines.

### A. The Nature and Circumstances of the Offense and History and Characteristics of the Defendant Warrant Just Punishment.

The nature and circumstances of the offense weigh heavily against this defendant. The case involved an extensive and sophisticated scheme in which the defendant, together with his co-conspirators, created and registered businesses through which they could market and sell beauty products from retail spaces across the Eastern District of Virginia and elsewhere. To maximize the profits of the Enterprise, the defendant and his co-conspirators employed a workforce comprised of foreign nationals who were not authorized to work in the United States (with some exceptions), which helped lower labor costs. PSR ¶61. The defendant's conduct had a wide reach, as he worked with a recruiting firm and travel agency based in Israel to build his workforce. He also engaged in deception to aid the Israeli workers' entry into the United States – hotel reservations were made on the workers' behalf as proof of their limited stay as a tourist even though the defendant and participants knew full well that the reservation would be cancelled, and the worker would be living in an Enterprise-leased apartment building.

As noted above, the scheme involved payment to illegal workers using stored value cards instead of a traditional payroll system, further highlighting the steps taken to avoid detection. The gross proceeds of the scheme were vast, totaling $3.96 million. PSR ¶64. The money flowing

through the Enterprise accounts, including those in the defendant's name, were then used to further promote the criminal scheme.

Furthermore, the defendant was the leader of this scheme, as the owner and operator of several Enterprise businesses. While he may have had managers who assisted him, he oversaw all activities related to the recruitment, travel, housing, and payment of the employees. Many of the Enterprise bank accounts were also in the defendant's name.

The government acknowledges the defendant's lack of criminal history, but the guidelines certainly credit this. The defendant may also argue that the offense conduct occurred more than 10 years ago. But the age of the prosecution is primarily due to the defendant's actions. As the defendant himself admitted, he resided in the northern Virginia area until he traveled to Israel in December 2013. PSR ¶110. When law enforcement executed search warrants on his residence and businesses, the defendant remained in Israel, abandoned his belongings, and did not face what was then an ongoing criminal investigation. It was only through the extradition process that the defendant could finally be held accountable for his criminal conduct. For this reason, as well as the defendant's role in this expansive scheme, a sentence within guidelines is very reasonable.

### B. The Defendant's Sentence Must Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment and Deterrence.

Additional factors outlined in § 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense; to promote respect for law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(A)-(C).

Deterrence under section 3553(a) is not limited to the necessary sentence to deter the individual defendant from engaging in further criminal conduct, but also includes consideration of deterring other potential criminals from engaging in similar conduct. "Because economic and fraud-based crime are 'more rational, cool and calculated than sudden crimes of passion or

opportunity' these crimes are 'prime candidates for general deterrence.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). Since "[w]hite collar criminals often calculate the financial gain and risk of loss of their crimes ... an overly lenient sentence sends the message that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty." *United States v. Oudomsine*, 57 F.4th 1262, 1267 (11th Cir. 2023) (internal quotations and citations omitted). A consideration of each of these factors warrants a sentence of incarceration of 46 months.

### C. The Defendant's Sentence Must Avoid Unwarranted Sentencing Disparities.

Within this conspiracy, co-defendants T.A. and R.G. pled guilty to their role in the scheme and were sentenced to two years' probation. PSR ¶11-12. However, unlike the defendant who remained in Israel following the December 2013 law enforcement operation, T.A. and R.G. remained in the United States, accepted responsibility for their respective roles in the scheme soon after their encounter with law enforcement, and cooperated with the government to aid its investigation.

The defendant may attempt to compare his case to that of *United States v. Asher Sharvit, et al.*, 1:18-cr-00370-DKC, which is a District of Maryland case that also involved a smuggling and illegal worker, mall-kiosk scheme. The lead defendant there received a sentence of 36 months. However, that case is distinguishable from the case before this Court. In *Sharvit*, there was no money laundering conspiracy charge, which appears to increase the guidelines in this case and in a similar case prosecuted within this District, *United States v. Gur, et al.*, E.D. Va. Case No. 4:16-cr-17.

In *Gur*, several members of a conspiracy pled guilty to an extensive scheme in which such members played a role in recruiting, transporting, and harboring an illegal work force (consisting of over 140 citizens from Israel), who then worked at mall kiosks spanning several states to sell

products from Israel. *See generally United States v. Gur, et al.*, E.D. Va. Case No. 4:16-cr-17. The lead organizer, Defendant Omer Gur, pled guilty to conspiracy to defraud and commit offenses against the United States (alien smuggling) and conspiracy to launder money for which he received a 60-month and 78-month sentence, respectively. *Gur*, 4:16-cr-17 (Dkt. 336). Another defendant, Eyal Katz, who was also a leader in both conspiracies, obtained 60-month and 84-month sentences for both conspiracies as well. *Id.* (Dkt. 431). And Shlomo Genish, the manager of one region, received a sentence of 60 months for his role. *Id.* (Dkt. 297). While the *Gur* case spanned across more states than Cohen's scheme and arguably employed more unauthorized aliens and generated almost double the gross profit/laundered money, it still involved substantially the same conduct and a sentence of 46 months is still reasonable in light of the disparities between the two cases.

## CONCLUSION

The defendant engaged in an extensive scheme in which he was the overall leader in an enterprise that ultimately generated millions of dollars in profit for the defendant's and his co-conspirator's benefit by using an illegal workforce. For the foregoing reasons, the United States respectfully requests that the Court impose a sentence of 46 months' imprisonment, which is sufficient but not greater than necessary to achieve the goals of sentencing.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By:          /s/
Raizza K. Ty
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22310
Tel.: 703-299-3700
Fax: 703-299-3890
Email: raizza.ty@usdoj.gov

NICOLE ARGENTIERI
ACTING ASSISTANT ATTORNEY GENERAL

By:        /s/
Clayton O'Connor
Trial Attorney
U.S. Department of Justice, Criminal Division
Human Rights and Special Prosecutions Unit
1301 New York Avenue, NW
John C. Keeney Building, Suite 1200
Washington, D.C. 20530
Email: Clayton.OConnor@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 12, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

And I hereby certify that on January 12, 2024, I emailed a copy of the foregoing to the U.S. Probation Officer assigned to this matter:

> Kelly Smihal
> Senior U.S. Probation Officer
> Alexandria, Virginia
> Email: Kelly_Smihal@vaep.uscourts.gov

                                              /s/
                                    Raizza K. Ty
                                    Assistant United States Attorneys
                                    United States Attorney's Office
                                    2100 Jamieson Avenue
                                    Alexandria, VA 22310
                                    Tel.: 703-299-3700
                                    Fax: 703-299-3890
                                    Email: raizza.ty@usdoj.gov