**In the United States District Court for the Eastern District of Virginia**
**Alexandria Division**

| | | |
|---|---|---|
| **United States of America** | ) | |
| | ) | |
| v. | ) | Criminal No. 1:16cr114 |
| | ) | Hon. Claude M. Hilton |
| **Shai Cohen,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**Position on Sentencing**

The F.B.I. shut down the mall kiosks run by Mr. Cohen, T.A., and R.G. in 2013 – more than ten years ago. At the time of the raid, Mr. Cohen was at home with his wife in Israel. Over the last ten years, he has worked and started a young family. Of these ten years, Mr. Cohen has spent more than two years on house arrest and seven months in custody – all for the conduct in this case. He has no new arrests and no other criminal record.

From 2010-2013, Shai Cohen, T.A., and R.G. ran a number of mall kiosks, and Israeli employees were recruited to come to the United States to work – though they did not have work authorization. When the F.B.I. shut down the kiosks in 2013, no one had ever gone to prison for running this kind of business. Mr. Cohen's partners, T.A. and R.G., each received sentences of Probation in this Court in 2015, now, the government seeks 46 months for Mr. Cohen. *See* 1:14cr331 (E.D. Va.), 1:14cr332 (E.D. Va.). Such different sentences for coconspirators is inconsistent and unjust. Mr. Cohen was arrested in Israel in 2021 and extradited to the United States in August 2023. He pleaded guilty before this Court on November 7, 2023. ECF No. 30.

Mr. Cohen's wife and young sons live 50 kilometers from the Israel-Lebanon border in a country where there is an ongoing – and possibly escalating – war. He seeks a sentence of time served to return to them in this terrible time.

1

## The history of Israeli mall kiosks in the United States

At the time the F.B.I. raided Mr. Cohen's associates and employees, no one had ever gone to prison for operating this kind of business. The only cases predating the raid that counsel was able to find were in Minnesota and Washington state.[1] The defendants received federal probation, in one case it was served mostly on inactive Probation while living at home in Israel.[2]

The setup of these businesses was straightforward and took advantage of a cultural arch in the lives of young Israelis. Many Israelis finish a grueling and compulsory two years in the Israeli Defense Force and look to relax and travel before returning to school or a professional path. Few have the money to immediately fund such a trip, so they look for work abroad to fund their travel – which is where mall kiosks come in. According to the Executive Director of the Jewish Prisoner Services International, Gary Friedman, Israelis can make as much money in three months at an American mall kiosk as they would in three years in Israel.[3] According to Friedman, the employees knew what they were getting themselves into – and the situation is far from anything resembling human trafficking.[4] Like in this case, many bosses rent employees comfortable apartments and provide cars – and the employees can leave whenever they wish.[5]

While the business model involved the Israelis working off the books, there had been little enforcement up to the point that the F.B.I. had raided Mr. Cohen's partners in 2013. The business model survived in earnest throughout the United States until 2016 when authorities

---

[1] *United States v. Nadivi, et. al.*, 13cr179 (D. Minn); *United States v. Oran*, 2:10cr6004 (E.D. WA.).
[2] *Id.*
[3] *Israelis working at the mall: copacetic or illegal*, The Jewish News of Northern California (Feb. 26, 2010), available at: https://jweekly.com/2010/02/26/israelis-working-at-the-mall-copacetic-or-illegal/.
[4] *Id.*
[5] *Id.*

prosecuted Omer Gur, who ran a large-scale operation of over 4,000 employees, revenues of over $14 million, and company retreats at the Venetian Hotel in Las Vegas.[6] Mr. Gur and his coconspirators were prosecuted and received prison sentences based on the size and scale of their operation. *U.S. v. Gur*, 4:16cr17 (E.D. Va.). That prosecution and a 2018 prosecution in Maryland, *U.S. v. Asher Sharvit*, deterred most of the remaining Israeli kiosk businesses in the United States. The few that continued were eliminated by the COVID-19 pandemic: empty malls and protocols that prevented employees from demonstrating their skin products on potential customers.

### Mr. Cohen's Personal History Warrants a Sentence of Time Served

Shai Cohen is a 39-year-old man whom family and friends describe as generous, loyal, optimistic and compassionate. *See* Exhibit A, Collected Letters from Loved Ones. On August 3, 2023, Mr. Cohen was extradited from Israel, where his immediate family and the majority of his extended family continue to reside.

Mr. Cohen was born and raised by both his parents in Haifa, Israel. PSR ¶ 105. Money was tight – Mr. Cohen remembers being yelled at for leaving a light on because of the cost of electricity – but through their hard work, Mr. Cohen's parents provided the necessities for their children. Exhibit C, letter from Shai Cohen; Exhibit A, Letter from Shiri Lavi; PSR ¶ 105. His parents' work ethic affected Mr. Cohen even from an early age. As a young boy, he transferred that drive to the soccer field, where the sport also taught him to value excellence, determination, dedication, and responsibility. PSR ¶ 105. *See also* Attachment A, Letter from Yaniv Gabbai,

---

[6] Amit, Hagai, *Mall Rat: How the Israeli King of U.S. Kiosk Cosmetics Ended up in Jail*, Haeertz (Nov. 7, 2016), available at: https://www.haaretz.com/israel-news/business/2016-11-07/ty-article/how-the-israeli-king-of-u-s-kiosk-cosmetics-ended-up-in-jail/0000017f-db0a-d856-a37f-ffcafb8b0000.

3

*Id*., Letter from Shoshana Cohen. His drive and motivation to succeed led him to play for one of the biggest and best soccer clubs in Israel and, then ultimately, for the youth national team. PSR ¶ 105.

Mr. Cohen's parents fought constantly while he was a child, and it finally ended in a divorce that devastated his mother. The determination he had developed served him well when he was forced to take on the role of patriarch at age 14. With his older sister completing her mandatory military service, household responsibilities and providing emotional support for his mother fell to Mr. Cohen. PSR ¶ 104, *See* Attachment A, Letters from Shiri Lavi, Shoshana Cohen, and Yossi Cohen. At the same time, Mr. Cohen started working after school to support his mother financially. Juggling soccer, work, family duties, and school took a toll on Mr. Cohen; his schoolwork suffered. In the end, Mr. Cohen transferred to a special school to complete his high school degree.

Like his sister, and all Israelis, Mr. Cohen entered the Israeli Army, or Israeli Defense Forces ("IDF") when he turned 18 years old. PSR ¶ 105. The same drive that propelled him to success in soccer led Mr. Cohen to the Egoz Unit of the Golani Brigade. *See* Attachment A, Letters from Yaniv Gabbai and Shiri Lavi. The Egoz Unit is a special forces unit of IDF's ground forces specially trained for warfare on Israel's Lebanese border.[7] In 2006, the last year of Mr. Cohen's three-year military service, Hezbollah attacked Israel; Mr. Cohen and his unit were heavily involved in the fighting. As a result of the airstrikes, ground invasion, and prolonged rocket attacks that characterized this conflict, Mr. Cohen lost several friends from his unit. At the end of his service, Mr. Cohen received an honorable discharge and remained a

---

[7] https://www.idf.il/en/mini-sites/idf-brigades/commando/egoz/egoz-unit/.

reservist. PSR ¶ 122. Given the ongoing war in Israel, it is possible that he would be recalled into military service upon his return to Israel.

Like many Israelis, Mr. Cohen spent a period after his military service travelling. He travelled abroad to India and Thailand with his buddies from the military. PSR ¶ 106. *See* Attachment A, Letter from Adi Levi. Unfortunately, his itinerary was cut short when his mother, who suffers from Chronic Obstructive Pulmonary Disease ("COPD"), Congestive Heart Failure, and Chronic Renal Failure, among other conditions, fell ill. Mr. Cohen returned to Israel to care for her. *See* Attachment A, Letter from Shoshana Cohen. When his mother was well enough for Mr. Cohen to travel again, he secured an H-2B visa to travel to and work temporarily in the United States.

Mr. Cohen lived in the United States from 2006-2013, though he took frequent trips back to Israel to visit relatives. While in the United States, Mr. Cohen worked in the diamond and cosmetics industries before joining T.A. and R.G. to open mall kiosks selling Dead Sea skin care products in Virginia. PSR ¶¶ 119-121.

In December of 2013, Mr. Cohen travelled back to Israel to celebrate the birth of his sister's child. From Israel, Mr. Cohen learned of the police raid on the apartments in Northern Virginia where a group of his mall kiosk employees lived; consequently, he did not return to the United States. PSR ¶ 108. Instead, Mr. Cohen built a life in Israel. He and his wife, Shiran, have three young sons, and he is a devoted husband and father. *See generally*, Attachment A. He dotes on his children, instilling in them his core values of a Jewish education, respect for parents, and love and acceptance of others. *See* Attachment A, Letter from Eti Yochai. Mr. Cohen also regularly volunteers at the kids' school – teaching the other children, through his soccer lessons, sportsmanship, respect, and more. *See* Attachment A, Letter from Liron Avitan.

Furthermore, because of their proximity, Mr. Cohen shoulders the responsibility of caring for his aging and infirm parents. His mother, age 76, suffers from several chronic conditions, as previously noted. Similarly, his father, age 73, is beginning to see the effects of a lifetime of smoking; he's been diagnosed with Carotid Artery Stenosis, Hypertension, Peripheral Vascular Disease ("PVD"), among other conditions. Mr. Cohen takes them to their frequent doctors' appointments and helps with their medications. *See* Attachment A, Letters from Shiri Lavi, Shoshana Cohen and Yossi Cohen. In addition to supporting his family, Mr. Cohen regularly gave back to the less fortunate in his community. *See* Attachment A, Letters from Adi Sosan, Eyal Rivner, Idan Meshulam and Rabbi Ilan Eliyahu Yitzchaki. He did so financially and was also generous with his time. For instance, Mr. Cohen volunteered with Holocaust survivors in nursing homes. *See* Attachment A, Letter from Tziki Avisar.

Mr. Cohen also provided for his family financially. After the raid in Virginia, Mr. Cohen worked as a recruiter, and then he opened his own cosmetic business, which started as a door-to-door operation and blossomed into two storefronts. On May 31, 2021, Mr. Cohen was arrested and incarcerated in Israel for the instant offense. Because he faced high maximum penalties relative to penalties in Israel, he spent one month at a high-security facility. He spent the next two years on house arrest. Unlike house arrest in the United States, Mr. Cohen could not leave his house at all for the first twelve months. Unsurprisingly, his business closed, and his family suffered without him able to work. Nevertheless, Mr. Cohen, "[made] a deep effort to maintain happiness, joy, and calm despite the pressure and restrictions he has faced over the past two years. *See* Attachment A, Letter from Rabbi Ilan Eliyahu Yitzchaki. Mr. Cohen's extradition in August 2023 brought even more unrest to the home. In his absence, his children have struggled emotionally, and the family's already precarious economic status deteriorated: friends pay his

rent and utilities have threatened to shut off service.  *See* Attachment A, Letter from Shiran Cohen, Attachment C, Letter from Shai Cohen.  Concerned for the well-being of his family, Mr. Cohen vowed to get back to Israel as soon as he could: he consented to detention in this case to begin and end his sentence as quickly as possible.  Then, on October 7, 2023, his fear for his family rose exponentially when Israeli civilians were attacked by Hamas fighters in Israel, precipitating the current conflict in Gaza.  *See* Attachment B, Aleph submission.

Mr. Cohen's family is now in a bomb shelter at least once a day; still, the family has prioritized connecting by phone.  To them, Mr. Cohen has expressed remorse for his actions.  *See* Attachment A, Letters from Yifat Schiller, Shiri Lavi, Shoshana Cohen, and Yossi Cohen. Even prior to his current detention, in his professional life, Mr. Cohen used his platform as a recruiter to extol the importance of following the proper procedures and legal channels for working abroad. *See* Attachment C, Letter from Shai Cohen.   In his personal life, Mr. Cohen has used his situation as a lesson to his children - that one must take responsibility for his actions, but that there is always the possibility to make amends. *See* Attachment A, Letter from Yifat Schiller.

## The current guidelines are incorrectly calculated and reflect a dramatically more serious crime.

The guidelines in this case are inaccurate and reflect far more serious conduct than what occurred.  Many of the sentencing enhancements applied to Mr. Cohen <u>have never been applied in similar cases – including the cases of his partners in this conduct</u>.  Mr. Cohen and others recruited Israeli citizens to work in mall kiosks.  These employees had recently completed their military service and wanted to make money while seeing another country.  There was nothing unwitting about their participation.

Certainly, Mr. Cohen's conduct was illegal: he and others facilitated individuals working at the kiosks without proper immigration status.  Cohen and others also did not pay taxes on

7

those employees. However, the guidelines paint a picture of a far more nefarious conspiracy; an accurate calculation arrives at an offense level of 12, exactly that calculated for his partner, T.A.[8].

Current guidelines calculation

| | |
|---|---|
| Base Offense Level | +12 |
| Convicted under 18 U.S.C. § 1956 | +2 |
| Sophisticated Laundering | +2 |
| Number of Unlawful Aliens | +6 |
| Aggravated Role | +4 |
| Acceptance of Responsibility | -3 |
| Total: | 23 |

Accurate guideline calculation

| | |
|---|---|
| Base Offense Level | +12 |
| Reduction under USSG § 2L1.1(b)(1). | -3 |
| Convicted under 18 U.S.C. § 1956 | +2 |
| Number of Unlawful Aliens | +3 |
| Aggravated Role | +2 |
| Zero Point Criminal History Reduction | -2 |
| Acceptance of Responsibility | -2 |
| Total: | 12 |

1. **Like other recent defendants, Mr. Cohen's guidelines should be reduced under USSG § 2L1.1(b)(1).**

The guidelines include a reduction where a defendant did not gain from the smuggling or harboring itself, i.e., that the defendant was not paid to traffic individuals. USSG § 2L1.1(b)(1). That is the case here. In a recent case involving similar conduct, *United States v. Asher Sharvit, Oren Sharvit, and Rona Zhfani* (1:18-cr-00370-DKC)(D. Md.), the government specifically applied this reduction for all defendants, noting in the plea agreements:

> Although the offense was committed for commercial gain, the offense was not "for profit" under the guidelines because there was no payment or expectation of payment for the smuggling, transporting or harboring of any of the unlawful aliens.

---

[8] Based on information provided by the government as to T.A.'s sealed Presentence Report.

*Id.*, Doc. 97 at 4. In both *Sharvit* and Mr. Cohen's case, the reduction is warranted because there was no payment or expectation of payment for the smuggling or transporting of the employees. Not applying the reduction for Mr. Cohen where each defendant in *Sharvit* received the reduction would result in an unwarranted disparity, contrary to the Court's mandate under 18 U.S.C. §3553(a)(6).

2. **The indictment indicates 12 individuals working in violation of visa status.**

First, in Mr. Cohen's partners' cases, the <u>government agreed that this enhancement did not apply</u>, and the plea agreements seem designed to avoid this enhancement. *See* 1:14cr331, Doc No. 8 at 3; 1:14cr332, Doc No. 8 at 3. The present indictment identified 12 individuals who worked in violation of their visa status – many of the kiosks' employees were working legally. ECF No. 1. This results in a 3-point enhancement under USSG § 2L1.1(b)(2), rather than a 6-point enhancement. Proving this enhancement is the government's burden. If the government alleges greater than 25 individuals, Mr. Cohen requests their identities and corroborative evidence of Mr. Cohen's involvement in each.

3. **The sophisticated laundering enhancement does not apply.**

Counsel has not found a single similar case where the sophisticated money laundering enhancement applied: not in *Gur*, not in *Sharvit*, not in the cases of T.A. or R.G. Courts have warned the enhancement would lose its meaning if applied to all money laundering cases. *See United States v. Maddux*, 2016 WL 4445246, at *5 (E.D. Ky. Aug. 23, 2016). Here, there is no evidence that "the conduct shows a greater level of planning or concealment than a typical fraud of its kind." *See United States v. Landwer*, 640 F.3d 769 (7th Cir.2011)(per curiam).

> The Sentencing Commission have set criteria for what constitutes sophisticated:
>
> "sophisticated laundering" means complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense. Sophisticated

> laundering typically involves the use of (i) fictitious entities; (ii) shell corporations; (iii) two or more levels (i.e., layering) of transactions, transportation, transfers, or trans-missions, involving criminally derived funds that were intended to appear legitimate; or (iv) offshore financial accounts.

U.S.S.G. § 2S1.1, cmt. n.5(A).

This offense conduct lacks each of those criteria. Here, the enhancement appears to be based on payments to recruiters who recruited employees. Nothing about the use of recruiter is sophisticated, and it is not mentioned in either the enhancement itself or the case law. (The *Sharvit* defendants also used recruiting organizations, and the sophisticated laundering enhancement was not applied.[9]) The enhancement also seems to be based on the use of a payment-card company to pay employees: plainly, the kiosk employees were paid in the equivalent of gift cards. Nothing about the use of this payment method shows sophistication. Mr. Cohen's business was a cookie-cutter of the many other Israeli mall kiosks around the United States at the time – where defendants did not face this enhancement. Mr. Cohen is a high school graduate and military veteran – he has no specialized education or training in finance, accounting, or business administration. Courts have rejected the sophisticated enhancement for "garden-variety" money laundering. *United States v. Eckstein*, 2016 WL 546663 at *10 (D.N.M. Feb. 3, 2016).

In *Sharvit* and *Gur*, the defendants ran more elaborate organizations – running many more illegal employees, including minors, shredding documents to evade prosecution – and the government did not seek the sophisticated laundering enhancement. *See U.S. v. Sharvit,* (1:18-cr-00370-DKC)(D. Md.), Doc. 97.

---

[9] *See, e.g.* Doc. 97-1 at 3 ("Defendant Oren Sharvit instructed co-conspirators to make sure 'that the company in Israel [doesn't] tell to the new employees that they finish their day at 8:00pm' and to ~ ' bring me me [sic] maximum of employees bcse [sic] we are going to conquest America!!!!' ").

**4. The two-point leadership enhancement is more appropriate in this case.**

Mr. Cohen objects to the four-point leadership enhancement. A two-point enhancement is supported by the facts of the case. Mr. Cohen's partner T.A. received a two-point enhancement for his role; R.G. received no enhancement for hers.

This Court is familiar with cases where individuals received a four-point enhancement for managing networks of international drug or perpetuating tens of millions of dollars of financial fraud. While Mr. Cohen did have managerial responsibilities, the scope of the conspiracy – having some employees at mall kiosks working under the table – weighs against applying the <u>maximum enhancement allowed by law</u>. The defendants in *Sharvit* (involving over 100 individuals and at least one minor) did not receive a four-point leadership enhancement. There, the person at the top, Asher Sharvit, received a 3-point leadership enhancement (Doc. 97); Oren Sharvit and Rona Zhfani received no leadership enhancement despite their organizing roles in that conspiracy. Docs. 97, 99, 116. These enhancements account for the defendants' roles and scope of the conspiracy and counsel for a 2-point enhancement here.

**5. The Zero Point Criminal History Reduction should apply to Mr. Cohen.**

In negotiating the plea agreement, both the government and counsel anticipated application of the Zero Point Reduction under USSG §4C1.1. The guideline states:

> (10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848;

The aggravating role and continuing criminal enterprise are listed under the same criterion; they are separated by "and" not "or", so to meet the criteria the defendant must not have been a leader in a narcotics enterprise (under 21 U.S.C. § 848). If the Sentencing

11

Commission had intended aggravated role alone to be a preclusion, it could have simply separated the two provisions:

> (10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role); and
>
> (11) the defendant was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848.

But the Commission did not do this – because it was not trying to preclude a reduction for every defendant with zero criminal history who played any managerial role. Instead, the Commission was trying to preclude narcotraffickers from receiving this reduction. In explaining the development of this language, the Commission specifically referred to narcotics crimes – in the form of the safety valve exception.[10]

### The Statutory Purposes of Sentencing Support a Time Served Sentence.

In addition to Mr. Cohen's background and characteristics, this Court should consider the other 3553(a) factors, which support a sentence of time served.

First, Mr. Cohen has already received a just punishment. In the last ten years, Mr. Cohen has spent more than two years in home detention and six more months in jail, including five months at the Alexandria Detention Center, thousands of miles from his family in Israel. At the time of his offense, other courts found simple Probation to be a just sentence for similar conduct.[11] In addition, because he was extradited and does not have legal status in the United States, Mr. Cohen

---

[10] "The Commission was also informed by existing legislation, including the congressionally established criteria for the statutory safety valve at 18 U.S.C. 3553(f) and the recent firearms legislation set forth in the Bipartisan Safer Communities Act." *See* Federal Register at https://www.federalregister.gov/documents/2023/05/03/2023-09332/sentencing-guidelines-for-united-states-courts.

[11] *United States v. Nadivi, et. al.*, 13cr179 (D. Minn); *United States v. Oran*, 2:10cr6004 (E.D. WA.).

will likely serve more time in custody than other inmates receiving the same sentence.[12] Finally, the house arrest and incarceration have meant Mr. Cohen could no longer support his family, and now the war means that he lives in minute-to-minute fear that an ongoing war will destroy his home or injure or kill his wife and children. The sentencing court can take this collateral punishment into account in fashioning a sentence. *See, e.g.*, *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was already punished by the loss of his business as a result of his EPA-related charges); *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (granting a downward variance part because defendant had lost job as a result of conviction).

These same facts have already accomplished deterrence – without a need for further incarceration. Mr. Cohen has accepted responsibility for his conduct. The Sentencing Commission has found that offenders with zero criminal history points, like Mr. Cohen, have considerably lower recidivism rates than other offenders, including those with one criminal history point.[13] The last ten years bear that out: Mr. Cohen has had zero new arrests in the last ten years. And finally, he lives with the fact that his actions resulted in his sons living through a war without their father to protect them. Further incarceration is not necessary to deter him from committing future crimes.

---

[12] The instant conviction will make Mr. Cohen deportable; as a result, Mr. Cohen will likely not serve any of his sentence in a halfway house, as most inmates do. Further, he will not be able to work toward even earlier halfway house release by participating in programming under the First Step Act's earned time credits system. *See* Jacob Schuman, The Marshall Project, *Federal Prisons Don't Even Try to Rehabilitate the Undocumented* (Oct. 17, 2017), available at: https://www.themarshallproject.org/2017/10/17/federal-prisons-don-t-even-try-to-rehabilitate-theundocumented.

[13] *See* U.S. Sent'g Comm'n, Recidivism of Federal Offenders Released in 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. (Among other findings, the report concluded that "zero-point offenders" were less likely to be rearrested than "one point" offenders (26.8% compared to 42.3%), the largest variation of any comparison of offenders within the same Criminal History Category.)

At the time of Mr. Cohen's offense, courts found probation – far shy of Mr. Cohen's two years of house arrest and six months in jail – as sufficient to deter others. Moreover, the Sentencing Commission has determined that incarceration – like that Mr. Cohen has already served – is a sufficient deterrent in these cases: for fraud and similar offenses, "the definite prospect of prison, even though the term may be short, will serve as a significant deterrent, particularly when compared with pre-guidelines practice where probation, not prison, was the norm." U.S.S.C. Guidelines Manual, Ch. 1 Pt. (A)(4)(d) (2018). Perhaps most importantly, there simply are not cases left to deter. Due to successful prosecutions and COVID-19, the number of Israeli-run mall kiosks has already declined precipitously since Mr. Cohen's conduct in the instant offense. Greater incarceration is plainly unnecessary for general deterrence.

Finally, while the last ten years – and Mr. Cohen's entire life before the kiosks – illustrate why there is no need to protect the public, there is also a lessened need to protect the public given Mr. Cohen's expected return to Israel. *Cf. United States v. Ramirez-Ramirez*, 365 F. Supp. 2d 728, 733 (E.D. Va. 2005) (noting the decreased need to protect the public from further crimes of the defendant when he "will ultimately be removed and sent out of the country"); *United States v. Biheiri*, 356 F. Supp. 2d 589, 603 (E.D. Va. 2005) (observing that the goal of protecting the public was "of little import" where the defendant was going to be deported to Egypt immediately following his release from custody). It is difficult to imagine circumstance where Mr. Cohen again sets foot in the United States.

## Conclusion

This is a straightforward fraud case, not a smuggling or trafficking case. The employees are not victims; the United States, however, is owed the payroll taxes for the mall kiosks and

these employees.  Time served – two years of house arrests and 6 months in jail – is far more than his partners received and is a sufficiently just sentence for Mr. Cohen's conduct.

Dated:  January 13, 2024                                    By:        _____/s/_____

Brooke Sealy Rupert
Assistant Federal Public Defender
Virginia State Bar No.79729
Brooke_Rupert@fd.org
(703) 600.0849

Nathaniel Wenstrup
Assistant Federal Public Defender
Virginia State Bar No. 96324
Nate_Wenstrup@fd.org
(703) 600-0825

Office of the Federal Public Defender
Eastern District of Virginia
1650 King Street, Suite 500
Alexandria, VA 22314